## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

AEROGROUP INTERNATIONAL,
INC., *et al*.,

                                    Debtors.[1]

Chapter 11

Case No. 17- 11962

(Joint Administration Requested)

## DECLARATION OF MARK WEINSTEN IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I,      Mark Weinsten, being duly sworn, deposes and says:

1.      I am the Chief Restructuring Officer for Aerogroup International, Inc. ("Aerogroup International") and each of its domestic wholly owned subsidiaries (each, a "Debtor" and collectively, the "Debtors") that have filed voluntary petitions (the "Chapter 11 Petitions") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing the above captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors and the Non-Debtor Foreign Affiliates (as defined below) are referred to herein collectively as "Aerosoles" or the "Company."

2.      I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") in support of the Debtors' Chapter 11 Petitions and the First Day Motions (as defined below).

3.      I was appointed as Chief Restructuring Officer of the Debtors in anticipation of the filing of the Chapter 11 Petitions, and, prior to that, I led the team at Berkeley Research Group, LLC ("BRG") that was serving as financial advisors to the Company since June 2017. In

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Aerogroup International, Inc. (6119), AGI Holdco, Inc. (7087), Aerogroup International LLC (4658), Aerogroup International Holdings LLC (4312), Aerogroup Retail Holdings, Inc. (4650), and Aerogroup Gift Card Company, Inc. (7551). The mailing address for the Debtors, solely for purposes of notices and communications, is: 201 Meadow Road, Edison, New Jersey 08817.

that capacity, I have become familiar with the Debtors' businesses, operations and financial affairs.  As part of my duties as Chief Restructuring Officer in these Chapter 11 Cases, I will be advising the Debtors on their day-to-day operations, bankruptcy compliance, budgets, cash flows, financial analyses and overall restructuring efforts.

4.       In addition to being the Chief Restructuring Officer of the Debtors, I am a Managing Director of BRG, an international financial advisory firm, and my business address is BRG's Boston office located at 75 State Street, Suite 1805, Boston, MA 02109.  The Company retained BRG as financial advisor in June 2017.  Since its retention, BRG has been significantly involved with all aspects of the Company's businesses.  BRG has been instrumental in advising the Company with regard to cash management, inventory purchases, and expense reductions, working through credit issues with the Prepetition Credit Parties (as defined herein) and advising the Company on a potential restructuring transaction or potential sale of the business and/or its assets.

5.       Prior to joining BRG in 2016, I was a senior managing director at FTI Consulting, Inc. for 14 years. Over the past 20 years, I have served as Interim Executive Chairman, CEO, CRO and/or CSO for numerous companies, including Manischewitz, LodgeNet, Inspiration Bio Pharmaceuticals, Andrew Marc, and American Apparel.  I have also been involved in many retail bankruptcy cases, including Ultimate Electronics, DB Mart, KB Toys, Tower Records, Filene's Basement, Whitehall Jewelers, and Sportsman's Warehouse.

6.       On September 15, 2017 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing the Chapter 11 Petitions in the United States Bankruptcy Court for the District of Delaware (the "Court").

7.     The Debtors remain in possession and continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

8.     To minimize the adverse effects of filing the Chapter 11 Petitions while at the same time preserving value for the benefit of stakeholders, the Debtors have filed a number of motions requesting various kinds of customary "first day" relief (the "First Day Motions"):

    i.    *Debtors' Motion for an Order Directing Joint Administration of Cases Pursuant to Fed. R. Bankr. P. 1015(b)*

    ii.    *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate List for Each Debtor; (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors; and (III) Related Relief*

    iii.    *Debtors' Application Pursuant to 28 U.S.C. 0167 156(c), 11 U.S.C. § 503(b)(1)(A), and Local Rule 2002-1(f) for Entry of an Order Appointing Prime Clerk LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date*

    iv.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) the Continued Use of the Debtors' Cash Management System, Existing Bank Accounts and Business Forms, (B) the Continuation of Intercompany Transactions, and (C) Granting Administrative Expense Priority Status to Postpetition Intercompany Transactions, and (II) Extending the Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code*

    v.    *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits*

    vi.    *Debtors' Motion for Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies and (III) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service*

    vii.    *Debtors' Motion for Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees*

     viii.  *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Policies, (B) Pay All Prepetition Obligations in Respect Thereof and (C) Continue Their Insurance Premium Financing Program, and (II) Authorizing Banks to Honor Related Checks and Transfers*

     ix.  *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Payment of Certain Prepetition Shipping and Delivery Charges and (B) Granting Certain Related Relief*

     x.  *Debtors' Motion for Interim and Final Orders Authorizing the Debtors to (I) Honor Certain Prepetition Obligations to Customers, (II) Continue Customer Programs and (III) Receive, Process and Honor Credit Card Transactions*

     xi.  *Debtors' Motion For Interim and Final Orders (I) Authorizing Retail Store Closing Sales Free and Clear of All Liens, Claims and Encumbrances; (II) Approving the Store Closing Procedures; (III) Authorizing the Debtors to Assume the Liquidating Agent Agreement; (IV) Authorizing Customary Bonuses to Employees at the Closing Stores; and (V) Granting Related Relief*

     xii.  *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing*

     9.    Additionally, the Debtors anticipate filing at the outset of these Chapter 11 Cases, among other things, applications seeking authorization for the Debtors to retain certain professionals in connection with these Chapter 11 Cases and a motion to establish interim compensation procedures for such professionals.

     10.    Except as otherwise indicated, all statements set forth in this Declaration are based upon (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable; (c) my review of relevant documents or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon, I could and would testify to the facts set forth herein.  I am authorized to submit this Declaration.

11.     This Declaration provides an overview of the Debtors and the circumstances leading to the commencement of these Chapter 11 Cases. Part I of this Declaration provides background information about the Debtors and their business operations, circumstances and events preceding the bankruptcy filings.  Part II affirms and incorporates the facts that support the relief requested in the First Day Motions.

**PART I**

**BACKGROUND**

*The Debtors' Historical Operations And Business*

12.     Established in 1987 through a buyout of the What's What division of Kenneth Cole, the Company is a New Jersey-based women's footwear brand providing shoes that are fashionable and "feel good"—delivering superior comfort, support, flexibility and fit at a compelling value.  The Company offers a wide array of footwear, including heels, flats, wedges, boots and sandals that appeal to broad consumer tastes.  The Company's comprehensive, multi-category assortment is infused with the latest comfort technologies, from diamond-flex soles for shock absorption to heel rests, providing differentiated comfort to consumers without compromising style.

13.     The Company operates a true multi-channel business with five fully-formed profit centers across channels, tiers of retail and geographies, consisting of the following:

i.      **Direct Retail Store Business**.  The Company currently operates approximately 78 stores across a variety of formats, including malls, lifestyle centers, street locations and outlet centers.  In 2016 the Company reduced its retail store count by over 30 stores and, as described in more detail below, plans to further reduce its retail store footprint during these Chapter 11 Cases, seeking to maximize unit economics and ensure the long-term strength of the Debtors' retail business.

ii.     **Direct E-Commerce Business**.  The Debtors sell product directly through their website ([www.aerosoles.com](www.aerosoles.com)).  This high-margin channel gives the Company an ideal medium to engage directly with new and existing

customers.  The Company averages over 1.4 million visitors per month on its website.  In addition to the website, direct orders are captured through two call centers; the main call center is located in-house and overflow and off-hours volume is handled by a third-party call center.  The Company recently completed a revamp of its website to enhance the user interface and streamline navigation.

iii.    **Wholesale Business**.  The Debtors are a leading supplier to well-known retailers across a variety of wholesale formats including department stores, off-price chains, specialty stores, home shopping networks and internet businesses.  The wholesale sales division is organized into four parts: (1) national / major accounts, (2) mid-tier accounts, (3) third party direct response television and E-Commerce or dotcom accounts and (4) independent and specialty store accounts.  The Company has meaningful online presence through its wholesale partners, with online outlets generating between 20-50% of sales with its largest customers. The Company recently reached an agreement with a major new wholesale customer to carry its higher price point Aerosoles Collection line of shoes during the spring 2018 season.

iv.    **First Cost Business**.  The Debtors utilize their design and production expertise to aide certain domestic retailers and footwear manufacturers in designing, pricing and sourcing shoe products to be shipped directly from the factory to such first cost customers.  The Debtors never take possession of the finished product and receive payment from the first cost customers in the form of a royalty, which comes due 30-60 days after shipment from the factory.

v.    **International Licensing Business**.  The Debtors have partnerships with certain international licensees that distribute Aerosoles branded products either on a first cost basis or via long-term licensing agreement. The Company typically has design and marketing approval rights for company-branded products developed by licensees.

