**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AEROGROUP INTERNATIONAL,<br>INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 17-11962 (KJC)<br><br>(Jointly Administered)<br><br>**Hearing Date: TBD**<br>**Obj. Deadline: TBD** |

**MOTION OF THE DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BID
PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS, (B) APPROVING RELATED CONTRACT ASSUMPTION AND
ASSIGNMENT PROCEDURES, (C) AUTHORIZING THE DEBTORS TO ENTER
INTO STALKING HORSE AGREEMENTS AND APPROVING CERTAIN BID
PROTECTIONS, SUBJECT TO A FURTHER HEARING, (D) SCHEDULING A SALE
HEARING, AND (E) GRANTING CERTAIN RELATED RELIEF; AND (II) AN ORDER
(A) APPROVING THE SALE OF THE DEBTORS' ASSETS, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

Aerogroup International, Inc. and certain of its affiliates, as debtors and debtors in

possession in the above-captioned cases (each, a "Debtor" and collectively, the "Debtors" or the

"Company") hereby move, pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rules 2002,

6003, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"), for the entry of (i) an order substantially in the form attached hereto as

**Exhibit A** (the "Bid Procedures Order") (a) approving the bid procedures attached as **Exhibit 1**

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax
identification number, are as follows: Aerogroup International, Inc. (6119), AGI Holdco, Inc. (7087), Aerogroup
International LLC (4658), Aerogroup International Holdings LLC (4312), Aerogroup Retail Holdings, Inc. (4650),
and Aerogroup Gift Card Company, Inc. (7551).  The mailing address for the Debtors, solely for purposes of notices
and communications, is: 201 Meadow Road, Edison, New Jersey 08817.

to the Bid Procedures Order (the "Bid Procedures") in connection with a sale or sales (collectively, one or more such sales, the "Sale") of all or substantially all of the Debtors' Assets (as defined below); (b) approving certain notice procedures; (c) approving procedures (the "Contract Procedures") for the assumption and assignment of the Executory Contracts (as defined below); (d) subject to a further hearing, authorizing the Debtors to enter into stalking horse agreements and approving certain customary bid protections for any stalking horse bidder(s) in connection with a sale transaction; (e) scheduling a hearing to approve the Sale (the "Sale Hearing"); and (f) granting certain related relief; and (ii) an order (the "Sale Order") (a) approving the Sale free and clear of all claims, liens, liabilities, interests and encumbrances, (b) approving the assumption and assignment of certain designated Executory Contracts, and (c) granting certain related relief.  In support of this motion (the "Motion"), the Debtors respectfully state as follows:

## JURISDICTION

1.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     Pursuant to Local Rule 9013-(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      The statutory predicates for the relief requested are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6006 and 9014 and Local Rules 2002-1, 6004-1 and 9006-1.

## RELIEF REQUESTED

4.      First, the Debtors seek entry of the Bid Procedures Order, substantially in the form attached hereto as **Exhibit A**, (i) approving the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order, in connection with the Sale, (ii) approving certain notice procedures with respect to the Sale, (iii) establishing the Contract Procedures, (iv) subject to a further hearing, authorizing the Debtors to enter into stalking horse agreement(s) and approving certain customary bid protections to any stalking horse bidder(s) in connection with a sale transaction, and (v) scheduling the Sale Hearing (collectively, the "Bid Procedures Relief").

5.      By this Motion, the Debtors also seek approval of the successful bid(s) after completion of the bidding and auction process.  The Motion seeks the customary relief for sales of the Debtors' assets free and clear of liens, claims and encumbrances (the "Sale Relief").[2]

## BACKGROUND

6.      On September 15, 2017 (the "Petition Date"), the Debtors commenced these bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[2]      Given the emergency nature of the relief being requested in this Motion, the Debtors request that Local Rule 6004-1(b) requiring the attachment of a proposed form of sale order be waived under these circumstances.  The Debtors will file a form of sale order as soon as practicable prior to a Sale Hearing or once a stalking horse bidder has been identified.

7.       On September 26, 2017, Region 3 of the Office of the United States Trustee (the "U.S. Trustee") appointed a five-member Official Committee of Unsecured Creditors (the "Committee").  No trustee or examiner has been appointed.

8.       The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading up to the filing of these Chapter 11 Cases, as well as the facts and the circumstances supporting the relief requested herein is set forth in detail in the *Declaration of Mark Weinsten in Support of Chapter11 Petitions and First Day Motions* [D.I 3], filed on the Petition Date.

**BASIS FOR RELIEF**

9.       Prior to and throughout these Chapter 11 Cases, the Debtors, with the assistance of their investment banking firm, Piper Jaffray & Co. ("Piper Jaffray"), have explored all possible options available to the Company, including potential partnerships and sources of capital funding, as well as a sale of the Company as a going concern or a sale of substantially all of the assets of the Company for liquidation purposes.  Piper Jaffray has sought offers in various forms in response to the marketing process, including, among other variations, (a) offers to purchase some or all of the Debtors' e-commerce, wholesale and/or first cost business lines as going concerns, (b) offers to purchase all or a portion of the Debtors' assets for liquidation purposes, (c) offers to engage in strategic partnerships involving the licensing of the Debtors' intellectual property, and (d) offers to provide capital investments for a streamlined go-forward, reorganized business.

10.     On October 24, 2017, the Debtors filed the *Debtors' Joint Plan of Reorganization* [D.I. 203] (the "Original Plan").  The Original Plan provided for either (a) the reorganization of the Debtors' business in connection with the completion of one or more licensing transactions

and a sale of the Debtors' remaining assets (the "Non-IP Assets") not required in connection with the go-forward business (the "Reorganization") or (b) the sale of all or substantially all of the Debtors' assets through one or more sales under section 363 of the Bankruptcy Code and the appointment of a plan administrator for purposes of distributing all proceeds of such sale(s) (the "Liquidation Scenario").