14.    The women's footwear business is highly competitive, and the Debtors' businesses account for a fraction of the total market for women's footwear. The Company's stores compete with other footwear stores, department stores, manufacturer-owned factory outlet stores and other retail outlets. At various times of the year, department store chains and specialty shops offer brand-name merchandise at substantial markdowns which further intensifies the competitive nature of the industry.  Additionally, as further described below, in April 2016 the

Debtors experienced a major sourcing disruption, causing an approximately $4 million EBITDA impact and requiring interim sourcing relationships to ensure inventory supply.

15.     As of the Petition Date, the Debtors owned assets of approximately $73 million on a consolidated basis and had aggregate liabilities of approximately $109 million. The Debtors' revenue for the prior fiscal year ending July 2017 was approximately $[130] million.

***The Debtors' Corporate Structure***

16.     A corporate organization chart depicting the ownership structure of the Debtors is attached hereto as **Exhibit A**.  AGI Holdco, Inc. ("AGI Holdco"), a Delaware corporation, is the parent company of each of the other Debtors.

17.     The Debtors' retail business is operated by Aerogroup Retail Holdings, Inc. ("Aerogroup Retail Holdings").  The Debtors' wholesale, e-commerce and first cost businesses are operated by Aerogroup International, LLC.  AGI Holdco is the indirect parent of three foreign, non-debtor affiliates – AFC Holding (Hong Kong) Limited, AFC Management Limited, and China International Intellectech (Shenshen) Co., Ltd. (collectively, the "Non-Debtor Foreign Affiliates").  The Non-Debtor Foreign Affiliates employ six individuals through a contract with a third-party agency in China and provide on the ground inventory inspection services that benefit the Debtors and certain of their business partners.

18.     Since 2014, the Company has been majority-owned by Palladin Partners LP, which currently owns approximately 75% of the equity prior to any dilution.  The Company's founder, Jules Schneider, holds a little more than 20% of the equity personally and through an irrevocable family trust, and THL Credit, Inc., together with certain of its affiliates, holds approximately 4% of the equity. The remaining equity is held by individuals, each with no greater than a 0.3% share.

19.    The Company currently has issued 9,000,000 shares of common stock and 1,000,000 shares of preferred stock.  Additionally, at the option of the holders of the Prepetition Notes (as defined below), the entire outstanding principal amount of the Prepetition Notes and accrued interest thereon is convertible into approximately 259 million shares of fully-paid and non-assessable shares of common stock.  A list of the shareholders for each Debtor is attached to each of the Chapter 11 Petitions.

***The Debtors' Prepetition Capital Structure***

20.    As of the Petition Date, the Debtors had approximately $72.3 million of outstanding funded indebtedness, comprised of approximately:

- $22.9 million outstanding under the Prepetition Revolver Facility;

- $19.7 million outstanding under the Prepetition Term Loan Facility;

- $19.1 million outstanding Prepetition Senior Notes;

- $8.9 million outstanding Prepetition Subordinated Notes; and

- $1.7 million outstanding under the Prepetition Subordinated Loan.

**A.    *The Prepetition Revolver Facility***

21.    Aerogroup International and the other Debtors (other than AGI Holdco, Inc. ("AGI Holdco"), who is a guarantor) are borrowers (collectively, the "Prepetition Revolver Loan Parties") under that certain Credit Agreement[2] dated as of June 9, 2014 (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, the "Prepetition Revolver Credit Agreement" and together with all related Loan Documents (as defined in the Prepetition Revolver Credit Agreement), the "Prepetition Revolver Credit Documents") with Wells Fargo Bank, National Association ("Wells Fargo"), as administrative agent (in such capacity, the "Prepetition Revolver Agent"), the other lenders party thereto from time to time

---

[2] Any summary of an agreement in this Motion is qualified in its entirety by the terms of that agreement.

(the "Prepetition Revolver Lenders" and, together with the Prepetition Revolver Agent and the other "Credit Parties" (as defined in the Prepetition Revolver Credit Agreement), the "Prepetition Revolver Credit Parties"), and the other parties thereto.

22.    The Prepetition Revolver Credit Agreement provides for among other things $37,588,729 in aggregate maximum principal amount of revolving loan commitments, including letter of credit and swingline loan commitments, with a sublimit for letters of credit of $5,000,000 (the "Prepetition Revolver Facility").   As of the Petition Date, the outstanding principal amount owed by the Prepetition Revolver Loan Parties under the Prepetition Revolver Facility was not less than $22,454,455.69 and $500,000 of issued and outstanding letters of credit (collectively, together with any amounts paid, incurred or accrued prior to or following the Petition Date in accordance with the Prepetition Revolver Credit Documents, unpaid principal, interest, fees, charges, expenses and disbursements (including, without limitation, attorneys' fees and related expenses and disbursements), and other obligations owed to the Prepetition Revolver Agent and Prepetition Revolver Lenders, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any obligations under the Prepetition Revolver Credit Documents, including all "Obligations" as described in the Prepetition Revolver Credit Agreement, the "Prepetition Revolver Obligations").

**B.    *The Prepetition Term Loan Facility***

23.    Aerogroup International as Lead Borrower and the Borrowers and Guarantors named therein (collectively the "Prepetition Term Loan Parties", together with the Prepetition Revolver Loan Parties, the "Prepetition Loan Parties") under that certain Term Loan Agreement dated as of June 9, 2014 (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, the "Prepetition Prepetition Term Loan Credit Agreement" and, together with all related Loan Documents (as defined in the Prepetition Term Loan Agreement), the "Prepetition

Term Loan Credit Documents") with THL Corporate Finance, Inc., as Administrative Agent and Collateral Agent (in such capacities, the "Prepetition Term Loan Agent" and together with the Prepetition Revolver Agent, the "Prepetition Agents"), the lenders party thereto from time to time (the "Prepetition Term Loan Lenders" and, together with the Prepetition Revolver Lenders, the "Prepetition Lenders" and, the Prepetition Term Loan Lenders collectively with the Prepetition Term Loan Agent and the other "Credit Parties" (as defined in the Prepetition Term Loan Agreement), the "Prepetition Term Loan Credit Parties" and, the Prepetition Term Loan Credit Parties, together with the Prepetition Revolver Credit Parties, the "Prepetition Senior Credit Parties"), and the other parties thereto.

24.     The Prepetition Term Loan Credit Agreement provides for a $20 million term loan with a maturity date of December 9, 2019 (the "Prepetition Term Loan Facility" and, together with the Prepetition Revolver Facility, the "Prepetition Senior Credit Facilities").  As of the Petition Date, the Prepetition Term Loan Parties were indebted under the Prepetition Term Loan Facility in the aggregate amount of not less than $19,699,148.47 (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Term Loan Credit Documents, unpaid principal, interest, fees, charges, expenses and disbursements (including, without limitation, attorneys' fees and related expenses and disbursements) and other obligations owed to the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, whether contingent, whenever arising, accrued, accruing, due, owing or chargeable, including all "Obligations" as described in the Prepetition Term Loan Credit Documents, the "Prepetition Term Loan Obligations").