11.    In connection with the Original Plan on November 7, 2017, the Debtors filed the *Debtors' Motion for (I) an Order (A) Approving Bid Procedures For the Sale of Substantially All of the Debtors' Assets, (B) Approving Procedures For the Assumption and Assignment of Executory Contracts or Unexpired Leases in Connection with the Sale, (C) Scheduling a Sale Hearing and (D) Granting Certain Related Relief, and (II) an Order (A) Approving the Sale of the Debtors' Assets, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* [D.I. 248] (the "Original Sale Motion").

12.    Following the filing of the Original Plan and the Original Sale Motion, the Debtors agreed to the terms of a license agreement, a retail distribution agreement, and an asset purchase agreement (collectively, the "GBG Agreements") with GBG USA Inc. ("GBG").

13.    On December 4, 2017, the Debtors filed the *Debtors' First Amended Joint Plan of Reorganization* [D.I. 326, 346] (as amended for solicitation, the "Amended Plan" and as revised on January 17, 2018, the "Plan")[3] and the *Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization* [D.I. 327, 347] (as amended for solicitation, the "Disclosure Statement"). The Amended Plan removed the Liquidation Scenario and refined concepts related to the Reorganization in anticipation of the execution of the GBG Agreements.

---

[3] Undefined capitalized terms used herein shall have the meanings set forth in the Plan.

14.    On December 5, 2017, a hearing was held to consider approval of the bidding procedures relief requested in the Original Sale Motion and the approval of the Disclosure Statement.   At that hearing, the Debtors informed the Court that based on the developments in the transaction with GBG, any sale pursuant to the Original Sale Motion would be limited to the Debtors' interests in their unexpired retail leases of non-residential retail real property.

15.    On December 8, 2017, the Court entered the *Order (A) Approving Bid Procedures For the Sale of Certain of the Debtors' Nonresidential Real Property Leases, (B) Approving Related Assumption and Assignment Procedures, (C) Scheduling a Sale Hearing and (D) Granting Certain Related Relief* [D.I. 352] (the "Lease Sale Procedures Order").   However, the Debtors did not receive any bids for their leases and subsequently cancelled the related auction. *See Notice of Cancellation of Auction* [D.I. 380].

16.    The Court held a series of hearings on January 11th, 17th and 22nd related to confirmation of the Plan.   The hearing on confirmation of the Plan has been adjourned to February 14, 2018.   As a result of certain outstanding issues related to the Plan and the transactions proposed thereunder, the Debtors do not believe they will be able to procced with confirmation of the Plan on February 14, 2018.

17.    Instead, the Debtors file this emergency Motion requesting that the Court approve the Bid Procedures for the immediate sale of substantially all of the Debtors' assets.   The Bid Procedures are substantially similar to those proposed in the Original Sale Motion and similar to those approved under the Lease Sale Procedures Order. The Bid Procedures are designed to generate the greatest level of interest and the highest or otherwise best offer for the Debtors' Assets, including, without limitation, the Debtors' inventory, accounts receivable, deposits, fixtures, furniture and equipment, customer lists, intellectual property, interests in remaining

unexpired contracts and leases (the "Executory Contracts")[4] and any other available assets (collectively, the "Assets").  Consistent with the marketing process the Debtors and Piper Jaffray engaged in prior to and during these Chapter 11 Cases, the Bid Procedures intend to solicit (a) offers to purchase some or all of the Debtors' e-commerce, wholesale and/or first cost business lines as going concerns, (b) offers to purchase all or a portion of the Debtors' Assets for liquidation purposes, and (c) offers for some combination of a going concern and liquidation sale.

18.      Upon completion of the Sale, the Debtors will no longer have the ability to (a) maintain their customer programs, including honoring gift cards, returns, refunds, or exchanges, or (b) continue any promotional programs, including honoring coupons or the Debtors' loyalty club program.  The Debtors are in the process of updating their stated policies to indicate all sales are final and will seek relief related to the termination of customer programs at the Sale Hearing.

## THE PROPOSED BID PROCEDURES

19.      The Debtors seek approval of the Bid Procedures, which they have designed to be flexible and open to all variations of bids and facilitate a robust sale process thereby generating the greatest value for the Assets.

20.      The Debtors propose the following timeline for the solicitation of bids, the Auction (as defined below) and the Sale Hearing.  The timeline for the Sale is driven by the stage of these cases, the Debtors' limited liquidity, and the significant marketing for the Debtors' Assets that has already occurred.

---

[4] The Debtors have rejected, or will soon reject, all of their non-residential retail real property leases and such leases will not be included in the Assets.

| Action | Deadline |
|---|---|
| Bid Procedures Objection Deadline | TBD |
| Bid Procedures Hearing | TBD |
| Cure Notice Service | February 2, 2018 |
| Stalking Horse Deadline | February 5, 2018 at 5:00 p.m. (ET) |
| Bid Deadline | February 9, 2018 at 5:00 p.m. (ET) |
| Sale/Cure Objection Deadline | February 12, 2018 at 4:00 p.m. (ET) |
| Auction | February 12, 2018 at 10:00 a.m. (ET) |
| Adequate Assurance Objection Deadline | February 13, 2018 at 4:00 p.m. (ET) |
| Sale Hearing[5] | February 14, 2018 at 10:00 a.m. (ET) |

21.    The Bid Procedures describe, among other things, the requirements and manner in which bidders and bids become "qualified," the coordination of diligence efforts, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of any ultimately successful bidders.

a)    Bidder Requirements:  A party must submit the following documents to the Debtors in order to be a "Qualified Bidder" and be allowed to participate in the bidding process and receive access to conduct due diligence:

(1)    An executed confidentiality agreement substantially in form and substance satisfactory to the Debtors; and

(2)    Reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Assets identified in such party's bid.