## C.   *The Prepetition Subordinated Loan*

25.     Prior to the commencement of the Chapter 11 Cases, the Equityholders (as defined in the Prepetition Subordinated Loan Agreement, the "Prepetition Subordinated

Lenders") became entitled to receive the Holdback Amount (as defined in the Prepetition Subordinated Loan Agreement) in the principal amount of $7,500,000 and certain interest payments described therein (together with the Holdback Amount, the "Prepetition Subordinated Loan") pursuant to that certain Agreement and Plan of Merger, dated as of April 18, 2014 (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, the "Prepetition Subordinated Loan Agreement" and, together with all related documents, the "Prepetition Subordinated Loan Documents") by and among, among others, AGI Holdco and Aerogroup International (collectively the "Prepetition Subordinated Loan Parties") and Shareholder Representative Services LLC, as "Equityholders' Representative."

26.    As of the Petition Date, the Prepetition Subordinated Lenders were indebted under the Prepetition Subordinated Loan in the aggregate amount of not less than $1,687,249 (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Subordinated Debt Documents, unpaid principal, interest, fees, charges, expenses and disbursements (including, without limitation, attorneys' fees and related expenses and disbursements) and other obligations owed to the Prepetition Subordinated Lenders, whether contingent, whenever arising, accrued, accruing, due, owing or chargeable, the "Prepetition Subordinated Loan Obligations").

**D.  *The Prepetition Senior Notes***

27.    Prior to the commencement of the Chapter 11 Cases, AGI Holdco and Aerogroup International (collectively the "Prepetition Senior Note Parties") issued those certain Subordinated Convertible Notes due March 9, 2020 (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, the "Prepetition Senior Notes", together with all related Subordinated Debt Documents, the "Prepetition Senior Note Documents") pursuant to that certain Purchase Agreement dated as of January 20, 2016, by and among the Prepetition

Senior Note Parties, Palladin Partners, LP, as agent (in such capacity, the "Prepetition Senior Notes Agent"), and the Purchasers, as defined therein (the "Prepetition Senior Noteholders" and, together with the Prepetition Senior Notes Agent, the "Prepetition Senior Note Credit Parties"), on account of a loan provided by the Prepetition Senior Noteholders to the Prepetition Senior Note Parties in the principal amount of $16,275,885.

28.    As of the Petition Date, the Prepetition Senior Note Parties were indebted under the Prepetition Senior Notes in the aggregate amount of not less than $19,052,301 (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Senior Note Documents, unpaid principal, interest, fees, charges, expenses and disbursements (including, without limitation, attorneys' fees and related expenses and disbursements) and other obligations owed to the Prepetition Senior Note Credit Parties, whether contingent, whenever arising, accrued, accruing, due, owing or chargeable, including all "Obligations" as described in the Prepetition Senior Note Documents, the "Prepetition Senior Note Obligations").

E.    *The Prepetition Subordinated Notes*

29.    Prior to the commencement of the Chapter 11 Cases, AGI Holdco (the "Prepetition Subordinated Note Party", together with the Prepetition Subordinated Loan Parties, the "Prepetition Subordinated Debt Parties") issued those certain Subordinated Convertible Non-Transferrable Notes due March 9, 2020[3] (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, the "Prepetition Subordinated Notes", together with all related Subordinated Debt Documents, the "Prepetition Subordinated Note Documents", and,

---

[3] AGI Holdco also issued a Subordinated Note due March 9, 2020 issued in the aggregate principal amount of $2,088,729.76 on December 11, 2015 (the "Prepetition Non-convertible Subordinated Note"), evidencing a loan made by Palladin Partners, LP, as lender to AGI Holdco. However, as part of the issuance of the Prepetition Senior Notes (as defined below) Palladin Partners, LP received Prepetition Senior Notes of like principal amount in exchange for the cancellation of the Prepetition Non-convertible Subordinate Note.

together with the Prepetition Subordinated Loan Documents and the Prepetition Senior Note Documents, the "Prepetition Subordinated Debt Documents"), to the "Prepetition Subordinated Noteholders" (together with the Prepetition Senior Note Credit Parties, the "Prepetition Secured Note Credit Parties" and, the Prepetition Secured Note Credit Parties, together with the Prepetition Senior Credit Parties, the "Prepetition Secured Credit Parties"), on account of a loan provided by the Prepetition Subordinated Noteholders to the Prepetition Subordinated Note Party in the principal amount of $7,000,000.

30.    As of the Petition Date, the Prepetition Subordinated Note Party was indebted under the Prepetition Subordinated Notes in the aggregate amount of not less than $8,856,163 (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Subordinated Note Documents, unpaid principal, interest, fees, charges, expenses and disbursements (including, without limitation, attorneys' fees and related expenses and disbursements) and other obligations owed to the Prepetition Subordinated Noteholders, whether contingent, whenever arising, accrued, accruing, due, owing or chargeable, including all "Obligations" as described in the Prepetition Subordinated Debt Documents, the "Prepetition Subordinated Note Obligations", and, together with the Prepetition Revolver Obligations, the Prepetition Term Loan Obligations, the Prepetition Senior Note Obligations, and the Prepetition Subordinated Loan Obligations, the "Prepetition Obligations").

**F.    *Prepetition Liens and Prepetition Collateral.***

31.    As more fully set forth in the Prepetition Documents (defined below), prior to the Petition Date, the Prepetition Loan Parties, for the benefit of the Prepetition Secured Credit Parties, and the Prepetition Subordinated Debt Parties, for the benefit of the Prepetition Secured Note Credit Parties, granted security interests in and liens on, among other things, substantially all assets of the Prepetition Loan Parties and the Prepetition Subordinated Debt Parties

(collectively, the "Prepetition Collateral") to: (1) the Prepetition Revolver Agent (the "Prepetition Revolver Liens"); (2) the Prepetition Term Loan Agent (the "Prepetition Term Loan Liens", together with the Prepetition Revolver Liens, the "Prepetition Senior Liens"); and (3) the Prepetition Secured Note Credit Parties (the "Prepetition Subordinated Liens", and, together with the Prepetition Revolver Liens and the Prepetition Term Loan Liens, the "Prepetition Liens"). The priorities of the Prepetition Senior Liens in respect of the Prepetition Collateral are governed by that certain Intercreditor Agreement, dated as of June 9, 2014 (the "Intercreditor Agreement"), between the Prepetition Agents and acknowledged by certain Prepetition Loan Parties.  The priority of the Prepetition Subordinated Liens in respect of the Prepetition Collateral is governed by (a) that certain Subordination Agreement, dated as of June 9, 2014 by and among, (i) the Shareholder Representative Services LLC, as "Equityholders' Representative", (ii) the Prepetition Agents, and (iii) AGI Holdco and Aerogroup International; (b) that certain Subordination and Intercreditor Agreement dated as of August 5, 2015 by and among (i) (A) Palladin Partners, LP, (B) THL Credit, Inc., and (C) the other Subordinated Creditors (as defined therein), (ii) the Prepetition Agents, and (iii) AGI Holdco and Aerogroup International; and (c) that certain Subordination and Intercreditor Agreement dated as of January 20, 2016 by and among (i) Palladin Partners, LP, as agent, (ii) the Prepetition Agents, and (iii) AGI Holdco and Aerogroup International (collectively, the "Subordination Agreements" and, together with the Prepetition Revolver Credit Documents, Prepetition Term Loan Credit Documents, Prepetition Subordinated Debt Documents, and the Intercreditor Agreement, collectively, the "Prepetition Documents").

### *Events Leading To The Filing Of The Chapter 11 Cases*

32.     The Debtors' operations have generally been profitable during the past thirty years; however, declining mall traffic, a highly promotional and competitive retail environment,

and a shift in customer demand and preference for online shopping versus the traditional brick and mortar environment have all contributed to the Debtors' declining financial performance. Amidst these evolving industry forces, the Debtors have also faced certain Company-specific challenges, including:

- *Difficulty operating a levered business and maintaining cash reserves.* Like many retailers, the Debtors build-up their inventory stock in the months leading up to the spring and fall seasons. The stocking-up process heavily depletes the Company's cash reserves during these two times of year and limits re-investments in the Company pending turnover of inventory through sales. The need to adapt to the changing retail environment and transition the Company's operations has magnified the need for greater liquidity and availability for future investment in the business.