See Bid Procedures, ¶ A.

b)    Bid Requirements: In order to be eligible to participate in the Auction, a Qualified Bidder must, on or before the Bid Deadline, deliver a written and executed copy of an asset purchase agreement and ancillary

---

[5]    The Debtors reserve all rights to request that the Court postpone or adjourn the Sale Hearing to a later date for any reason.

documents by which the potential bidder offers to purchase some or all of the Assets at a purchase price and upon the terms and conditions set forth therein  and which provides, or otherwise complies with, the items noted below (any such offer, a "Qualified Bid"):

(1)    Identifies the Assets (or the portion thereof) to be purchased, including (x) whether the bid contemplates a liquidation or operating any or all of the Debtors' business lines as going concerns, and (y) any Executory Contracts that would be assumed and assigned in connection with the proposed transaction;

(2)    Identifies, if applicable, the proposed form of adequate assurance of future performance with respect to any Executory Contracts that would be assumed and assigned in connection with the proposed transaction;

(3)    Constitutes a binding proposal regarding the assets sought to be acquired and the consideration to be paid; and

(4)    Remains irrevocable until 48 hours after the Sale Hearing;

(5)    Other than as agreed by the Debtors in connection with seeking approval of protections for a Stalking Horse Bidder (defined below), is not subject to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement; and

(6)    Is accompanied by a good faith deposit in the amount of 10% of the proposed purchase price (a "Good Faith Deposit").[6]

*See* Bid Procedures, ¶ B.  The DIP Lender and the Prepetition Term Loan Agent shall each be deemed a Qualified Bidder and shall not be required to provide a Good Faith Deposit. *See* Bid Procedures, ¶ C.

c)    Credit Bidding:  Qualified Bidders may credit bid some or all of their claims to the full extent permitted by section 363(k) of the Bankruptcy Code.  *See* Bid Procedures, ¶ I.  The DIP Lender and the Prepetition Term Loan Agent may each participate in the Auction and to the extent set forth in the Final DIP Order, may credit bid at any time up to the conclusion of the Auction, each in their sole and absolute discretion, any portion and up to the entire amount of their individual claims (a "Credit Bid").  Upon the exercise of a Credit Bid, the DIP Lender and Prepetition Term Loan Agent shall not be required to take title to or ownership of, or have any obligation in connection with or be deemed to have taken title to or ownership of, or have any obligation in connection with the Assets and the DIP Lender and the Prepetition Term Loan agent separately shall have the right to designate any person or entity it their respective sole and absolute

---

[6]    The Debtors may waive the deposit requirement for bidders that submit credit bids.

discretion that shall take title to the Assets that are subject to the Credit Bid. Neither the DIP Lender nor the Prepetition Term Loan Agent will be a Backup Bidder unless either consents in writing otherwise. *See* Bid Procedures, ¶ C.

d) <u>Due Diligence</u>: The Bid Procedures permit all Qualified Bidders to participate in the diligence process. *See* Bid Procedures, ¶ D.

e) <u>Conduct of Auction</u>: If more than one Qualified Bid is received with respect to the Sale, the Debtors will conduct an auction at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036 (the "<u>Auction</u>"). Bidding shall begin initially with the highest Qualified Bid and subsequently continue in minimum increments that will be announced by the Debtors after consultation with (i) Polk 33 Lending, LLC (the "<u>DIP Lender</u>"), (ii) THL Corporate Finance, Inc. (the "<u>Prepetition Term Loan Agent</u>"), (iii) the Prepetition Senior Noteholders and the Prepetition Subordinated Noteholders, and (iv) the official committee of unsecured creditors (the "<u>Committee</u>" and collectively with the parties at (i) – (iii), the "<u>Consultation Parties</u>"). The Debtors may conduct the Auction in the manner they determine will result in the highest, best or otherwise financially superior offer(s) for the Assets. The Auction shall be conducted openly. *See* Bid Procedures, ¶ E.

f) <u>Evaluation of Qualified Bids</u>: A Qualified Bid may be for all or some portion of the Assets and may contemplate a liquidation or the operating of any or all of the Debtors' business lines as going concerns. The Debtors reserve the right to determine the value of any Qualified Bid (either by itself or in connection with one or more other Qualified Bid), and which Qualified Bid constitutes the highest, best or otherwise financially superior offer. *See* Bid Procedures, ¶¶ B, F.

g) <u>Selection of Successful Bid(s)</u>: Upon the conclusion of the Auction, the Debtors and their advisors, in consultation with the Consultation Parties, shall (i) identify the bid or bids that constitute the highest and best offer for the Assets (such bid, the "<u>Successful Bid</u>" and such person submitting such bid the "<u>Successful Bidder</u>"), and (ii) may identify, in their discretion, the bid or bids that constitutes the next highest or best offer for the Assets (such bid the "<u>Backup Bid</u>" and such person submitting such bid the "<u>Backup Bidder</u>"), and, in each case, so notify the Successful Bidder and Backup Bidder. *See* Bid Procedures, ¶ F.

h) <u>Sale Hearing</u>: The Debtors request that the Sale Hearing take place at the omnibus hearing already scheduled for February 14, 2018, at 10:00 a.m. (ET). However, the Debtors reserve all rights to request that the Court postpone such Sale Hearing for any reason. *See* Bid Procedures, ¶ G.

i)      <u>Provisions Related to Stalking Horse Bidder(s)</u>: At any time on or prior to February 5, 2018 (the "<u>Stalking Horse Deadline</u>"), the Debtors (after consultation with the Consultation Parties) may enter into one or more stalking horse purchase agreement (each, a "<u>Stalking Horse Agreement</u>") with Qualified Bidders (each, a "<u>Stalking Horse Bidder</u>"). The Debtors shall not enter into Stalking Horse Agreements with more than one potential purchaser for a distinct set of Assets. Each Stalking Horse Agreement shall be subject to higher or better offers at the Auction and shall establish a minimum bid at the Auction for the Assets included in the Stalking Horse Agreement. The Stalking Horse Agreement may contain customary terms and conditions providing the Stalking Horse Bidder with reasonable bid protections (the "<u>Bid Protections</u>"). If the Debtors enter into any such Stalking Horse Agreement(s), (a) on or before the Stalking Horse Deadline, the agreement(s) shall be placed on the Court's docket and notice thereof shall be given to all parties who received notice of this Motion, all parties on the Debtors' 2002 notice list and all potential bidders; and (b) the Court shall conduct a hearing on a date that is one (1) or more business days thereafter, subject to the Court's availability, to approve the Debtors' entry into any Stalking Horse Agreements and consider approval of the proposed Bid Protections. The Bid Protections hearing may be adjourned or rescheduled without notice other than as stated on the record in court or in an appropriate agenda letter. *See* Bid Procedures, ¶ J.