- *Retail unit expansion and lease renewal on unfavorable terms in the lead up to the retail industry slowdown.* In 2012 and 2013, the Debtors significantly expanded their retail store footprint, reaching a total of approximately 125 retail stores at their height. Because of the rapid pace at which the Company sought to expand during that time, the leases associated with the new retail stores had less favorable terms and resulted in significant additional expense. Soon after the Debtors completed their retail store expansion in 2013, the retail industry began experiencing a general downturn and shifted more heavily from the brick and mortar store model to a focus on online sales. Combined with the unfavorable lease terms, this has made it difficult for the Debtors to maintain their expanded footprint at such high costs, resulting in a previous reduction by approximately 30 stores and the current plan to close almost all of the Company's retail stores.

- *Disruptive and costly supply chain interruption.* In April 2016, the Debtors' sole product sourcing agent in Asia immediately stopped providing services for the Company's retail, wholesale, and e-commerce business lines. While the Company worked quickly to find a new sourcing agent, it lost customers across all of the affected business lines due to lack of inventory, quality control issues and delays in product shipment. These issues continued through the fall 2016 and spring 2017 seasons as the new sourcing agent experienced difficulties in getting its operations up and running. For example, 15% percent of the spring 2017 inventory was four weeks late. These supply issues have also had long-term effects on the Company's relationships with numerous of its customers. For example, the Company's largest wholesale customer ordered 50% less inventory for the spring 2017 season than the prior season.

33.    A critical portion of the Strategic Plan is a re-focus on the Debtors' wholesale, direct e-commerce, and first cost businesses, which have become the most successful aspects of the Debtors' operations.  Although sales in its own retail stores have declined, the Company has seen growing success in its wholesale business, becoming a leading supplier to other well-known retailers.  Its online outlets generate between 20-50% of its sales with its largest wholesale customers, and a focus on this aspect of its business has the potential to generate even greater revenues.  Similarly, a shift in focus to the Debtors' e-commerce business will realign the Company with the current marketplace environment, in which consumers heavily favor e-commerce over brick-and-mortar stores.  In fact, as noted above, the Debtors average over 1.4 million visits per month to their website.

34.    To shift the appropriate resources to growing these aspects of their business, the Debtors' Strategic Plan involves a reduction in the number of retail stores operated by the Debtors.  To identify the appropriate stores for closure, the Debtors evaluated their retail store base and worked with their advisors as well as engaged in various analyses and discussions with other interested parties.  Ultimately, the Debtors determined that the shift in the Company's focus to its more profitable businesses warranted the closing of approximately 74 retail stores.  As discussed further below, contemporaneously with the filing of this Declaration, the Debtors have filed a motion for authorization to continue store closing or similar themed sales (the "Store Closing Sales") at the closing stores to efficiently liquidate the merchandise and owned furniture, fixtures and equipment located at such stores over a 2-3 month period.  To maximize the efficiency and net proceeds of the Store Closing Sales the Debtors have entered into an agreement (the "Liquidating Agent Agreement") with Hilco Merchant Resources, LLC (the

"Liquidating Agent") to serve as the Company's exclusive liquidating agent for the Store Closing Sales.

**Objectives Of The Chapter 11 Cases**

35.     In June 2017, the Company retained Piper Jaffray & Co. ("Piper Jaffray") as its investment banking firm to commence exploration of all possible sources of capital funding for the Company as well as a potential sale of the Company, each in accordance with the terms of the existing engagement between the Company and Piper, dated June 22, 2017.  Piper has provided services on matters relating to capital raising (whether from institutional or other lenders, or from the private placement of debt instruments or equity securities), potential mergers, sales, joint ventures or similar transactions.

36.     Starting in July 2017, Piper assisted the Company's active efforts in securing either or both of a capital raise or a potential sale of the Company.  In connection with these efforts, Piper reached out to over 153 potential investors and over 34 potential purchasers.  A confidential information memorandum was prepared and a fully functional data room made available to potential investors or buyers who signed a non-disclosure agreement to review certain confidential Company business and financial information.   Additionally, senior management of the Company has met with potential investors or buyers in person and via conference call to review the opportunity and answer any and all questions pertaining thereto. There have been 42 potential investors or buyers who have who have accessed the data room and six (6) potential investors or buyers who have engaged in active talks with the Company.

37.     The Company received two (2) draft term sheets in August 2017 for potential investment or acquisition transactions.   In addition, the Company received two additional proposals which were deemed to be unresponsive or not actionable at the present time.  Each of

the two (2) draft term sheets received contemplate repaying Wells and THL in full either in cash or debt in the reorganized Company. The Company considered both proposals and ultimately did not, in the exercise of its business judgment, approve to proceed with either transaction at this time; however, the Company and Piper Jaffray continue to develop and cultivate interest from the respective parties in a potential transaction.  While there continues to be interest among these and other potential purchasers and investors, an acceptable "stalking horse" agreement or proposed investment has not yet been agreed.

38.     Accordingly, the Debtors filed these Chapter 11 Cases to maximize value for the benefit of all interested parties - including creditors and stockholders - by immediately reducing their retail footprint and continuing the process of soliciting interest in the acquisition or financing of a business restructured around its wholesale, e-commerce and first cost business units.  The Debtors believe they will be able to secure such proposals within the next 60 days and emerge from chapter 11 by the end of the year.

## PART II

## FIRST DAY MOTIONS[4]

39.     Concurrently with the commencement of these Chapter 11 Cases, the Debtors have filed a number of First Day Motions to minimize the adverse effects of the Chapter 11 Cases on their businesses during the pendency of the bankruptcy.  I have reviewed each of the First Day Motions and related orders (including the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief. I believe that the relief sought in each of the First Day Motions and Orders (a) is vital to enable the Debtors to make the transition to, and operate in,  chapter 11 with minimum interruption or

---

[4] Capitalized terms used but not otherwise defined in this Part II have the meanings ascribed to them in the respective First Day Motions.

disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving a reorganization of the Debtors' businesses.

## I.    JOINT ADMINISTRATION MOTION

40.    The Debtors seek entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only. I believe that joint administration will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be served and filed herein and (b) file the papers in one case rather than in multiple cases. I understand that joint administration will also protect parties in interest by ensuring that parties in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in these cases.

41.    I have also been advised that rights of the respective creditors and stakeholders of each of the Debtors will not be adversely affected by joint administration of these Chapter 11 Cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.

## II.    CONSOLIDATED CREDITOR LIST MOTION

42.    The Debtors request that the Court: (i) authorize the Debtors to file (a) a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtors and (b) a consolidated list of the Debtors' top thirty creditors; (ii) authorize the Debtors to redact certain personal identification information for individual creditors, and (iii) grant related relief.

43.    The Debtors estimate that they have over 300 creditors on a consolidated basis. Contemporaneously with the filing of the motion, the Debtors have filed an application to retain Prime Clerk, LLC as their notice and claims agent (the "Claims Agent") in these Chapter 11 Cases. The Debtors believe that using the Claims Agent for this purpose will maximize

administrative efficiency in these Chapter 11 Cases and reduce the administrative burdens that would otherwise fall upon this Court and the U.S. Trustee.

44.     The Debtors believe that preparing the consolidated list in the format or formats currently maintained by the Debtors in the ordinary course of business will be sufficient to permit the Claims Agent to promptly provide notices to all applicable parties. Further, I believe that a combined list of the top thirty (30) largest general unsecured creditors is more reflective of the general unsecured creditor body than separate lists.  Indeed, a combined list captures creditors with claims as low as approximately $36,952.  Any marginal benefit in preparing individual creditor lists for each Debtor is far outweighed by the burden and expense of doing so. Accordingly, the Debtors believe that filing consolidated creditor lists rather than preparing and filing separate matrices and lists will maximize efficiency, increase accuracy and reduce costs to the benefit of these estates.