22.      Other Highlighted Terms Under Local Rule 6004-1(b)(iv):

j)      <u>Local Rule 6004-1(b)(iv)(A)</u>. To the extent a proposed purchaser is an insider (within the meaning of section 101(31) of the Bankruptcy Code), the Debtors will make the necessary disclosures to the Court and take measures to ensure the fairness of the sale process and the proposed transaction.

k)      <u>Local Rule 6004-1(b)(iv)(B)</u>. The Debtors do not have any agreement between any interested bidder and the Debtors' management or key employees.

l)      <u>Local Rule 6004-1(b)(iv)(C)</u>. The Bid Procedures Relief does not include the granting of any release in favor of any entity.

m)      <u>Local Rule 6004-1(b)(iv)(F)</u>. The Debtors are requiring Qualified Bids to include a 10% good faith deposit, unless waived by the Debtors for credit bidding parties.

n)      <u>Local Rule 6004-1(b)(iv)(G)</u>. The Debtors do not currently have any interim management or other agreement with any party.

o)     <u>Local Rule 6004-1(b)(iv)(H)</u>.  The Debtors are not seeking to release any sale proceeds without further order of the Court.

p)     <u>Local Rule 6004-1(b)(iv)(I)</u>.  The Debtors are not seeking pursuant to this Motion to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.

q)     <u>Local Rule 6004-1(b)(iv)(J)</u>.  The Debtors will retain necessary books and records, or copies thereof, to enable them to administer their bankruptcy cases in any Sale.

r)     <u>Local Rule 6004-1(b)(iv)(K)</u>.  The Debtors are not seeking to sell avoidance actions.

s)     <u>Local Rule 6004-1(b)(iv)(L)</u>.  The Debtors are seeking to sell the Assets free and clear of successor liability claims.

t)     <u>Local Rule 6004-1(b)(iv)(M)</u>.  The Debtors are seeking to sell the Assets free and clear of all liens, claims and encumbrances to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code.

u)     <u>Local Rule 6004-1(b)(iv)(N)</u>.  Pursuant to the proposed Bid Procedures, Qualified Bidders may credit bid some or all of their claims to the full extent permitted by section 363(k) of the Bankruptcy Code

v)     <u>Local Rule 6004-1(b)(iv)(O)</u>.  The Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for any sale.

23.     The Debtors may modify the Bid Deadline, the date of the Auction or the date of the Sale Hearing to the extent necessary to obtain the highest or best offer for the available Assets.

**PROPOSED SALE NOTICE PROCEDURES**

24.     <u>Sale Notice</u>.  Within one (1) day after the entry of the Bid Procedures Order, or as soon thereafter as practicable (the "<u>Mailing Date</u>"), the Debtors (or their agents) shall serve a notice of the Auction and the Sale substantially in the form annexed hereto as **<u>Exhibit B</u>** (the "<u>Sale Notice</u>") by e-mail (if known) and first-class mail, postage prepaid, upon (i) the U.S. Trustee; (ii) counsel to the THL Corporate Finance, Inc., as the Term Loan Agent, Paul Hastings LLP, 71 S. Wacker Drive, Forty-Fifth Floor, Chicago, Illinois 60606 (Attn: Matthew Murphy),

mattmurphy@paulhastings.com; (iii) Palladin Consumer Retail Products, Attn: John Lawrence, John Hancock Tower, 200 Clarendon Street, 26th Floor, Boston, MA 02116; (iv) counsel to the Prepetition Senior Noteholders and the Prepetition Subordinated Noteholders, Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153 (Attn: Jacqueline Marcus), jacqueline.marcus@weil.com; (v) the Internal Revenue Service; (vi) the United States Attorney for the District of Delaware; (vii) counsel to the Committee, Cooley LLP (Attn: Michael Klein and Sarah A. Carnes), mklein@cooley.com and scarnes@cooley.com; (viii) counsel to the DIP Lender, Arent Fox LLP, 1675 Broadway, New York, New York 10019 (Attn: Robert M. Hirsh, Esq.), Robert.Hirsh@arentfox.com; (ix) any party known or reasonably believed to have asserted any lien, claim or encumbrance or other interest in the Debtors' Assets; (x) any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Debtors' Assets; and (xi) any parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002.  Such notice shall be sufficient and proper notice of the Sale with respect to known interested parties.

25.    The Debtors have requested that the deadline for filing an objection to the Sale shall be **February 12, 2018 at 4:00 p.m. (ET)** (the "Sale Objection Deadline").  Objections, if any, shall be in writing, filed with the Court and served upon: (i) co-counsel to the Debtors: (a) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036–8704 (Attn: Gregg M. Galardi), gregg.galardi@ropesgray.com; and (b) Bayard, P.A., 600 N. King Street, Suite 400, Wilmington, DE 198013 (Attn: Scott D. Cousins and Erin R. Fay) scousins@bayardlaw.com, efay@bayardlaw.com; (ii) the U.S. Trustee; (iii) counsel to the THL Corporate Finance, Inc., as the Term Loan Agent, Paul Hastings LLP, 71 S. Wacker Drive, Forty-Fifth Floor, Chicago, Illinois 60606 (Attn: Matthew Murphy), mattmurphy@paulhastings.com; (iv) Palladin Consumer

Retail Products, Attn: John Lawrence, John Hancock Tower, 200 Clarendon Street, 26th Floor, Boston, MA 02116; (v) counsel to the Prepetition Senior Noteholders and the Prepetition Subordinated Noteholders, Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153 (Attn: Jacqueline Marcus), jacqueline.marcus@weil.com; (vi) counsel to the Committee, Cooley LLP (Attn: Michael Klein and Sarah A. Carnes), mklein@cooley.com and scarnes@cooley.com; and (vii) counsel to the DIP Lender, Arent Fox LLP, 1675 Broadway, New York, New York 10019 (Attn: Robert M. Hirsh, Esq.), Robert.Hirsh@arentfox.com, so that it is actually received on or before the Sale Objection Deadline (collectively, the "Objection Notice Parties").