45.     Further, I believe that cause exists to redact address information of individual creditors — many of whom are the Debtors' employees — from the creditor matrix because such information could be used to perpetrate identity theft.  The Debtors propose to provide an un-redacted version of the matrix to the United States Trustee, any official committee of unsecured creditors appointed in the Chapter 11 Cases, and to this Court, upon request.

## III.     CLAIMS AND NOTICING AGENT APPLICATION

46.     The Debtors request that Prime Clerk be appointed as the claims and noticing agent for the Debtors and these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in these Chapter 11 Cases.

47.     The Debtors have obtained and reviewed engagement proposals from three other court-approved claims and noticing agents to ensure selection through a competitive process.

After initial proposals were received from all four claims and noticing agents, the claims agents were asked to improve those bids and provide proposed budgets. The Debtors submit, based on all proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

48.     Accordingly, the Debtors believe that it is in the best interests of their creditors, stakeholders and estates to retain the Claims Agent for these Chapter 11 Cases.

## IV.     CASH MANAGEMENT MOTION

49.     Prior to the Petition Date, the Debtors employed a cash management system to efficiently collect, transfer, and disburse the funds generated by their business operations (the "Cash Management System"). The Cash Management System facilitates the Debtors' cash forecasting and reporting and enables the Debtors to monitor and record the collection and disbursement of funds and maintain control over the administration of their Bank Accounts (as defined in the Cash Management Motion).

50.     The Cash Management System is an ordinary course, essential business practice of the Debtors. The Cash Management System currently in place enables the Debtors to (a) closely control and monitor corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the efficient movement of funds. Altering the Cash Management System may disrupt payments to key vendors and employees. Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures.

51.     I believe that changing the Bank Accounts could significantly and negatively impact the Debtors' cash flow as it takes a substantial amount of time to open new accounts. Both the Master Depositary Account (where most of the Debtors' cash is held) and the Master Operating Account (from which funds are disbursed to the various accounts of the Debtors on an

as needed basis) are with Wells Fargo Bank, N.A. ("Wells Fargo"), a financially stable banking institution with FDIC insurance. To protect against the unauthorized payment of prepetition obligations, the Debtors represent that if they are authorized to continue to use the Bank Accounts, they will not pay, and Wells Fargo will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court. If there are funds currently in an account at a bank other than Wells Fargo, the Debtors will direct such bank not to pay any debts incurred before the Petition Date, other than as authorized by this Court.

52. To minimize expenses to their estates, the Debtors also request authority to use all checks and other business forms, including electronic forms and paper forms, preprinted letterhead and related documents (collectively, the "Business Forms") that were in existence immediately before the Petition Date. Given that the Business Forms were used prepetition, they do not include references to the Debtors' current status as debtors in possession. As is the case with the existing Cash Management System, I believe that requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their efforts away from administering these Chapter 11 Cases and impose needless expenses on the estates, without any meaningful corresponding benefit.

53. Due to the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is important that the Debtors be permitted to continue to use the Business Forms without alteration or change and without the "Debtor in Possession" designation.

54. In the ordinary course of business, certain of the Debtors' funds may become intermingled as a result of their Cash Management System. These transfers are reconciled through intercompany transactions (the "Intercompany Transactions"). The Debtors maintain

records of transfers of cash and can trace and account for all such Intercompany Transactions. The Debtors will continue to maintain such records, including records of all current intercompany accounts receivable and payable. If the Debtors were no longer able to undertake such Intercompany Transactions, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.

55.    I am informed that section 345 of the Bankruptcy Code requires deposits or investments of an estate's funds in a certain manner. I believe that obtaining an extension of the time to ensure that this provision is complied with is in the best interests' of the Debtors in that it would assist in a smooth transition into these cases and provide appropriate parties sufficient time to address an issues with respect to deposits or investments.

56.    Accordingly, the Debtors believe that it is in the best interests of their creditors, stakeholders and estates to (i) continue to maintain and use their existing Cash Management System, Bank Accounts and Business Forms, (ii) to continue to engage in Intercompany Transactions, and (iii) to obtain an extension of the time period set forth in section 345(b) of the Bankruptcy Code..

## V.    WAGE MOTION

57.    The Debtors' workforce is comprised of full-time corporate salaried employees (the "Corporate Salaried Employees"), full-time retail salaried employees (the "Retail Salaried Employees" and, together with the Corporate Salaried Employees, the "Salaried Employees"), full-time hourly employees (the "Hourly Employees" and, together with the Salaried Employees, the "Full Time Employees") and regular part-time hourly employees ("Part Time Employees"). As of the Petition Date, the Debtors employ approximately 683 employees, and 13 temporary employees. The Debtors' workforce is comprised of corporate employees and retail employees. Corporate employees include 113 full-time salaried employees, 18 full-time hourly employees

and 17 part-time hourly employees, all of which either work at the Company's headquarters or fulfill a primarily corporate role elsewhere.  Retail employees include 15 full-time salaried employees, 154 full-time hourly employees, and 366 part-time hourly employees, all of which work primarily at the Company's retail stores.  The Debtors also utilize temporary employees provided by a third party agency from time to time.[5]

58.     All Employees are paid bi-weekly (every other Thursday) by either direct deposit or a payroll debit card.  All Employees are paid through and including the previous Saturday. The payroll for the period ending on September 2, 2017, including employer-paid taxes, was approximately $920,000 for all the Employees and was paid on September 7, 2017.  The Debtors' next scheduled payroll date is September 21, 2017 for the payroll period ending September 16, 2017.  The Debtors estimate that, as of the Petition Date, approximately $30,000 is accrued and owing to the Temporary Employees and approximately $5,500 in commissions is accrued and owing to the Independent Contractor.

59.     The Debtors offer medical, vision, dental, life, supplemental life, and disability insurance; health care spending and flexible spending accounts; commuter benefits; a 401(k) plan and contributions to such plan; and miscellaneous benefits to certain employees such as cell phone reimbursement (collectively, the "Employee Benefit Plans"), each as described more fully in the motion, to Full Time Employees.  The Debtors also maintain policies for requests by Full Time Employees for time off work, whether paid or unpaid, as the result of, among other things, jury duty, appearance in a court proceeding on behalf of the Debtors, military obligations, inclement weather, family and medical leave, and personal leave (collectively, the "Time Off Policies").

---

[5] This includes the six individuals employed through a third-party agency in China that provide services to the Non-Debtor Foreign Affiliates.

60.     The Debtors seek authority to pay all prepetition amounts owed on account on the Employee Benefit Plans and to continue to make payments as necessary to continue the Employee Benefit Plans in the ordinary course of business. The Debtors believe it is essential to continue each of the Employee Benefit Plans because the Employees rely on these benefits for their health and well-being; cancelling these programs would impose undue hardship on the employees and would be detrimental to the Company.

61.     The Debtors request that the Court enter an order, authorizing, but not directing, the Debtors: (a) to pay and/or perform, as applicable, prepetition obligations to current employees, retirees and independent contractors, including accrued prepetition wages, salaries and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, the "Employee Claims"); (b) to honor and continue in the ordinary course of business until further notice (but not assume) the Employee Benefit Plans and the Time Off Policies, and to pay all fees and costs in connection therewith, except as otherwise set forth herein; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations"); (d) to pay all related prepetition withholdings, and payroll-related taxes associated with the Employee Claims and the Employee Benefit Obligations (the "Employee Taxes"); and (e) to pay all administrative fees, employee contributions and employer matching contributions to the Employee 401(k) plan (the "401(k) Obligations" and, together with the Employee Claims, the Employee Benefit Obligations, the Employee Expense Obligations and the Employee Taxes collectively, the "Prepetition Employee Obligations"), all as described in detail in the Wage Motion.