26.     Bidding Results.  As soon as practicable after the Bid Deadline, but no later than one (1) day after such deadline, the Debtors shall provide electronic notice on the case docket as to whether more than one Qualified Bid has been received and whether the Debtors will proceed with the Auction.  Such notice shall also contain a brief description of the Assets included in each Qualified Bid, specifically including a list of the Executory Contracts included in such bid.

27.     Auction Results.  As soon as practicable after the Auction, but no later than one (1) day after conclusion of the Auction, the Debtors shall provide electronic notice of the results thereof on the case docket.

## PROPOSED NOTICE OF ASSUMPTION AND ASSIGNMENT OF CONTRACTS

28.     As part of the Sale, the Debtors seek authority to potentially assume and assign certain of the Executory Contracts to the Successful Bidder(s).

29.     With respect to the Executory Contracts, no later than February 2, 2018, the Debtors will file with the Court and serve on each party to an Executory Contract a notice substantially in the form attached hereto as **Exhibit C** (the "Cure Notice") setting forth the

amount of cure owed thereunder according to the Debtors' books and records (the "Cure Amount"), (ii) notify each party that such party's Executory Contract may be assumed and assigned to the Successful Bidder to be identified at the conclusion of the Auction, (iii) state the date of the Sale Hearing; and (iv) state the deadline by which the non-Debtor party shall file an objection to the Cure Amount.

30.    The Debtors have requested that the deadline for filing an objection (a "Cure Objection") to the Cure Amounts shall be **February 12, 2018 at 4:00 p.m. (ET)** (the "Cure Objection Deadline").  Objections, if any, shall be in writing, filed with the Court and served upon the Objection Notice Parties, so that they are actually received on or before the Cure Objection Deadline.  Any objection to a Cure Amount must state with specificity what cure the party to the Executory Contract believes is required with appropriate documentation in support thereof.  If no objection is timely received, the Cure Amount set forth on the Cure Notice shall be controlling notwithstanding anything to the contrary in any Executory Contract or other document as of the date hereof or the date of the Cure Notice, as applicable.  Any objections not resolved by the Sale Hearing may be adjourned to a later hearing date as fixed by the Court.

31.    Any non-Debtor counterparty to any Executory Contract who does not file a Cure Objection by the Cure Objection Deadline, shall be forever barred from objecting to the Cure Amount or asserting or claiming any Cure Amount (other than the Cure Amount listed on the Cure Notice) against the Debtors or any Successful Bidder.

32.    Non-Debtor parties to the Executory Contracts may seek additional adequate assurance information by emailing their request (and explicitly agreeing in writing that they will keep any information they receive confidential) to counsel for the Debtors, Gregg M. Galardi, Esq. (Gregg.galardi@ropesgray.com), Alex McGee, Esq. (alex.mcgee@ropesgray.com), and

Erin R. Fay, Esq. (efay@bayardlaw.com) at least one day prior to the Auction.  Counsel for the Debtors will email adequate assurance packages to those parties as soon as practicable but no later than one day after the Auction.

33.    The Debtors have requested that the deadline for filing an objection (an "Adequate Assurance Objection") to the assumption and assignment of an Executory Contract on the basis of a lack of adequate assurance of future performance shall be **February 13, 2018 at 4:00 p.m. (ET)** (the "Adequate Assurance Objection Deadline").  Objections, if any, shall be in writing, filed with the Court and served upon the Objection Notice Parties, so that they are actually received on or before the Adequate Assurance Objection Deadline.  Any objections not resolved by the Sale Hearing may be adjourned to a later hearing date as fixed by the Court.

34.    Any non-Debtor party to an Executory Contract who does not file a timely Cure Objection or Adequate Assurance Objection shall be deemed to have consented to the assumption and assignment of its Executory Contract to the Successful Bidder and will be forever barred from objecting to such assumption and assignment on account of the Cure Amount, lack of adequate assurance or any other grounds.

35.    The hearing with respect to any Cure Objections and/or Adequate Assurance Objections may be held (i) at the Sale Hearing, or (ii) on such other date as the Bankruptcy Court may designate.  To the extent the Debtors and a non-Debtor counterparty to an Executory Contract are able to consensually resolve a Cure Objection or Adequate Assurance Objection prior to the Sale Hearing, the Debtors shall promptly provide notice to the Committee, the U.S. Trustee and the Successful Bidder, as applicable, of such resolution.

## IDENTIFICATION OF A STALKING HORSE BIDDER

36.     To further facilitate the monetization of the Debtors' Assets, the Debtors seek authority to select one or more Stalking Horse Bidders, in consultation with the Consultation Parties, and to provide any Stalking Horse Bidder with certain customary Bid Protections including a breakup fee and expense reimbursement.  If the Debtors are able to reach an agreement with any Stalking Horse Bidder by February 5, 2018, the Debtors propose to file a notice of entry into any such agreements and to supplement this Motion with the applicable disclosures required by Local Rule 6004-1. The Court would then hold a hearing to approve the Debtors' entry into any Stalking Horse Agreement and any Bid Protections.

## APPLICABLE AUTHORITY

### I.    THE BID PROCEDURES SHOULD BE APPROVED

37.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction.  The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Mushroom Transp.  Co*., 382 F.3d 325, 339 (3d Cir. 2004) (noting that the debtor in possession "had a fiduciary duty to protect and maximize the estate's assets").