62.     The Debtors believe, in the exercise of their business judgment, that relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. Paying prepetition wages, employee benefits and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors to conduct the postpetition liquidation and wind-down process effectively.  Indeed, the Debtors believe that without the relief requested herein being granted, their Employees may seek alternative opportunities sooner than the liquidation is complete. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to continue to operate.

63.     Accordingly, the Debtors believe that it is in the best interests of their creditors, stakeholders and estates to continue to honor and pay the Prepetition Employee Obligations.

## VI.       UTILITIES MOTION

64.     In connection with the operation of their businesses and the management of their properties, the Debtors obtain water, gas, electricity, telephone, and similar utility products and services (collectively, the "Utility Services") from the utility companies covering a number of utility accounts.

65.     On average, prior to the Petition Date, the Debtors paid approximately $60,000 each month on account of Utility Services.[6]  For each Utility Company listed on the Utility Company List and for which no current deposit exists, the Debtors will place a deposit equal to approximately 14 days of Utility Services in a newly created deposit account (the "Utility Deposit").  The Debtors estimate that the aggregate Utility Deposit will be $30,000 based on the average amounts paid prior to the Petition Date over the course of three (3) months for each of the Utility Companies on the Utility Company List.

---

[6] The Debtors have not included in this calculation certain amounts paid directly by the Debtors' landlords at certain store locations to various utility companies.

66.     Uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases. Should any Utility Company alter, refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' efforts. It is essential that the Utility Services continue uninterrupted.

**VII.     TAX MOTION**

67.     Prior to the Petition Date, the Debtors, in their ordinary course of business, incurred various Taxes, including state and local sales and use tax liabilities. The Debtors estimate they may be liable for approximately $235,000 in Taxes, all of which are property or sales and use taxes that must be remitted to the Taxing Authorities.

68.     Sales and use taxes accrue as the Debtors sell merchandise or consume goods and are calculated on the basis of statutorily mandated percentages of the price at which the Debtors' merchandise is sold and/or cost of merchandise consumed. As of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes; however, certain Taxes attributable to the prepetition period were not yet due.  Out of an abundance of caution, the Debtors are also seeking authority to pay any other prepetition Taxes that may remain outstanding.

69.     The continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby creating a greater recovery for creditors and stakeholders. If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether the obligations are proratable or fully prepetition or postpetition, and whether penalties, interest, and attorneys' fees and costs can continue to accrue on a postpetition basis,

and, if so, whether such penalties, interest, and attorneys' fees and costs are priority, secured or unsecured in nature.

70.      Further, I have been advised that certain Taxes may constitute "trust fund" taxes that are not included in property of the Debtors' estates, and/or obligations as to which the Debtors' officers and directors may have personal liability in the event of nonpayment. Efforts by Taxing Authorities to collect such taxes would provide obvious distractions to the Debtors and their officers and directors in their efforts to maximize the value of the estates.

71.      Finally, certain Taxing Authorities either have not been paid or have been sent checks and/or wires for Taxes that may or may not have been presented or cleared as of the Petition Date. Similarly, in other cases, obligations have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable. Accordingly, the Debtors seek authorization for their banks to honor prepetition checks and wires issued by the Debtors to the Taxing Authorities in payment of prepetition Taxes that, as of the Petition Date, have not cleared or been transferred. In addition, to the extent the Debtors have not yet sought to remit payment to the Taxing Authorities with respect to certain Taxes, the Debtors seek authorization to issue checks or provide for other means of payment to the Taxing Authorities as necessary to pay the Taxes.

72.      I believe that it is in the best interest of the Debtors' estates that the Taxes be paid on time so as to avoid any disruptions. Delayed payment of the Taxes may cause the Taxing Authorities to take precipitous action, including a marked increase in state audits, a flurry of lien filings, and significant administrative maneuvering at the expense of the Debtors' time and resources. Prompt and regular payment of the Taxes will avoid this unnecessary governmental action.

**VIII.**        **INSURANCE PROGRAMS MOTION**

73.    By the Insurance Motion, the Debtors seek authorization to (a) continue to maintain and administer their prepetition insurance policies (the "Insurance Policies") and revise, extend, renew, supplement, or change such policies, as needed, (b) pay or honor obligations outstanding on account of prepetition insurance policies, if any, and (c) continue their insurance premium financing program.

74.    In the ordinary course of business, the Debtors maintain fourteen (14) Insurance Policies covering a variety of matters including, without limitation, general commercial liability insurance, automobile insurance, workers compensation and employers liability insurance, directors and officers insurance, and property insurance. The Debtors are required to pay premiums under the Insurance Policies (the "Insurance Premiums"), based on a rate established and billed by each Insurer. The Insurance Premiums total approximately $750,000 on an annual basis.  The Debtors pay the majority of the Insurance Premiums through an insurance premium financing arrangement (the "Finance Agreement"), which the Debtors also seek authorization to continue in connection with the Insurance Policies.

75.    The Insurance Policies provide a comprehensive range of coverage for the Debtors' employees, businesses, and property. I believe that if the Insurance Policies were allowed to lapse, the Debtors could be exposed to substantial liability for any damage resulting to persons and property of the Debtors and others. Failure to maintain the Insurance Policies, therefore, would be detrimental to the Debtors' reorganization efforts and adversely affect the value of their estates by exposing them to unnecessary risks of loss.

76.    As of the Petition Date, the Debtors are current on amounts due under the Insurance Policies and the Finance Agreement.  The Debtors seek authority to continue the

Insurance Policies, continue paying the Insurance Premiums, and continue making the payments and honoring their other obligations under the Finance Agreement.

77.    Payment of prepetition Insurance Premiums, continuation and renewal of the Insurance Policies, continuation of the insurance premium financing program and entry into new insurance policies, if necessary, are all essential to preserving the value of the Debtors' businesses, properties, and assets.  Moreover, in certain cases, I understand that the Debtors are required by law to maintain certain types of insurance coverage.

78.    I believe that the relief requested in the Insurance Motion is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any other form of impairment to the coverage, benefits, or proceeds provided under any Insurance Policy. Any lapse in insurance coverage for failure to pay prepetition obligations or honor obligations coming due during these Chapter 11 Case could expose the Debtors to substantial liability for damages and negatively impact the Debtors' ability to wind down its business. Moreover, in such circumstances, the Debtors may be required to obtain replacement policies on an expedited basis at a significant cost to their estates.

IX.    **SHIPPING AND DELIVERY MOTION**

79.    In the ordinary course of their businesses, the Debtors incur certain fees and charges to several common carriers to ship, transport, store and deliver goods through the Debtors' established distribution networks. The Debtors have contracts with these common carriers for the transportation services provided. The contracts typically set forth agreed upon rates for the transportation services.  The common carriers are generally not paid in advance but rather invoice the Debtors for shipping services previously rendered.  At any given time, there are common carriers shipping goods to the Debtors' Distribution Centers as well as carriers

shipping goods from the Distribution Centers to the Debtors' stores. In addition, the Debtors may be required to pay customs duties for goods delivered to them from overseas.

80.     The Debtors rely extensively on their Shippers to distribute and transport merchandise to and from the Distribution Centers in Edison, New Jersey and Redlands, California. The Debtors also may rely on their Shippers to return goods, merchandise and products to the Debtors' vendors. The services provided by these Shippers are critical to the day-to-day operations of the Debtors' retail business. At any given time, shipments are en route to the Debtors' Distribution Centers and retail stores. As of the Petition, the Debtors owe approximately $520,000 of Shipping Charges, including approximately $55,000 owed to ocean freight shippers utilized to transport products from overseas to the Distribution Centers (the "Ocean Freight Shippers"), $150,000 owed to shippers and vendors used in connection with transportation of products from the Distribution Centers to the retail stores or customers (the "Ground Shippers"), and approximately $315,000 in fees owed to U.S. Customs and Border Protection (the "Customs Fees").