38.     Courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F. 3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v. Integrated Res.  Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (noting that bid procedures "encourage bidding and ... maximize the value of the debtor's assets").

39.     The Debtors believe that the Bid Procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for the Assets because such procedures will ensure a competitive and fair bidding process.  The Debtors also believe that the Bid Procedures will promote active bidding from seriously interested parties and will generate the highest or otherwise best offer for the Assets.  The Bid Procedures will allow the Debtors to conduct the Auction (if more than one Qualified Bid is received), in a controlled and fair manner that will encourage participation by financially capable bidders that demonstrate the ability to close the Sale.

40.     The Debtors believe that the Bid Procedures are consistent with the bankruptcy bidding and auction procedures approved routinely in this District and are most likely to maximize the realizable value of their assets for the benefit of the Debtors' estates, creditors, and other parties in interest.  Indeed, this Court and other bankruptcy courts in this District have routinely approved similar bid procedures.  *See, e.g., In re iGPS Co.  LLC*, No. 13-11459 (KG) (Bankr. D. Del. July 03, 2013) [D.I. 234]; *In re Centaur, LLC*, No. 10-10799 (KJC) (Bankr. D. Del. July 28, 2010) [D.I. 489]; *In re RNI Winddown Corp*., No. 06-10110 (CSS) (Bankr. D. Del. Feb. 24, 2006) [D.I. 80].[7] Accordingly, the Debtors believe the Court should approve the Bid Procedures.

41.     The Debtors, with the assistance of their advisors, have been looking for strategic buyers, financial buyers, and capital providers for more than six months.  Throughout that process, the Debtors have exhaustively marketed themselves and their assets for sale, and multiple interested parties have conducted significant due diligence.  Nonetheless, the Bid

---

[7]     The referenced orders are voluminous in nature and are not attached to this motion; however, in accordance with Local Rule 7007-2, as made applicable to main cases by the Court's General Chambers Procedures, undersigned counsel has copies of each order and will make them available to the Court or to any party that requests them.

Procedures will allow any prospective bidders and other interested parties time before the Bid Deadline to conduct any due diligence required.  If other interested parties are discovered, the Debtors will provide every possible opportunity to such parties to conduct the due diligence such parties need to submit the best possible Qualified Bid.  The Debtors submit that the extensive process conducted since June 2017 has given potentially interested parties significant time, notice, and opportunity to conduct due diligence, and given current liquidity, a process on an expedited basis will best maximize value.

## II.    PROPOSED STALKING HORSE PROTECTIONS

42.    The Debtors have determined, in their reasonable business judgment, that proceeding with the sale process as requested herein without first entering into a "stalking horse" agreement is warranted and necessary.  The Debtors intend to pursue discussions with potential Stalking Horse Bidders and seek the right to enter into one or more Stalking Horse Agreements and provide certain Bid Protections if the Debtors believe that such an agreement will further the purposes of the Auction, by among other things, enticing value-maximizing bids.

43.    Accordingly, the Debtors request authority, in the exercise of their sound business judgment, and in consultation with the Consultation Parties, to agree to Stalking Horse Agreements and Bid Protections, including, *inter alia*, a break-up fee in an amount not to exceed 3% of the total guaranteed cash or cash-equivalent price plus reimbursement of reasonable and documented expenses, subject to an appropriate monetary cap.  Any agreement to provide a Bid Protections would be expressly conditioned on the Court's approval of such protections.  The Bid Protections would be an administrative expense claim against the Debtors' estates under section 503(b) of the Bankruptcy Code; *provided, however*, in the event that the Debtors agree to Bid Protections, and (a) the Successful Bidder is a result of such bidder's exercise of any credit

bid right, or (b) a sale of the property does not close for any reason on or before an agreed duration of time after entry of the Sale Order, then the Bid Protections would not be paid by the Debtors, their estates, or any other person or party, and no administrative obligation will be created, and any agreement by the Debtors to pay Bid Protections will provide and acknowledge the same.

44.     While such procedures are, admittedly, not always found in "naked" auctions, the Debtors believe that, in this case, such relief is warranted to ensure the Debtors' ability to take advantage of a potentially value-maximizing bid. The ability of the Debtors to offer a Stalking Horse Bidder the Bid Protections is beneficial to the Debtors' estates and creditors because it allows the Debtors to provide the incentive required to induce a potential bidder to submit or increase its bid prior to the Auction. To the extent bids can be improved prior to the Auction, a higher floor is established for further bidding. Thus, even if a Stalking Horse Bidder is offered the Bid Protections and ultimately is not the Successful Bidder, the Debtors and their estates will have benefited from the higher floor established by the improved bids. The Debtors will exercise prudent business judgment before offering or agreeing to any of the Bid Protections and will only do so if such protections, in the reasonable business judgment of the Debtors and in consultation with the Consultation Parties, will likely result in the realization of greater value for the Debtors and their estates.

45.     There is substantial justification for authorizing the Debtors to choose a Stalking Horse Bidder after approval of the Bidding Procedures but before an Auction in situations where (a) the stalking horse bidder is not readily apparent or the stalking horse agreement was not readily available at the time the bidding procedures motion was filed; (b) any such later determination to enter into a stalking horse agreement will only be made with the consent of

other constituents, such as the creditors committee; and (c) further court approval is sought. *See In re AFA Investment Inc.*, Case No. 12-11127 (MFW) (Bankr. D. Del. May 9, 2012) (authorizing Debtors to provide bid protections in the form of (i) a topping fee, (ii) a requirement that other bidders be obligated to agree to a form of asset purchase agreement no less favorable to debtors than the stalking horse agreement, and (iii) minimum initial and overbid increments; provided, that the top-up fee is expressly conditioned on consummation of the sale to another party and subject to court approval on two (2) business days' notice); *see also In re Archway Cookies LLC*, Case No. 08-12323 (CSS) (Bankr. D. Del. May 9, 2012) (approving stalking horse bidder, where motion stated the Debtors' intent to entertain stalking horse offers and indicated that, if one was accepted, the Debtors would apply to the bankruptcy court for approval and prior to hearing, a stalking horse was identified).