81.     The Debtors seek to pay the prepetition Shipping Charges for several reasons. First, because of the filing of these Chapter 11 Cases, certain Shippers who hold goods for delivery to or from the Debtors may refuse to release such goods pending payment for their services. Second, if the prepetition Shipping Charges are not paid, many of the Shippers may refuse to perform future services for the Debtors. In such event, the Debtors will incur additional expenses (such as premium shipping costs) to replace the Shippers, which amounts may exceed the amount of unpaid prepetition Shipping Charges that the Debtors request permission to pay hereunder.

82.     Third, because of the method of distribution employed by the Debtors, as well as space limitations, the Debtors' Distribution Centers and the stores themselves hold only limited quantities of merchandise at a given time.  If shipments from the Distribution Centers to the stores are not made promptly and regularly, the Debtors may risk having inadequate in-store inventory, which would disrupt the Debtors' reorganization efforts.

83.     Finally, I have been advised that any delays in payment of Shipping Charges with respect to goods that are in the possession of the Shippers as of the Petition Date will likely result in the assertion, under applicable law, of possessory liens upon the Debtors' property in the possession of such parties.

84.     Additionally, the Debtors seek to pay the Customs Fees.  I understand that merchandise could potentially be stopped in transit if customs fees are not paid in the ordinary course.  Moreover, there is a sizable bond related to U.S. Customs and Border Protection obligations securing such obligations. The Debtors request authority to pay such amounts to enable them to continue their operations in as seamless and uninterrupted a manner as possible.

85.     Accordingly, it is the Debtors' business judgment that the failure to pay the Shipping Charges could have a material adverse impact on the operations of their businesses and, thus, their efforts to maximize the value of their estates.

X.      **CUSTOMER PROGRAMS MOTION**

86.     Prior to the Petition Date, in the ordinary course of business, the Debtors engaged in certain marketing and sales practices that are, among other things, (i) targeted to develop and sustain a positive reputation for their goods in the marketplace and (ii) designed to attract new customers and to enhance loyalty and sales among the Debtors' existing customer base (collectively, the "Customer Programs").  The Debtors seek authority to maintain the Customer

Programs and Credit Card Processing (as defined and described in detail in the Motion) to avoid disruption to the Debtors' business operations.

87.     It is necessary to preserve and build goodwill in the Debtors' customer base to maximize the value of the Debtors' assets.  Honoring the Sales Promotions, Coupons, Gift Cards, Merchandise Credits, Loyalty Program and the Affiliate Program, in addition to permitting Refunds, all as set forth in the Motion, are critical to achieving this goal and avoid harm to the Debtors' estates.

88.     The ability of the Debtors to maximize the value of their inventory for the benefit of their creditors and stakeholders are dependent upon the patronage of their customers.  The potential harm and economic disadvantage that would stem from an inability to honor customer obligations or accept credit card payments is grossly disproportionate to the costs associated with these programs.  Approximately 89% of the products sold at the Debtors' stores and website are purchased with credit cards, and the Debtors' ability to continue Credit Card Processing is essential to the Debtors' business operations.  Without this ability, the Debtors would lose a major method for conducting sales transactions during its postpetition operation.  Moreover, the Debtors' customers have a certain expectation that the Debtors will honor their obligations under the Customer Programs and rely on such representations when purchasing merchandise.  I believe that any failure to honor prepetition customer obligations or inability to process credit card transactions, for even a brief time, may well drive away valuable customers and/or severely disrupt the Debtors' operations, thereby harming the Debtors' efforts to maximize the value of their inventory.  Accordingly, I believe that it is in the best interests of their creditors, stakeholders and estates to continue the Customer Programs and Credit Card Processing.

89.     Moreover, I am advised that the failure to continue the Customer Programs may subject the Debtors to liability for consumer deceptive trade practices.  Most, if not all, of the states where the Debtors conduct their business have enacted statutes declaring unlawful any deceptive trade practices by any business being conducted in that state.  The Debtors' customers have a certain expectation that the Debtors will honor the Customer Programs prior to the Petition Date and rely on such representations when purchasing merchandise and participating in the Customer Programs.  Thus, it is necessary for the Debtors to continue the Customer Programs to avoid liability for claims arising out of state law consumer deceptive trade practices acts.

## XI.     STORE CLOSING MOTION

90.     Prior to the Petition Date, the Debtors and their advisors considered various strategic options with respect to the sale of the retail stores.  It was ultimately concluded with input from BRG and based on the results of efforts by Piper Jaffray to obtain "going concern" transactions that included the Debtors' retail stores as well as obtaining additional financing, that immediately closing approximately 74 of the Debtors' stores (the "<u>Closing Stores</u>") that could not sustain continued operations and were not saleable as going concerns was in the best interests of the Debtors and their stakeholders.  The Debtors also determined that it was critical to commence the Store Closing Sales as soon as possible to take advantage of the back to school season and the upcoming holiday shopping season.  In addition, the sooner the Debtors commenced the Store Closing Sales, the sooner they would be able to reject the corresponding leases at the Closing Stores, eliminating significant expenses, and in turn maximizing value for the estates and their creditors.

91.     Through the Store Closing Motion, the Debtors are seeking approval of streamlined procedures to conduct the Store Closing Sales free and clear of liens, claims and

encumbrances (the "Store Closing Procedures"). The Debtors are seeking interim approval to apply the Store Closing Procedures to the Closing Stores given the significant operating losses continuing in the Closing Stores in the aggregate, the Debtors' liquidity constraints, and the budget set forth in the Debtors' proposed postpetition financing facility.  Based on my experience with other retail chapter 11 debtors, I believe that implementing the Store Closing Procedures will provide the best and most efficient means for the Debtors to sell the Retail Assets to maximize their value to the estates.  The Retail Store Closing Sales will take approximately two (2) to three (3) months.  Such closures will help stem the Debtors' significant cash burn, increase the Debtors' liquidity, and allow the Debtors to focus their reorganization efforts around a smaller footprint of more profitable stores as well as their wholesale, e-commerce and first cost business units.  I understand that the Debtors intend to market the leases for the Closing Stores during that time, and, therefore, the Debtors have not yet made a determination whether to reject the leases for the Closing Stores.

92.    Certain states in which the Debtors operate stores have Liquidation Sale Laws that establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Retail Store Closing Sales.  Additionally, many of the Debtors' leases with their landlords restrict the use of "store closing" or similarly themed signage.  Absent relief from the Court, such requirements hamper the Debtors' ability to maximize value in selling their Retail Assets.  The most important factor in maximizing value in the context of a store closing sale is the ability to drive a message to the consumer that creates some urgency to purchase.  Complying with Liquidation Sales Laws and lease provision restricting store closing sales will have a significant negative impact on sales

at the closing stores and value that the Debtors will be able to generate from the store closing sales.

93.     Further, certain states in which the Debtors operate have Wage Requirements that require the Debtors to pay an employee contemporaneously with his or her termination. In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated.  The nature of the Retail Store Closing Sales contemplated by the Motion will result in a substantial number of employees being terminated during the Retail Store Closing Sales.  The Debtors' payroll systems will likely be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

94.     While the Debtors intend to pay their terminated employees as expeditiously as possible, the requirements imposed by these state laws and regulations are unworkable in light of these extraordinary circumstances.  If the Debtors are required to comply with these state laws and regulations, their efforts to wind down their operations and mitigate unnecessary payroll costs will be hampered.  Indeed, if forced to comply, the Debtors will face the choice of (i) having to incur the costs of keeping employees employed after the conclusion of the Retail Store Closing Sales while payroll is being prepared, or (ii) staging terminations to the detriment of the Debtors' estates.  Both of these options will provide no benefit to the Debtors' estates and will only increase the administrative costs of conducting the Retail Store Closing Sales.  Accordingly, complying with the Wage Requirements would have a detrimental effect on the Debtors' ability to maximize the value of their estates.