46.     In this case, the Debtors have not yet been presented with acceptable stalking horse bids but remain optimistic that such a bid will emerge for certain of the Assets. Under these circumstances, authorization of the Debtors to offer Bid Protections, subject to further Court approval, will be beneficial to the Debtors' efforts to maximize value for all constituents.

47.     Any Stalking Horse Bidder will have expended considerable time, money and energy pursuing and negotiating the transaction.  Accordingly, the Debtors may not be able to find a Stalking Horse Bidder without having the flexibility to offer the Bid Protections.  Further, such protections are warranted in light of the benefit to the Debtors' estates and creditors for providing a market-based indication of value to open the Auction and from the increased certainty of a transaction.  *See generally In re 95 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("breakup fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is

undertaking."); *In re Integrated Res., Inc.*, 147 B.R. 650, 660-61 (S.D.N.Y. 1992) (noting that break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

48.     The Debtors submit that any Bid Protections will be consistent with the applicable standards and should be approved as fair and reasonable.  *See, e.g., In re O'Brien Env't Energy. Inc.*, 181 F.3d 527 (3d Cir. 1999) (requiring bidding incentives such as break-up frees to provide benefit to the estate); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("the allowability of break-up fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate").

49.     First, the Debtors and their professionals will negotiate with any and all potential bidders to submit a Qualified Bid and serve as the Stalking Horse Bidder, which dispenses with any implication of self-dealing or a lack of arm's-length negotiations under the circumstances. Second, the Debtors believe, based on reasoned business judgment and in consultation with the Consultation Parties, that the ability to designate a Stalking Horse Bidder is warranted and is likely to increase the value to the estates from the proposed sale process by signaling the existence of a contractually-committed bidder at a floor price believed to be fair and reasonable while providing the opportunity of potentially receiving a higher or otherwise better offer which, absent such a bid floor, might not otherwise be realized.   Additionally, any proposed Bid Protections will be within the range of such fees and expenses approved by this and other courts.

Further, if the Bid Protections were to be paid, it will be because the Debtors have received a higher or otherwise better offer.

### III.  THE SALE NOTICE PROCEDURES ARE REASONABLE AND APPROPRIATE

50.     Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the Sale, including a disclosure of the time and place of any Auction, the terms and conditions of the Sale and the deadline for filing any objections thereto.

51.     The Debtors submit that the notice procedures described above comply with Bankruptcy Rule 2002 and the Local Rules and are reasonably calculated to provide timely and adequate notice of the Bid Procedures, the Auction and the Sale Hearing to the Debtors' creditors and other interested parties that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Debtors' Assets.

52.     Accordingly, the Debtors request that the Court approve the notice procedures set forth herein, including the form and manner of service of the Sale Notice and that no other or further notice of the Bid Procedures, the Auction and the Sale Hearing is necessary or required.

### IV.  THE SALE RELIEF

53.     By this Motion, the Debtors also request that the Court approve the Sale pursuant to sections 105, 363 and 365 of the Bankruptcy Code.  This portion of the relief is requested to be entered after the Sale Hearing.  The Debtors submit that the sale of substantially all of their Assets to a Successful Bidder(s) is in the best interests of the Debtors, their estates and stakeholders and should be approved.

#### A.     Sale Pursuant to Section 363(b)(1).

54.     Section 363(b)(1) of the Bankruptcy Code provides, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

55.    A debtor should be authorized to sell assets out of the ordinary course of business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan or reorganization if it demonstrates a sound business purpose for doing so. *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (finding that the sale of substantially all of debtor's assets outside of a reorganization plan is appropriate when a sound business reason justifies such a sale); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Mid-Am. Waste Sys.*, Case No. 97-104 (PJW) (Bankr. D. Del. Mar. 7, 1997).

56.    Courts have applied the following four factors in determining whether a sound business justification exists: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. *See Delaware & Hudson Ry.*, 124 B.R. at 175 (adopting *Lionel* factors to consider in determining whether sound business purpose exists for sale outside ordinary course of business in this District); *Lionel*, 722 F.2d at 1071 (setting forth the "sound business" purpose test); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the articulated business justification test of *Lionel* standard and adding the "good faith" requirement).

57.    As explained above, the Debtors have determined that their best opportunity to maximize creditor recoveries is to sell the Assets as described herein.  Accordingly, it is a valid

exercise of the Debtors' business judgment to seek approval of the transaction for the Sale of the

Debtors' Assets.

      **B.**      **Sale Free and Clear Pursuant to Section 363(f).**

    58.      Bankruptcy Code section 363(f) provides:

> The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if -
>
>     (1)      applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
>     (2)      such entity consents;
>
>     (3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
>     (4)      such interest is in bona fide dispute; or
>
>     (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363 (f).

    59.      The Debtors maintain that one of the five subsections of section 363(f) will be

satisfied in connection with the Sale, and therefore, the Debtors may sell their assets free and

clear of all liens, claims, and encumbrances.  Specifically, the Debtors will consult with the

Prepetition Term Loan Agent and the DIP Lender and seek to obtain their consent prior to

seeking approval of the particular Sale Relief.  Moreover, the Debtors submit that any such lien,

claim, or encumbrance will be adequately protected by attachment to the net proceeds of the sale,

subject to any claims and defenses the Debtors may possess with respect thereto.  In addition, the

Debtors incorporate by reference their arguments set forth in the *Reply in Support of*

*Confirmation and to Objections of Wiesner Products, Inc. and Moveon Componentes E Calcado*

[D.I. 459] in support of the free and clear nature of the Sale Relief.  The Debtors further reserve

their rights to make additional arguments related to the free and clear nature of the Sale Relief, including based on the recent decision in *In re Tempnology, LLC*, No. 16-9016, 2018 WL 387621 (1st Cir. Jan. 12, 2018).  Accordingly, the Debtors request that the assets be transferred to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances attaching to the proceeds of the sale of the Assets.