95.     To the extent that the Liquidating Agent does not sell any remaining FF&E upon the conclusion of the Retail Store Closing Sales, such property will be of inconsequential value and

benefit to the estates and may be costly and burdensome to the estate to retain them.    As a result, the Debtors' estates would benefit from the ability to abandon any remaining unsold FF&E.

96.    The Debtors further requesting the authority, but not direction, to pay store closing bonuses (the "Store Closing Bonuses") to store-level and certain field employees who are employed by the Debtors during the Retail Store Closing Sales.  The Store Closing Bonuses are necessary to motivate employees during the Retail Store Closing Sales and will assist the Debtors in retaining those employees necessary to successfully complete the Retail Store Closing Sales.  The amount of the Store Closing Bonuses will vary depending upon a number of factors, including the employee's position with the Debtors and length of service.  The total aggregate cost of the Store Closing Bonus program, however, will not exceed five percent (5%) of the base annual payroll, including taxes and typical benefits, for all employees working at the Closing Stores.  The Debtors estimate that the aggregate cost of the Retail Store Closing Bonus program will not be more than $550,000, and approximately 200 employees will be covered by the program.

97.    Payment of the Store Closing Bonuses in connection with the Retail Store Closing Sales will aid in maximizing the value of the Debtors' estates by inducing employees who are needed to manage and complete the Retail Store Closing Sales to remain in the employ of the Debtors and to maximize the returns from such sales.  Should the Debtors be unable to pay the Store Closing Bonuses, they would likely lose a number of their current employees at the Closing Stores and would be required to hire additional employees, resulting in additional expense and delay, and such employees would not be as familiar with the Debtors' merchandise and operations, which may reduce the overall success and profitability of the Retail Store

Closing Sales.  Therefore, the bonuses are justified by a sound business purpose and should be approved.

98.     Given the breadth of the Store Closing Sales and the need to obtain maximum value for the retail assets, and to do so over as short a period as possible, the Debtors determined that the use of an outside liquidator would provide the highest and best value for the Debtors' creditors.   After considering available options, the Debtors determined, in their business judgment, that Hilco Merchant Resources, LLC (the "Liquidating Agent") was best suited to performing all required tasks.  Under the terms of the Liquidating Agent Agreement, and subject to Court approval, the Liquidating Agent will serve as the exclusive consultant to the Debtors for purposes of conducting the Retail Store Closing Sales to liquidate the Retail Assets at the Closing Stores.  Under the terms of the Liquidating Agent Agreement, in consideration of the services to be rendered, the Debtors will provide the Liquidating Agent with a fee equal to one and one-quarter percent (1.25%) of the Gross Proceeds of Merchandise sold at the Closing Stores and seventeen and one-half percent (17.5%) of the Gross Proceeds of the FF&E.  Based on my experience with liquidation consultants and liquidation consulting agreements approved in other retail chapter 11 cases, I believe the terms proposed under the Liquidating Agent Agreement are reasonable.  I believe the Debtors' selection process has ensured that the compensation and any other fees agreed to by the Debtors are reasonable and market based.

99.     The relief requested in the Store Closing Motion is integral to maximizing the value of the Debtors' estates and, based on my prior experience, is a routine part of chapter 11 cases involving retail debtors.   It will permit the Debtors to immediately advertise and commence the store closing sales at the Closing Stores, resulting in a helpful boost to the Debtors' liquidity, and it will establish fair and uniform store closing procedures to assist the

Debtors and their creditors through the Debtors' transition to a smaller, more profitable enterprise.

## XII.        CASH COLLATERAL MOTION

100.    The Debtors require immediate access to Cash Collateral to ensure that they are able to continue the operation of their business during the pendency of these Chapter 11 Cases while they pursue a partial liquidation through the store closing sales at their retail stores and the reorganization of their remaining business units.  As of the Petition Date, the Cash Collateral will be the Debtors' sole source of funding for operations and the costs of administering these Chapter 11 Cases.  Absent authority to use Cash Collateral immediately, the Debtors would need to immediately cease operations that would cause irreparable harm to the Debtors' creditors and their estates.  Thus, the Debtors' immediate access to Cash Collateral is necessary to preserve and maximize value for the benefit of all parties in interest.  Without such access to liquidity, the Debtors' ability to navigate through the chapter 11 process will be jeopardized to the detriment of all of the Debtors' stakeholders.

101.    In light of the Debtors' need to access liquidity, the Debtors entered into discussions with the Prepetition Revolver Agent regarding use of cash collateral.  After good-faith, arm's-length negotiations, [the Debtors and the Prepetition Revolver Agent on behalf of the Prepetition Revolver Lenders, reached an agreement regarding the consensual use of Cash Collateral].

102.    The Debtors' agreement with the Prepetition Revolver Agent regarding Cash Collateral is subject to certain conditions, including the provision of adequate protection to the Prepetition Senior Credit Parties. The Debtors will also operate in accordance with the Budget during the interim period.

103.    The Debtors propose to provide the Prepetition Senior Credit Parties with the following adequate protection package:

- Replacement security interests in, and liens on the Postpetition Collateral, subject to the terms of the Intercreditor Agreements;

- allowed administrative claims as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors;

- the payment of interest and letter of Credit Fees (each at the Default Rate set forth under the Prepetition Revolver Credit Documents) and all reasonable and documented fees, expenses, and disbursements incurred by the Prepetition Revolver Agent under the Prepetition Revolver Credit Agreement;

- the current payment of the reasonable and documented out-of-pocket fees and expenses of the financial advisors and attorneys of the Prepetition Term Loan Credit Parties not to exceed the amount set forth in the Budget;

- maintenance of the Debtors' cash management system and certain modifications thereof, in a manner consistent with an order granting the Debtors' cash management motion;

- the payment of Excess Proceeds (as defined in the Interim Order) on a weekly basis to the Prepetition Revolver Agent to be applied to the Prepetition Revolver Obligations;

- continued compliance with certain financial reporting requirements set forth in the Prepetition Revolver Credit Agreement and certain additional reporting requirements described in the Interim Order;

- certain restrictions set forth in the Interim Order related to sales and dispositions of Collateral; and

- satisfaction of certain key case milestones.

104.    Additionally, the Debtors have stipulated, subject to a challenge period, to (a) the amount of the claims of the Prepetition Credit Parties as of the Petition Date, (b) the validity and priority of the liens and security interests securing the Prepetition Secured Obligations, (c) the relative priority of the liens securing the Prepetition Secured Obligations as to each other, pursuant to the Intercreditor Agreements, and (d) the fact that all cash and cash proceeds, in the

Debtors' banking, checking or other deposit accounts with financial institutions as of the Petition Date or deposited after the Petition Date, subject to certain exceptions set forth in the Interim Cash Collateral Order, are Cash Collateral of the Prepetition Secured Parties.

105.    I understand that courts in this jurisdiction have approved similar requests for relief in other, recent chapter 11 cases. Accordingly, I believe that the Debtors' consensual use of Cash Collateral and agreed-upon adequate protection package is fair and appropriate under the circumstances of these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

[*Remainder of page left intentionally blank.*]

\*        \*        \*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 15, 2017                    */s/ Mark Weinsten*
        Edison, New Jersey                    Name: Mark Weinsten
                                           Title:   Chief Restructuring Officer

**Exhibit A**
**Aerogroup Corporate Structure**



AGI HoldCo, Inc.
DE C Corp
46-5367087

Aerogroup International, Inc.
NJ C Corp
13-3436119

Aerogroup Retail Holdings,
Inc.
DE C Corp
51-0364650

Aerogroup
International, LLC
DE LLC
26-2694658

Aerogroup International
Holdings, LLC
DE LLC
26-2694312

Aerogroup Gift
Card Co, Inc.
VA C Corp
46-2547551

AFC Holding
(Hong Kong) Limited
Hong Cong Corp

AFC Management
Limited
Hong Kong Group

China International
Intellectech
(Shenshen) Co., Ltd.
Chinese Wholly Foreign-
Owned Enterprise

**LEGEND**

Foreign non-debtor entity