### C.   Authorization of Assumption and Assignment of Executory Contracts and Unexpired Leases.

60.    To enhance the value of the Debtors' Assets, the Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of the Executory Contracts, as applicable, to the Successful Bidder(s).  The Debtors further request that the Sale Order provide that such Executory Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in such Executory Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

61.    Bankruptcy Code section 365 (f) (2) provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if —
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

62.    Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section

365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing, in pertinent part that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> > (A)  cures, or provides adequate assurance that the trustee will promptly cure, such default ...;
> >
> > (B)  compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)  provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

63.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.),* 139 B. R. 585, 593 (S.D.N.Y. 1992); *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *see also In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla.  1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").

64.     Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

65.     The Debtors intend to present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Successful Bidder(s) to perform under any Executory Contracts the Debtors intend to assume and assign to such Successful Bidder(s).  The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder(s) to provide adequate assurance of future performance under the such contracts, as required under Bankruptcy Code section 365(b)(1)(C).  Further, as set forth above, the Debtors will give notice to all parties to the Executory Contracts of their intention to assume the Executory Contracts and what the Debtors believe are the Cure Amounts.  Accordingly, the Court should authorize the Debtors to assume and assign any or all Executory Contracts, as applicable, to the Successful Bidder(s).

**D.     The Successful Bidder(s) (and Any Designee), Should be Afforded All Protections Under Section 363(m) of the Bankruptcy Code.**

66.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from the debtor notwithstanding that authorization of the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) provides, in relevant part, as follows:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

67.     Section 363(m) "reflects the ... 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir.

1983)).  *See also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings"); *In re Stein & Day, Inc*., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) (same).

68.     As discussed above, the selection of the Successful Bidder(s) will be a product of arm's length and good faith negotiations.  Based on the foregoing, the Debtors request that the Court determine that the Successful Bidder(s) is a good faith purchaser entitled to protections of section 363(m) of the Bankruptcy Code.

### RESERVATION OF RIGHTS

69.     The Debtors expressly reserve the right to amend, modify, and/or supplement the relief requested in this Motion in all respects prior to or at the applicable hearing (and the Bid Procedures prior to or during the Auction) and reserve the right to withdraw this Motion, in whole or in part, prior to or at the applicable hearing.

### REQUEST FOR WAIVER OF LOCAL RULE 6004-1(b)

70.     Local Rule 6004-1(b) requires, among other things, that any motion to sell property of the estate pursuant to section 363 of the Bankruptcy Code attach "[a] copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale [and a] copy of a proposed form of sale order."  Del. Bankr. L. R. 6004-1(b).  As set forth above, the Debtors and their professionals have been and are continuing an aggressive marketing of the assets. Nevertheless, the terms of the Sale of the Assets, including, in particular, the identification of the to-be purchased Assets, the purchase price of such Assets, and the extent of assumed liabilities, are uncertain as of the date hereof.  Any such forms the Debtors might submit at this time would

be merely generic in nature, rather than based on any actual transaction or terms being proposed, and the ultimate transaction(s) and term(s) proposed could differ materially from any speculative forms presented at this time.  Consequently, filing such forms would offer little benefit and may be confusing to the parties receiving notice of this Motion.  Accordingly, the Debtors request a waiver of the provisions of Local Rule 6004-1 to the extent applicable.

### REQUEST FOR WAIVER OF BANKRUPTCY RULE 6004(h)

71.    The Debtors request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  To maximize the value of the Assets and to minimize unnecessary administrative expenses, it is critical that the Debtors consummate a Sale on the timeline proposed.  Accordingly, the Debtors request that the automatic fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

### NOTICE

72.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel: (i) the U.S. Trustee; (ii) counsel to the THL Corporate Finance, Inc., as the Term Loan Agent, Paul Hastings LLP, 71 S. Wacker Drive, Forty-Fifth Floor, Chicago, Illinois 60606 (Attn: Matthew Murphy), mattmurphy@paulhastings.com; (iii) Palladin Consumer Retail Products, Attn: John Lawrence, John Hancock Tower, 200 Clarendon Street, 26th Floor, Boston, MA 02116; (iv) counsel to the Prepetition Senior Noteholders and the Prepetition Subordinated Noteholders, Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153 (Attn: Jacqueline Marcus), jacqueline.marcus@weil.com; (v) the Internal Revenue Service; (vi) the United States Attorney for the District of Delaware; (vii) counsel to the Committee,

Cooley LLP (Attn: Michael Klein and Sarah A. Carnes), mklein@cooley.com and scarnes@cooley.com; and (viii) counsel to the DIP Lender, Arent Fox LLP, 1675 Broadway, New York, New York 10019 (Attn: Robert M. Hirsh, Esq.), Robert.Hirsh@arentfox.com; (ix) any party known or reasonably believed to have asserted any lien, claim or encumbrance or other interest in the Debtors' assets; (x) any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Debtors' assets; (xi) the counterparties to the Executory Contracts, and their counsel, if known, at the address set forth in the notice provision of such Executory Contracts, or if none, the last known address available to the Debtors; and (xii) any parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Bid Procedures Order, substantially in the form attached as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

Dated: January 24, 2018
      Wilmington, Delaware

BAYARD, P.A.

*/s/  Erin R. Fay*
Scott D. Cousins (No. 3079)
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 N. King Street, Suite 400
Wilmington, Delaware  19801
Phone: (302) 655-5000
Email: scousins@bayardlaw.com
      efay@bayardlaw.com
      gflasser@bayardlaw.com

-and-

ROPES & GRAY LLP
Gregg M. Galardi
Mark R. Somerstein
William A. McGee
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  (212) 596-9000
Facsimile:    (212) 596-9090
Email: gregg.galardi@ropesgray.com
      mark.somerstein@ropesgray.com
      alex.mcgee@ropesgray.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*