# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>AEROGROUP INTERNATIONAL, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 17-11962 (KJC)<br>(Jointly Administered)<br><br>**Re: D.I. 566, 618, 622** |

## NOTICE OF SUCCESSFUL BIDDER

PLEASE TAKE NOTICE that on January 31, 2018, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (A) Approving Bid Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Approving Procedures for the Assumption and Assignment of Executory Contracts or Unexpired Leases in Connection with the Sale, (C) Authorizing the Debtors to Enter Into Stalking Horse Agreements and Approving Certain Bid Protections, Subject to a Further Hearing, (D) Scheduling a Sale Hearing, and (E) Granting Certain Related Relief* [D.I. 566] (the "Bid Procedures Order")[2] that, among other things, approved procedures (the "Bidding Procedures") for the solicitation and consideration of competing offers for the sale of substantially all of the Debtors' assets.

PLEASE TAKE FURTHER NOTICE that in accordance with the Bid Procedures Order, the Auction was originally scheduled for February 12, 2018, and was adjourned to February 15, 2018 at 10:00 a.m. (ET).

PLEASE TAKE FURTHER NOTICE that the Auction was held on February 15, 2018, commencing at 10:00 a.m. (ET) and continuing until February 16, 2018 at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036. At the Auction, Alden Global Capital, LLC, was designated as the Successful Bidder pursuant to the form of Asset Purchase Agreement attached hereto as Exhibit A.

PLEASE TAKE FURTHER NOTICE that a hearing will be held to approve the sale of the Debtors' assets to the Successful Bidder (the "Sale Hearing") before the Honorable Kevin J. Carey, United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801, 6th Floor, Courtroom 1, on **February**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Aerogroup International, Inc. (6119), AGI Holdco, Inc. (7087), Aerogroup International LLC (4658), Aerogroup International Holdings LLC (4312), Aerogroup Retail Holdings, Inc. (4650), and Aerogroup Gift Card Company, Inc. (7551). The mailing address for the Debtors, solely for purposes of notices and communications, is: 201 Meadow Road, Edison, New Jersey 08817.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bid Procedures Order.

**16, 2018 at 3:00 p.m. (ET)**.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

PLEASE TAKE FURTHER NOTICE that this Notice and any Sale are subject to the fuller terms and conditions of the Bid Procedures Order, the Bidding Procedures, and any further orders of the Court.  The Debtors encourage parties-in-interest to review such documents in their entirety.  Copies of the Bid Procedures Order, Bidding Procedures, and this Notice may be obtained by calling the Debtors' claims and notice agent, Prime Clerk LLC at (844) 858-8887 or by visiting https://cases.primeclerk.com/Aerosoles/. The Debtors reserve their right to adopt other or further modifications to the Bid Procedures in accordance with the terms thereof and of the Bid Procedures Order.

Dated: February 16, 2018
      Wilmington, Delaware

BAYARD, P.A.

 /s/  Erin R. Fay_____
Scott D.  Cousins (No. 3079)
Erin R. Fay (No. 5268)
Gregory J.  Flasser (No. 6154)
600 N. King Street, Suite 400
Wilmington, Delaware  19801
Phone: (302) 655-5000
Email: scousins@bayardlaw.com
     efay@bayardlaw.com
     gflasser@bayardlaw.com

-and-

ROPES & GRAY LLP
Gregg M. Galardi
Mark R. Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  (212) 596-9000
Facsimile:   (212) 596-9090
gregg.galardi@ropesgray.com
mark.somerstein@ropesgray.com

*Co-Counsel for the Debtors*

## Exhibit A

**Form Asset Purchase Agreement**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

dated as of

February 13, 2018

by and among

AEROGROUP INTERNATIONAL, INC.
AGI HOLDCO, INC.
AEROGROUP INTERNATIONAL LLC
AEROGROUP INTERNATIONAL HOLDINGS LLC
AEROGROUP RETAIL HOLDINGS, INC.
AEROGROUP GIFT CARD COMPANY, INC.,

as the Sellers

and

ALDEN GLOBAL CAPITAL, LLC,

as the Buyer

# TABLE OF CONTENTS

PAGE

ARTICLE 1 DEFINITIONS ................................................................................. 1

    SECTION 1.01       Definitions .......................................................................... 1
    SECTION 1.02       Other Definitions and Interpretative Matters ................................. 8

ARTICLE 2 PURCHASE AND SALE ................................................................ 9

    SECTION 2.01       Purchase and Sale ............................................................ 9
    SECTION 2.02       Excluded Assets .............................................................. 11
    SECTION 2.03       Assumed Liabilities ......................................................... 11
    SECTION 2.04       Excluded Liabilities ........................................................ 12
    SECTION 2.05       Assignment of Contracts and Rights ...................................... 13
    SECTION 2.06       Purchase Price; Adjustments to Purchase Price ......................... 14
    SECTION 2.07       Good Faith Deposit ......................................................... 15
    SECTION 2.08       Closing ........................................................................ 15

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLERS ............................... 16

    SECTION 3.01       Organization and Qualification .......................................... 16
    SECTION 3.02       Corporate Authorization .................................................. 17
    SECTION 3.03       Execution and Delivery; Enforceability ................................ 17
    SECTION 3.04       No Conflict .................................................................. 17
    SECTION 3.05       Consents and Approvals .................................................. 17
    SECTION 3.06       Contracts .................................................................... 17
    SECTION 3.07       Litigation ................................................................... 18
    SECTION 3.08       Compliance with Laws and Court Orders ............................... 18
    SECTION 3.09       Title to the Purchased Assets ............................................ 19
    SECTION 3.10       Intellectual Property ...................................................... 19
    SECTION 3.11       Employees Matters ........................................................ 21
    SECTION 3.12       Inventory ................................................................... 21
    SECTION 3.13       Customers and Suppliers ................................................. 22
    SECTION 3.14       Taxes ....................................................................... 22
    SECTION 3.15       Bank Accounts ............................................................ 22
    SECTION 3.16       Undue Influence ........................................................... 22
    SECTION 3.17       Accuracy of Information Furnished ..................................... 22

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................................ 22

    SECTION 4.01       Corporate Existence and Power .......................................... 22
    SECTION 4.02       Corporate Authorization .................................................. 23
    SECTION 4.03       Execution and Delivery; Enforceability ................................ 23
    SECTION 4.04       Governmental Authorization ............................................. 23
    SECTION 4.05       Sufficiency of Funds ...................................................... 23
    SECTION 4.06       Inspections; No Other Representations .................................. 23

i

**Error! Unknown document property name.**

ARTICLE 5 COVENANTS OF SELLERS ................................................................. 23

    SECTION 5.01        Conduct of the Business.................................................. 23
    SECTION 5.02        Access to Information ..................................................... 24
    SECTION 5.03        Notices of Certain Events ............................................... 25
    SECTION 5.04        Minimum Overbid ........................................................... 25
    SECTION 5.05        Expense Reimbursement and Break-Up Fee ................. 25
    SECTION 5.06        Update of Disclosure Schedules ..................................... 26
    SECTION 5.07        Sale Free and Clear ........................................................ 26

ARTICLE 6 COVENANTS OF BUYER.................................................................... 26

    SECTION 6.01        Confidentiality ................................................................ 26
    SECTION 6.02        Notices of Certain Events ............................................... 26

ARTICLE 7 COVENANTS OF BUYER AND SELLERS ........................................ 26

    SECTION 7.01        Further Assurances.......................................................... 26
    SECTION 7.02        Certain Filings................................................................. 27
    SECTION 7.03        Public Announcements .................................................... 28
    SECTION 7.04        Bankruptcy Court Approval............................................ 28

ARTICLE 8 TAX MATTERS.................................................................................... 28

    SECTION 8.01        Tax Definitions ............................................................... 28
    SECTION 8.02        Tax Cooperation; Allocation of Taxes............................ 29
    SECTION 8.03        Purchase Price Allocation .............................................. 30

ARTICLE 9 CONDITIONS TO CLOSING................................................................ 30

    SECTION 9.01        Conditions to Obligations of Buyer and the Sellers...................... 30
    SECTION 9.02        Conditions to Obligation of Buyer................................. 30
    SECTION 9.03        Conditions to Obligation of the Sellers.......................... 31

ARTICLE 10 SURVIVAL ......................................................................................... 32

    SECTION 10.01       Survival .......................................................................... 32

ARTICLE 11 TERMINATION .................................................................................. 32

    SECTION 11.01       Grounds for Termination ................................................ 32
    SECTION 11.02       Effect of Termination...................................................... 33
    SECTION 11.03       Costs and Expenses......................................................... 34
    SECTION 11.04       Exclusive Remedies ....................................................... 34

ARTICLE 12 MISCELLANEOUS ............................................................................ 34

    SECTION 12.01       Notices ........................................................................... 34

**Error! Unknown document property name.**

SECTION 12.02    Amendments and Waivers ........................................................ 35
SECTION 12.03    Successors and Assigns............................................................. 35
SECTION 12.04    Governing Law ........................................................................ 36
SECTION 12.05    Jurisdiction .............................................................................. 36
SECTION 12.06    WAIVER OF JURY TRIAL...................................................... 36
SECTION 12.07    Counterparts; Third Party Beneficiaries .................................. 36
SECTION 12.08    Specific Performance ............................................................... 36
SECTION 12.09    Entire Agreement ..................................................................... 37
SECTION 12.10    No Strict Construction ............................................................. 37
SECTION 12.11    Non-Recourse .......................................................................... 37
SECTION 12.12    Severability .............................................................................. 37

EXHIBITS

Exhibit A          Form of Assignment and Assumption Agreement
Exhibit B          Form of Assignment of Patents
Exhibit C          Form of Assignment of Trademarks
Exhibit D          Form of Assignment of Copyrights
Exhibit E          Form of Assignment of Domain Names
Exhibit F          Form of Stalking Horse Order
Exhibit G          Form of Sale Order


SCHEDULES

Schedule 2.05(a)       Available Contracts
Schedule 3.04          Conflicts
Schedule 3.05          Approvals
Schedule 3.05(ii)      Transfer Consents
Schedule 3.06          Contracts
Schedule 3.07          Litigation
Schedule 3.08          Compliance with Laws and Orders
Schedule 3.10(a)       Material Intellectual Property
Schedule 3.10(b)       Encumbrances on Material Intellectual Property
Schedule 3.10(b)(i)    Inbound License Agreements
Schedule 3.10(b)(ii)   Outbound License Agreements
Schedule 3.10(c)(i)    Validity and Enforceability
Schedule 3.10(c)(ii)   Claims of Infringement
Schedule 3.11(a)       Employees
Schedule 3.11(b)       Compliance with Employment Laws
Schedule 3.12          Inventory
Schedule 3.15          Bank Accounts
Schedule 5.10(a)       Conduct of Business
Schedule 5.10(b)       Certain Inventory

**Error! Unknown document property name.**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of February 13, 2018 (the "**Agreement**") is by and among (i) Aerogroup International, Inc., a New Jersey corporation, AGI HoldCo, Inc., a Delaware corporation, Aerogroup International LLC, a Delaware limited liability company, Aerogroup International Holdings LLC, a Delaware limited liability company, Aerogroup Retail Holdings, Inc., a Delaware corporation and Aerogroup Gift Card Company, Inc., a Virginia corporation (each, a Seller and collectively, the "**Sellers**") and (ii) Alden Global Capital, LLC, a Delaware limited liability company (the "**Buyer**"). Sellers and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**".

### W I T N E S S E T H :

**WHEREAS**, the Sellers are engaged in the business of developing, licensing, marketing and selling women's footwear, hosiery and related goods and products (the "**Business**");

**WHEREAS**, the Sellers have sought relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended, the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on September 15, 2017 (the "**Petition Date**"); and

**WHEREAS**, upon entry of the Sale Order (as defined below), the Buyer desires to purchase the Purchased Assets (as defined below) and to assume the Assumed Liabilities (as defined below), upon the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

### ARTICLE 1

### DEFINITIONS

SECTION 1.01    *Definitions*.

(a)    The following terms, as used herein, have the following meanings:

"**Accounts Receivable**" means any and all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that has not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any Claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person; *provided*, *however*, that with respect to the Sellers, "Affiliate" shall mean only the other Sellers.

1

**Error! Unknown document property name.**

"**Auction**" means an auction, if any, for the sale of the Sellers' assets conducted pursuant to the terms and conditions of the Bid Procedures Order.

"**Avoidance Actions**" means any Claim or Causes of Action of the Sellers arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Purchased Assets or the Business.

"**Bid Procedures Order**" means the *Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Approving Procedures for the Assumption and Assignment of Executory Contracts or Unexpired Leases in Connection with the Sale, (C) Authorizing the Debtors to Enter Stalking Horse Agreements and Approving Certain Bid Protections, Subject to a Further Hearing, (D) Scheduling a Sale Hearing and (E) Granting Certain Related Relief* [Docket No. 566], entered by the Bankruptcy Court on January 31, 2018.

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Break-Up Fee**" means a cash amount equal to two percent (2%) of the Purchase Price; *provided*, *however*, that the aggregate amount of the Break-Up Fee plus the Expense Reimbursement shall not exceed $450,000; *provided*, *further*, that the Buyer shall be permitted, in its sole discretion, to allocate the amount to be attributed to each of the Expense Reimbursement and the Break-Up Fee if this Agreement is terminated as provided in Section 11.02(b).

"**Causes of Action**" means any legal, governmental, regulatory, suits, proceedings, investigations, Claims, arbitrations or actions, related to: liabilities, preference actions and preferential transfers, Contracts, debts, breaches of fiduciary duties, accounts, reckonings, bonds, bills, covenants, agreements, damages, judgments, third-party Claims, counterclaims, and cross-claims, including License Disputes, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereinafter arising, in law or equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Closing Date.

"**Claim**" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"**Closing Date**" means the date of the Closing.

"**Copyrights**" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"**Confidentiality Agreement**" means that certain non-disclosure agreement, dated January 29, 2018, by and between Piper Jaffray & Co., as agent for and on behalf of the Sellers, and Alden Global Capital, LLC.

**Error! Unknown document property name.**

"**Contract**" means any contract, agreement, insurance policy, capitalized lease, license, sublicense, sales order, purchase order, instrument or other commitment, whether written or oral, that is binding on any Person or any part of its property under applicable law.

"**Cure Costs**" means the liabilities and obligations of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' defaults under the Assumed Contracts at the time of (or any time after) the assumption thereof and assignment to Buyer as provided herein.

"**Debtors**" means those Persons defined as such in the Bid Procedures Order.

"**DIP Financing Order**" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status with Respect to the DIP Collateral; (II) Granting Adequate Protection to the Prepetition Secured Credit Parties; (III) Modifying the Automatic Stay; (IV) Authorizing the Debtors to Enter Into Agreements with Polk 33 Lending, LLC; (V) Authorizing Use of Cash Collateral; and (VI) Granting Related Relief* [Docket No. 231] entered into by the Bankruptcy Court on November 11, 2017.

"**Disclosure Schedules**" means the Disclosure Schedules attached hereto, dated as of the date hereof, delivered by Sellers to Buyer in connection with the execution of this Agreement, as the same may be supplemented and amended pursuant to Section 5.06.

"**Encumbrance**" means any charge, Lien, Claim, right, demand, mortgage, lease, debt, losses, damage, demand, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, license, sublicense, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, rights of others, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third party interest or other restriction or limitation of any kind, whether imposed by Contract, legal requirement, equity or otherwise, including any "interest" as that term is used in Section 363(f) of the Bankruptcy Code.

"**Excluded Records**" means, insofar as they relate to Sellers' business generally and are not required for the future ownership or operation of the Purchased Assets, (a) the general corporate files and records of Sellers, (b) employee files only to the extent such files are not transferable under applicable law, (e) privileged information and (f) any other files or records to the extent solely relating to any Excluded Assets.

"**Expense Reimbursement**" means an amount equal to the reasonable out-of-pocket costs, fees and expenses of Buyer (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses and all filing fees under the HSR Act) related to the transactions contemplated by this Agreement, which amount shall constitute a superpriority administrative expense of Sellers with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code and over the debtor-in-possession financing obligations under the DIP Financing Order;

3

**Error! Unknown document property name.**

*provided*, *however*, that the aggregate amount of the Expense Reimbursement plus the Break-Up Fee shall not exceed $450,000.

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Bankruptcy Rule 8002; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"**Governmental Authority**" means any (a) multinational, federal, state, municipal, local or other governmental or public department, central bank, court, commission, commissioner, tribunal, board, bureau, agency or instrumentality, domestic or foreign, (b) any subdivision or authority of any of the foregoing, (c) any quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the above, or (d) stock exchange, automated quotation system, self-regulatory authority or securities regulatory authority.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Intellectual Property**" means all rights and title in and to intellectual property and intangible property, including all Copyrights, Patents, Software, Trademarks and Trade Secrets.

"**Intercompany Receivables**" means any and all amounts that are owed (i) by any direct or indirect subsidiary or Affiliate of any Seller to any Seller, or (ii) from one Seller to another Seller, in each case pursuant to bona fide obligations, and all Claims relating thereto or arising therefrom.

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or Encumbrance in respect of such property or asset.

"**License Disputes**" means, collectively, any Claim or dispute between any Seller and any Licensee related to the Intellectual Property (including any Claim by a Licensee that the Purchased Assets cannot be acquired by the Purchaser free and clear of all Encumbrances held by any Licensee), including: (i) Wiesner Products, Inc., relating to that certain license agreement dated December 31, 2014 and any amendments thereto, (ii) Tata International Limited, relating to that certain license agreement dated March 1, 2012 and any amendments thereto, (iii) Moveon

4

**Error! Unknown document property name.**

Componentes e Calçado, S.A., relating to that certain license agreement dated March 1, 2012 (Tata International Limited as counterparty) and any amendments thereto and (iv) Moveon Componentes e Calçado, S.A., relating to that certain Letter re Nonexclusive Trademark License dated May 12, 2016.

"**Licensees**" means any licensee or sublicensee under any agreement or any other contract or arrangement pertaining to the Intellectual Property of Sellers, including the following licensees: (i) Wiesner Products Inc., (ii) Tata International Limited, (iii) AEE International Ltd., (iv) Moveon Componentes e Calcado, S.A., (v) Keuka Footwear, Inc., (vi) Green Cross Manufacturers Proprietary Limited, (vii) Comercial ECCSA S.A., (viii) Complement Pte. Ltd., (ix) Daphne Marketing Co., Ltd., (x) Daphne Investment (Group) Co., Ltd., (xi) Daphne International Holdings Ltd., (xii) RNA Resources Group Limited, (xiii) Rustan Commercial Corporation and Stores Specialists, Inc., (xiv) Indeka Imports Ltd., (xv) ABC SAL, (xvi) Tiendas Por Departamento Ripley S.A. (xvii) iCIMS.com, Inc., and (xviii) Crews LLC.

"**Material Adverse Effect**" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, states of fact or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (x) the Purchased Assets or the assets, properties, prospects, financial condition or results of operations of the Business (excluding the Excluded Assets and the Excluded Liabilities), or (y) the ability of Sellers to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but, with respect to clause (x) only, excluding (A) any change or effect to the extent that it results from or arises out of (i) the filing of the Chapter 11 Cases and that could have been reasonably anticipated by Buyer; or (ii) changes in any accounting regulations or principles or changes in accounting practices or policies that the Sellers are required to adopt; and (B) any change or effect of economic or political conditions (including acts of terrorism or war) to the extent that such conditions do not disproportionately affect the Sellers, taken as a whole, as compared to other companies in the same Business as Sellers.

"**Open Source License Terms**" means terms in any license, distribution model or other agreement for Software, libraries, or other codes (including middleware and firmware) (a "**Work**"), e.g., the GNU General Public License, Lesser/Library General Public License, the Common Development and Distribution License, and the Artistic License (including Perl), which require, as a condition of use, reproduction, modification and/or distribution of the applicable Work or of any other Software, libraries, or other code (or a portion of any of the foregoing), in each case that is incorporated into or relies on, linked to or with, derived from in any manner, or distributed with a Work (collectively, "**Related Software**"), any of the following:  (i) the making available of source code or any information regarding the Work or any Related Software; (ii) the granting of permission for creating modifications to or derivative Works of the Work or any Related Software; (iii) the granting of a royalty-free license, whether express, implied, by virtue of estoppel or otherwise, to any person under Intellectual Property rights regarding the Work alone, any Related Software alone or the Work or Related Software in combination with other hardware or Software; (iv) the imposition of any restrictions on future Patent licensing terms, or other abridgement or restriction of the exercise or enforcement of any Intellectual Property rights through any means; (v) the obligation to include or otherwise communicate to other Persons any form of acknowledgement and/or Copyright notice regarding the origin of the Work or Related

5

Software; or (6) the obligation to include disclaimer language, including warranty disclaimers and disclaimers of consequential damages.

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, precept, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other judicially sanctioned Person or body.

"**Ordinary Course of Business**" means the ordinary and usual course of normal day-to-day operations of Seller and the Business, consistent with past practice occurring prior to the Chapter 11 Cases.

"**Patents**" means all inventions (whether or not patentable or reduced to practice), all improvements, enhancements, and updates thereto, United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"**Permitted Encumbrances**" means Encumbrances specifically permitted by the Sale Order.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in Section 13(d)(3) of the Exchange Act) or Governmental Authority.

"**Related Party**" means each Seller, any shareholder, member, officer, director, manager of or holder of any equity interest in Sellers and/or the subsidiaries or any of their respective spouses, parents, siblings or children, as applicable.

"**Regulatory Approvals**" means those sanctions, rulings, consents, Orders, exemptions, permits and other approvals (including the lapse, without objection, of a prescribed time under a statute or regulation that states that a transaction may be implemented if a prescribed time lapses following the giving of notice without an objection being made), waivers, early termination authorizations, clearances or written confirmation of no intention to initiate legal proceedings from Governmental Authorities as required and as set out in Schedule 3.05 hereto.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"**Sale Order**" means an Order by the Bankruptcy Court, in the form attached hereto as **Exhibit G**, among other things, (i) approving this Agreement, (ii) authorizing the sale of the Purchased Assets to Buyer pursuant to section 363 of the Bankruptcy Code, free and clear of any Encumbrances (other than Permitted Encumbrances) (iii) authorizing the assumption and assignment to Buyer of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code and (iv) authorizing the other transactions contemplated by this Agreement.

**Error! Unknown document property name.**

"**Software**" means computer software, including all source code, object code, and documentation related thereto and all software modules, algorithms, assemblers, applets, compilers, flow charts or diagrams, tools and databases.

"**Trade Secrets**" means trade secrets, confidential and/or proprietary business information, such as business data bases, know-how, techniques, concepts, methods, processes, specifications, product designs, blue prints, surveys, customer reviews, formulae, reports, customer/vendor lists, mailing lists, business plans, employee training systems and manuals, and other proprietary or confidential information and know-how.

"**Trademarks**" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, d/b/a and fictitious business names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"**Transaction Document**" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(b)    Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Assignment of Patents | Section 2.08 |
| Assignment of Trademarks | Section 2.08 |
| Assignment of Copyrights | Section 2.08 |
| Assignment of Domain Names | Section 2.08 |
| Assumed Contracts | Section 2.05 |
| Assumed Liabilities | Section 2.03 |
| Assumption Agreement | Section 2.08 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Bankruptcy Period | Section 12.05 |
| Buyer | Preamble |
| Buyer Designee | Section 2.01 |
| Cash Consideration | Section 2.06 |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.08 |
| Code | Section 8.01 |
| FCPA | Section 3.16 |
| E-Commerce Business | Section 2.01(b) |
| End Date | Section 11.01 |
| Excluded Assets | Section 2.02 |
| Excluded Contracts | Section 2.05 |
| Excluded Liabilities | Section 2.04 |
| Good Faith Deposit | Section 2.07 |

7

**Error! Unknown document property name.**

| | |
|---|---|
| Income Tax | Section 8.01 |
| Inbound License Agreements | Section 3.10 |
| Inventory | Section 2.01 |
| Material Intellectual Property | Section 3.10 |
| Outbound License Agreements | Section 3.10 |
| Party | Preamble |
| Petition Date | Recitals |
| Purchased Assets | Section 2.01 |
| Purchase Price | Section 2.06 |
| Sellers | Preamble |
| Seller Software | Section 3.10 |
| Seller Systems | Section 7.04 |
| Stalking Horse Order | Section 8.01 |
| Tax | Section 3.10 |
| Taxing Authority | Section 8.01 |
| Tax Return | Section 8.01 |
| Transfer Consent | Section 2.05 |
| Transfer Taxes | Section 8.02 |

SECTION 1.02    *Other Definitions and Interpretative Matters*.    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(a)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day. Any reference in this Agreement to days (but not Business Days) means to calendar days.

(b)    Any reference in this Agreement to $ means U.S. dollars.

(c)    Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(d)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(e)    The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "**Section**" or "**Article**" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(f)    Words such as "**herein**," "**hereof**" and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

8

**Error! Unknown document property name.**

(g)     The word "**including**" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h)     References to laws, rules and regulations shall include such laws, rules and regulations as they may from time to time be amended, modified or supplemented.

(i)     Reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented or restated through the date as of which such reference is made

(j)     References to any Person shall include its permitted successors and assigns and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities.

ARTICLE 2

PURCHASE AND SALE

SECTION 2.01     *Purchase and Sale*.  Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer and/or one or more other Persons designated by Buyer (a "**Buyer Designee**"), and Buyer and/or one or more Buyer Designees shall purchase, acquire and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Sellers' direct or indirect right, title and interest in, to or under the Business and the following (collectively, the "**Purchased Assets**"): all of Sellers' properties, rights, Claims and assets (other than the Excluded Assets) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, licensed, used or held for use in or relating to the Business, whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date. Without limiting the generality of the prior sentence, such Purchased Assets shall include, whether they relate exclusively to the Business or not (except where so noted in the following list or in any definition used in the following list) all of the following:

(a)     all Intellectual Property owned by Sellers, in whole or in part, and/or used or held for use in connection with the Business, together with any and all other rights and interests in such Intellectual Property, regardless of whether such rights and interest arise under an Assumed Contract, including all royalty interests, profits interests and all other interests of any kind or character;

(b)     all assets and property that comprise the Seller's e-commerce business, including all Intellectual Property related to the same (the "**E-Commerce Business**");

(c)     all customer sales, marketing, advertising, display materials, medial materials, packaging and promotional materials and other similar materials, files, lists, data, Software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical

9

**Error! Unknown document property name.**

information and data, and all other business and other records, in each case, that are used or useful in, held for use in, or that arise in any way out of or are related to, the Purchased Assets, the Assumed Liabilities or the Business;

(d)　　all samples, materials, fabrics and other similar items relating to the Purchased Assets and/or the Business whether acquired prior to or after the date hereof;

(e)　　except to the extent related to the Excluded Assets or the Excluded Liabilities, all Claims, interests, rights, rebates, abatements, remedies, recoveries, goodwill, customer and referral relationships, other intangible property and all privileges, set-offs and benefits of Sellers, and all Claims, demands, indemnification rights, Causes of Action, arising under or relating to any of the Purchased Assets (including the Intellectual Property owned by Sellers), the Assumed Liabilities or the Business, including those arising out of Assumed Contracts, express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Business or affecting the Inventory or other tangible Purchased Assets (*provided*, *however*, that the Purchased Assets shall not include, for the avoidance of doubt, any Avoidance Actions or any Claims or Causes of Action owned by the Sellers against officers and directors of Sellers, any equity holder of Sellers, or GBG USA Inc. in connection with or related to any actions taken by GBG USA Inc. in connection with or related to the Chapter 11 Cases);

(f)　　all Causes of Action, including past or present infringement or misappropriation of Intellectual Property owned by Sellers, and all express or implied guarantees, warranties, representations, covenants, indemnities, rights, Claims, counterclaims, defenses, credits, rights of contribution, rights to refunds, rights to set off or subrogation, rights of reimbursement and other rights of recovery, including any insurance proceeds in respect to any of the foregoing (regardless of whether such rights are currently exercisable);

(g)　　all of the files, records, information, and data, whether written or electronically stored, in Seller's possession and primarily relating to the Business, the Purchased Assets or the Assumed Liabilities;

(h)　　all Accounts Receivable and Intercompany Receivables, whether or not reflected on the books of Sellers as of the Closing Date;

(i)　　all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent), except professional fee retainers;

(j)　　other than as set forth in Section 2.04(e), all inventory of any kind or nature, merchandise and goods, related to the Business or the Purchased Assets and maintained, held or stored by or for Sellers on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including any goods in transit, other than any such items to the extent related to the Excluded Assets, and any prepaid deposits paid

10

by the Sellers to any suppliers for any finished or unfinished, or yet-to-be started, merchandise or goods (collectively, the "**Inventory**");

(k)　　all rights to any refunds of Taxes (or other related costs or expenses) that are borne by or the responsibility of Sellers, attributable to any Tax asset of Sellers, or to which Sellers are otherwise entitled;

(l)　　all Assumed Contracts, including all rights under such Contracts whether currently in effect or previously terminated, including all royalty payments due and payable under such Contracts;

(m)　　all rights under any Contract that has been previously rejected by the Sellers or approved as rejected by the Bankruptcy Court, including all royalty payments due and payable under such Contracts; and

(n)　　all personal property, fixtures and improvements (to the extent movable) on any real property or lease interest of the Sellers.

SECTION 2.02　*Excluded Assets*.　Notwithstanding any provision to the contrary set forth in this Agreement, Buyer expressly understands and agrees that any assets and properties of the Sellers not set forth in Section 2.01 (the "**Excluded Assets**") shall be excluded from the Purchased Assets, including the following:

(a)　　unless expressly designated by Buyer as an "Assumed Contract" in accordance with Section 2.05, the real property and leases of, and other interests in, real property, in each case together with all buildings, fixtures and improvements erected thereon;

(b)　　the Excluded Records;

(c)　　the Purchase Price;

(d)　　all cash and cash equivalents as of the Closing Date;

(e)　　all shares of capital stock or other equity interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interest of any Seller owned by any other Seller; and

(f)　　any Avoidance Actions and any Claims or Causes of Action owned by the Sellers against officers and directors of Sellers, any equity holder of Sellers or GBG USA Inc. in connection with or related to any actions taken by GBG USA Inc. in connection with or related to the Chapter 11 Cases.

SECTION 2.03　*Assumed Liabilities*.　Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume the following liabilities and obligations, and only such liabilities and obligations, of the Sellers (the "**Assumed Liabilities**"):

11

(a)    all liabilities and obligations of each Seller relating to the Assumed Contracts (including all Cure Costs relating to Assumed Contracts); and

(b)    all liabilities and obligations arising out of the Purchased Assets for periods following the Closing Date.

Notwithstanding anything to the contrary set forth herein, the assumption by Buyer of any Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

SECTION 2.04    *Excluded Liabilities*.    Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of any Seller of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain obligations and liabilities of the Sellers (all such liabilities and obligations not being assumed being herein referred to as the "**Excluded Liabilities**"), including, without limitation:

(a)    any and all liabilities for Transfer Taxes or Taxes (i) of or imposed on the Sellers (or any member or Affiliate of the Sellers) or (ii) related or attributable to the Purchased Assets or the Business for any pre-Closing period;

(b)    any amounts due to Affiliates of any Seller or Seller Related Party, including any declared dividends or distributions;

(c)    any indebtedness for borrowed money, bank loans or facilities or any other debt instruments;

(d)    any obligations or liabilities related to any pending litigation to which any Seller is a party and relating to the Business;

(e)    any obligations or liabilities with regard to any unpaid Inventory (whether such payments came due prior to, on or following the Petition Date) for which the Buyer is unable to reach a consensual resolution with the counterpart of such Inventory, including any liabilities relating to any Inventory for which the Debtors have pre-paid amounts for such Inventory;

(f)    all liabilities and obligations arising under any Contract that is not an Assumed Contract;

(g)    any liability or obligation under any employment agreement, collective bargaining agreement, benefit plan or any other retirement, retention, severance, deferred compensation or similar arrangement with any employee, consultant or contractor (or its representatives) of any Seller;

(h)    any liability or obligation of the Sellers related to the Sellers' present or former employees, officers, directors, retirees, independent contractors or consultants arising based on any act or omission of the Sellers (or any predecessor of any Seller), including any liability or obligation associated with any Claims arising under any law or regulation respecting employment and employment practices, including with respect to vacation, payroll, sick leave,

12

**Error! Unknown document property name.**

unemployment benefits, retirement benefits, severance, retention, termination, pension benefits, employee stock option, equity compensation, employee stock purchase, or profit sharing plans, health care and other welfare plans or benefits (including COBRA), or any other employee plans or arrangements or benefits, payments or other compensation of any kind to any employee, including under any benefit plans, programs and arrangements of any Seller, and liability or obligation of the Sellers (and their predecessors) pursuant to the WARN Act;

(i)    any insurance payables and trade payables and expenses arising prior to the Closing Date;

(j)    any costs or expenses payable by the Sellers in connection with the transactions contemplated by this Agreement, other than as specifically set forth herein;

(k)    any liability or obligation of any Seller related to any gift card, store credit, mark down allowance or margin support;

(l)    any liability or obligation of any Seller with respect to workers compensation;

(m)    any brokerage, commission, finders or similar fees, which in connection with the transactions contemplated by this Agreement or otherwise, pursuant to any arrangement with any Seller, subsidiary or any Affiliate thereof; and

(n)    any other liability or obligation, including liabilities for Taxes related to the Excluded Assets.

SECTION 2.05    *Assignment of Contracts and Rights.*

(a)    Schedule 2.05(a) sets forth a list of all executory Contracts (including all Intellectual Property Contracts) relating to the Business or the Purchased Assets to which one or more of Sellers are party (the "**Available Contracts**"), which Schedule 2.05(a) may be updated from time to time to add or remove any Contracts inadvertently included or excluded from such schedule.  Until the Closing Date, Buyer, in its sole discretion by written notice to Sellers, shall designate in writing which Available Contracts from Schedule 2.05(a) relating to the Business or the Purchased Assets that Buyer wishes to "Assume" (the "**Assumed Contracts**") and subject to the right of Buyer, at any time prior to the Closing Date, Buyer may determine not to "Assume" any Available Contracts previously designated as an Assumed Contract.  All Contracts of Sellers that are listed on Schedule 2.05(a) and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Purchased Assets and shall automatically be deemed "**Excluded Contracts**" (and for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs); *provided*, *however*, that the failure to include any Contract on Schedule 2.05(a) shall not affect Buyer's rights under Section 2.01(m). Upon Buyer's reasonable request, Sellers shall provide additional detailed information as to the liabilities under the Contracts sufficient for Buyer to make an informed assessment whether to accept an assignment and assumption of such Contract hereunder.

(b)    In the event of a dispute regarding assumption and assignment or cure of any Contract proposed to be an Assumed Contract as set forth in Section 2.05(a), any applicable Cure Costs shall be made by Buyer only upon entry of an Order by the Bankruptcy Court resolving

13

any such dispute (or upon the consensual resolution of such dispute as may be agreed by Buyer and such counterparty). Buyer shall have the right to designate any Assumed Contract as an Excluded Contract at any time following the Closing Date in the event any such dispute is not resolved to Buyer's satisfaction. Upon an election by Buyer to designate such previously Assumed Contract as an Excluded Contract in accordance with this Section 2.05(b), Buyer shall have no liability or other obligation whatsoever to the counterparty to such contract that may arise prior to or after the Closing Date.

(c)      Sellers shall use commercially reasonable efforts to assign, or cause to be assigned, the Assumed Contracts to Buyer, including taking all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

(d)      Sellers shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to the Sale Order. Except as to Assumed Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), would constitute a breach or in any way adversely affect the rights of Buyer or the Sellers thereunder. If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, the Sellers and Buyer will cooperate in a mutually agreeable arrangement (at Sellers' cost and expense) under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

(e)      At Closing, (i) Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assume and assign, or cause to be assigned, to Buyer (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned, (ii) subject to Section 2.05(b), Buyer shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as set forth in this Agreement, any filing with the Bankruptcy Court, as agreed to by Buyer and the contract counterparty, or as determined by the Bankruptcy Court), and (ii) Buyer shall assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order and the Assignment and Assumption Agreement. For the avoidance of doubt, Buyer shall be permitted to purchase Assumed Contracts and renegotiate and finalize Cure Costs (if any) after the Closing Date.

SECTION 2.06    *Purchase Price; Adjustments to Purchase Price.*

(a)      On the terms and subject to the conditions contained herein, including as set forth in Section 2.06(c), the purchase price (the "**Purchase Price**") for the Purchased Assets shall consist of:

(i)      cash equal to $26,175,000 (the "**Cash Consideration**"), subject to adjustment as set forth in Section 2.06(c); and

14

**Error! Unknown document property name.**

(ii)    subject to Section 2.05(b), the Cure Costs related to the Assumed Contracts; and

(iii)    the assumption of the Assumed Liabilities.

(b)    At the Closing, Buyer shall pay to the Sellers the Purchase Price less the Good Faith Deposit, by wire transfer of immediately available funds to an account or accounts designated by the Sellers at least one (1) day prior to the Closing Date.

(c)    The Purchase Price set forth above shall be subject to automatic reduction as set forth below:

(i)    If the value of the Inventory and Accounts Receivable, collectively, is less than (A) $5,300,000 for the value of the Inventory (in the distribution center & in-transit) and (B) $3,449,000 less SR&A (i.e. sales, returns, and allowances) of $1,044,000 for the value of the Accounts Receivable, then the amount of Cash Consideration payable by Buyer under Section 2.06 shall be automatically reduced at Closing, on a dollar-for-dollar basis, in an amount equal to such shortfall; and

(ii)    At Buyer's option (and in its sole discretion), the Cash Consideration shall be automatically reduced at Closing by an amount equal to the Expense Reimbursement.

SECTION 2.07    *Good Faith Deposit*.

(a)    As soon as reasonably practicable following entry of the Stalking Horse Order, Buyer shall deposit (or cause to be deposited) cash in the amount of $2,300,000 (the "**Good Faith Deposit**") to be held in escrow, subject to an escrow agreement reasonably satisfactory in form and substance to both Buyer and Sellers, to be applied as provided in Section 2.07(b).

(b)    The Good Faith Deposit (and any interest accrued thereon) shall be transferred to Sellers at the Closing as a credit against the Purchase Price. The Good Faith Deposit (and any interest accrued thereon) shall be returned to Buyer in the event of a termination pursuant Section 11.01.

SECTION 2.08    *Closing*. The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York, as soon as possible, but in no event later than five (5) Business Days, after satisfaction of the conditions set forth in Article 9, or at such other time or place as Buyer and the Sellers may agree. At the Closing:

(a)    Buyer shall deliver to the Sellers:

(i)    the Purchase Price less the Good Faith Deposit as described in Section 2.06 and any adjustments contemplated under Section 2.06(c);

**Error! Unknown document property name.**

(ii)    one or more assignment and assumption agreements, in the form attached hereto as **Exhibit A** (the "**Assumption Agreements**") and each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(iii)    such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Purchased Assets and Assumed Liabilities to Buyer; and

(iv)    a schedule of Assumed Contracts in accordance with Section 2.05(a).

(b)    Sellers shall deliver to Buyer:

(i)    the Assumption Agreements, and each other Transaction Document to which any Seller is a party, duly executed by each applicable Seller;

(ii)    instruments of assignment of the Patents (the "**Assignment of Patents**"), Trademarks (the "**Assignment of Trademarks**"), Copyrights (the "**Assignment of Copyrights**") and Domain Names (the "**Assignment of Domain Names**") that are included in the Purchased Assets, if any, duly executed by Sellers in a form appropriate for recordation with the appropriate Governmental Authorities in the form of **Exhibits B**, **C**, **D** and **E**, respectively;

(iii)    certificate of non-foreign status executed by each Seller (or, if applicable, a direct or indirect owner of a Seller) that is not a disregarded entity for U.S. federal Income Tax purposes, prepared in accordance with Treasury Regulation Section 1.1445-2(b);

(iv)    such other deeds, bills of sale, endorsements, consents, assignments and other good and sufficient instruments of conveyance and assignment as the parties and their respective counsel shall deem reasonably necessary to vest in Buyer all right, title and interest in, to and under the Purchased Assets; and

(v)    Lien releases and termination statements, each in form and substance acceptable to Buyer, with respect to all Encumbrances (other than Permitted Encumbrances) related to the Purchased Assets.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Buyer:

SECTION 3.01    *Organization and Qualification*.  Each Seller has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted.  Each Seller, as applicable, has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws

16

**Error! Unknown document property name.**

of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification.

SECTION 3.02    *Corporate Authorization*.  The execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby are within the Sellers' corporate powers and have been duly authorized by all necessary corporate action on the part of each Seller.  Each Seller has the full legal right, power, authority and capacity to execute and deliver this Agreement and each agreement, certificate, document and instrument to be executed and delivered pursuant to the this Agreement, as applicable and to consummate the transactions contemplated hereby and thereby and to performs its obligations hereunder and thereunder.

SECTION 3.03    *Execution and Delivery; Enforceability*.  This Agreement has been duly and validly executed and delivered by the Sellers, and, subject to the Bankruptcy Court's entry of the Sale Order will constitute the valid and binding obligation of the Sellers, enforceable against the Sellers in accordance with its terms.

SECTION 3.04    *No Conflict*.  Except as set forth on <u>Schedule 3.04</u>, the execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate (A) the formation or charter documents of any Seller, as applicable (B) any note, bond, mortgage, indenture, deed of trust, license, franchise permit, concession, contract, lease, agreement or other instrument, obligation or agreement of any kind to which any Seller is a party or by which any Seller may be bound or affected (C) any provision of law, statute, rule or regulation (D) any applicable Order of any court or any rule, regulation or Order of any Governmental Authority, where any such conflict, violation, breach or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (E) any provision of or result in the termination of any Assumed Contract or (ii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Sellers, other than the Permitted Encumbrances.

SECTION 3.05    *Consents and Approvals*.  Except as set forth on <u>Schedule 3.05</u> or otherwise in this Agreement, no consent, approval, authorization, Order, registration or qualification of or with any third party, court, Governmental Authority or body having jurisdiction over the Sellers or any of their properties is required for the execution and delivery by the Sellers of this Agreement and performance of and compliance by the Sellers with all of the provisions hereof and the consummation of the transactions contemplated herein, except (i) the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the Transfer Consents identified on <u>Schedule 3.05(ii)</u>, including filings with respect to and any consents, approvals or expiration or termination of any waiting period, under any antitrust or foreign investment laws which may include the HSR Act and any other Regulatory Approvals required, and (iii) such consents, approvals, authorizations, registrations or qualifications the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06    *Contracts*.

17

**Error! Unknown document property name.**

(a)      Except as may have occurred solely as a result of the commencement of the Chapter 11 Cases, each of the Assumed Contracts is in full force and effect and there are no material defaults thereunder on the part of any other party thereto which are not subject to an automatic stay, and none of the Sellers is in default in any material respect in the performance, observance or fulfillment of any of its obligations, covenants or conditions contained in any Assumed Contract to which it is a party or by which it or its property is bound which are not subject to an automatic stay.  Each Assumed Contract was entered into at arm's length and in the Ordinary Course of Business and, subject to the Sale Order and the assignment of each Assumed Contract by the applicable Seller in accordance with applicable Law, is a valid and binding obligation of the Seller and the other parties thereto and is in full force and effect in accordance with its terms.

(b)      Except as set forth on Schedule 3.06, no Seller is currently bound in respect of the Business by:

(i)      any employment or consulting Contracts, whether written or oral;

(ii)      any license agreement requiring annual payments by any Seller or third party in excess of $10,000;

(iii)      any Contract for the future purchase of materials, supplies or equipment pursuant to which any Seller (A) is obligated to spend more than $10,000 annually or in the aggregate under any such Contract, or (B) which was not entered in the Ordinary Course of Business; and

(iv)      any agreements with suppliers or customers of any Seller which were not entered into in the Ordinary Course of Business.

SECTION 3.07      *Litigation*.  Except as set forth on Schedule 3.07, there are no Causes of Action pending to which any of the Sellers is or may be a party, including any Causes of Action pending or, to the Knowledge of Sellers, threated (a) to restrain or prevent the transactions contemplated by this Agreement, or (b) otherwise affecting or relating to the Purchased Assets, before any Governmental Authority or any arbitrator, including without limitation a seizure procedure; nor, to the Knowledge of Sellers, has there occurred any event or circumstance that is reasonably expected to give rise to or serve as a basis for any such proceeding.

SECTION 3.08      *Compliance with Laws and Court Orders*.

(a)      Except as set forth in Schedule 3.08, none of the Sellers is, or has been at any time since June 30, 2016, in violation of any law or statute or any judgment, Order, rule or regulation of any court or arbitrator or governmental or regulatory authority.  No Seller has received any written communication from a Governmental Authority that alleges any Seller is not in compliance with any applicable Law in respect of the conduct of the Business as it relates to the Purchased Assets.

(b)      Sellers are aware of applicable Laws of the jurisdictions in which each Seller conducts business relating to the Purchased Assets and pertaining to trade, including import and

18

**Error! Unknown document property name.**

export controls, customs Laws, international trade Laws, economic sanctions, and anti-corruption or anti-bribery Laws (collectively, "**Trade Laws**"). Sellers are in compliance in all material respects with Trade Laws and none of the past acts or omissions of the Sellers would subject Buyer or any of its Affiliates to any material liability or loss. No Seller has received any oral or written communication from any Governmental Authority that it is under investigation or being audited under any Trade Law nor, to the Knowledge of Sellers, is any investigation or audit threatened during the last three (3) years, no Seller has received any written or oral communication from any Governmental Authority or other Person alleging noncompliance by any Seller with any Trade Law which has not been fully resolved with such Governmental Authority or other Person.

(c)     Each Seller has at all times maintained a system of internal accounting controls and policies and procedures relating to itself that provide assurance that all expenditures relating to the business conducted in connection with the Purchased Assets are captured and accurately reflected on its books and records.

(d)     To the Knowledge of the Sellers, any products manufactured, distributed or sold by or on behalf of the Business relating to the Purchased Assets, complied in all material respects with all applicable consumer product safety Laws and all voluntary industry standards and are and were safe for consumers as required by Law. No Seller has received any written or oral communication from any Governmental Authority alleging noncompliance with any such consumer product safety Laws and industry standards.

(e)     No Seller has received any written or oral communication from any Governmental Authority or other Person alleging noncompliance with any Laws applicable to the operations of Sellers in connection with the Business as currently conducted that relate to the environment, preservation or reclamation of natural resources, or to the protection of human health as it relates to environment or to the management, release or threatened release of hazardous materials.

SECTION 3.09     *Title to the Purchased Assets*.  Upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 2.08, and subject to the terms of the Sale Order, Sellers will thereby transfer to Buyer, all of Sellers' right, title and interest in and to the Purchased Assets free and clear of all Encumbrances other than Permitted Encumbrances. The Purchased Assets are sufficient for the continued conduct of the Business after Closing in a manner consistent with past practice of Sellers and the Business as conducted immediately prior to Closing.

SECTION 3.10     *Intellectual Property*.

(a)     The Intellectual Property identified on Schedule 3.10(a) collectively constitutes all (i) Copyrights, (ii) Patents (iii) Trademarks, (iv) Software, and (v) Trade Secrets included in the Purchased Assets (collectively, "**Material Intellectual Property**").  For each of the foregoing items, Schedule 3.10(a) also identifies the name of the record owner of the applicable Material Intellectual Property.  Sellers have the right to assign, convey, and transfer to Buyer, all Material Intellectual Property.  Each of the Material Intellectual Property that is the subject of a pending application or registration is subsisting and there is no opposition or cancellation

19

**Error! Unknown document property name.**

proceeding pending against any such Intellectual Property concerning the ownership, validity, enforceability or infringement of the same.

(b)     Sellers exclusively own or hold valid licenses to all Material Intellectual Property and, except as set forth on Schedule 3.10(b), such Intellectual Property is free and clear of any Encumbrances (other than (x) Encumbrances that will be removed at or prior to the Closing and (y) other than restrictions or limitations pursuant to written nonexclusive license agreements entered into in the Ordinary Course of Business).   Schedule 3.10(b)(i) lists each Contract, including license, permission or other agreement pursuant to which any Seller is granted any license or other right to use any Intellectual Property (the "**Inbound License Agreements**"). Schedule 3.10(b)(ii) lists each Contract, including license, permission or other agreement pursuant to which Sellers grants to any third party a license or other right to use, resell, sublicense or develop any Intellectual Property (the "**Outbound License Agreements**").

(c)     Except as set forth on Schedule 3.10(c)(i) the Material Intellectual Property is valid and enforceable.  Within the past six (6) years, none of the Material Intellectual Property has been or is the subject of (i) any pending or threatened adverse Claim, judgment, injunction, Order, decree or agreement restricting its use in connection with any of the Purchased Assets or (ii) except as noted on Schedule 3.10(c)(ii), any threatened litigation or Claim of infringement. No third-party has infringed upon, misappropriated, or otherwise violated any of the Seller Group's rights in any Material Intellectual Property.

(d)     Sellers have has taken reasonable steps to protect, maintain and enforce the Material Intellectual Property, including without limitation (i) obtaining assignments from all employees and third party consultants that contributed to the creation of any copyrightable works or other Intellectual Property conceived, created, or developed on behalf of Sellers in relation to the Material Intellectual Property; and (ii) taking steps necessary to maintain the confidentiality of the Trade Secrets included in Material Intellectual Property, to the extent it is confidential and the value of which is dependent upon the maintenance of the confidentiality thereof, and no such Trade Secrets has been disclosed to anyone not bound by a written confidentiality agreement.  To the Knowledge of Sellers, there has not been any breach of any confidentiality obligation relating to the Trade Secrets included in the Material Intellectual Property, and there has been no unauthorized access to or disclosure of such Trade Secrets.

(e)     to the extent that any third party Software was/is incorporated under license in any Software programs or applications used, developed, licensed, or distributed by or for the Sellers ("**Seller Software**"), the Seller is not in breach of any licenses pertaining to such third party Software or any Open Source License Terms or similar license agreement or distribution models governing such Software as used in the Seller Software that would require the Seller to provide any source code to third parties (including pursuant to an open source license agreement or similar distribution model to the extent that any third party Software was/is incorporated under license in any Software programs or applications used, developed, licensed, or distributed by or for Sellers.

(f)     The computer systems, including the Software, firmware, hardware, networks, interfaces, platforms and related systems, owned, leased or licensed by Sellers ("**Seller Systems**") are sufficient for the conduct of the Business. There have been no failures,

20

**Error! Unknown document property name.**

breakdowns, continued substandard performance or other adverse events affecting any such Seller Systems that have caused a material disruption or interruption in or to the use of such Seller Systems; (ii) there have been no privacy or data security breaches (including a cyber attack) resulting in the unauthorized access, acquisition, exfiltration, manipulation, erasure, use, or disclosure of any Trade Secrets or other sensitive data or that triggered any reporting requirement under any breach notification law or contract provision; and (iii) no service provider (in the course of providing services for or on behalf of the Sellers) has suffered any material privacy or data security breach that resulted in the unauthorized access, acquisition, exfiltration, manipulation, erasure, use, or disclosure of any Trade Secrets of other sensitive data, or the introduction of any malware, viruses, bugs, or other malicious codes into any of the Seller Systems.

(g)  Sellers' current use and dissemination of any personally-identifiable information concerning individuals are in compliance in all material respects with all applicable laws.  The Sellers maintain policies and procedures regarding data security and privacy and maintains administrative, technical, and physical safeguards.

SECTION 3.11  *Employees Matters*.

(a)  A true and correct list of all of the current officers and full-time and part-time employees of the Business, (the "**Employees**") is set forth on Schedule 3.11(a), which Schedule 3.11(a) indicates, as of day prior to the Closing Date, the current total annual compensation (including without limitation, wages, salaries, commissions and other monetary compensation) payable to each such Employee, the business location, status (active or inactive) with respect to each such Employee, and the date used by the Sellers, as applicable, as the commencement of employment of each such Employee. As of the most recent payroll date, all compensation, including wages, commissions, and bonuses payable to all Employees for services performed on or prior to such date have been paid in in accordance with past practices as customary for the Business.

(b)  To the Knowledge of Sellers, except as set forth on Schedule 3.11(b), with respect to the Employees (i) each Seller has complied, in all material respects, with all Laws respecting employment and employment practices, including those pertaining to wages, pay equity, hours, overtime, working conditions, collective bargaining, employment discrimination and harassment, immigration, occupational safety and health, worker's compensation, unemployment insurance, or annual leave, and (ii) there are no discrimination charges (relating to sex, age, religion, race, national origin, ethnicity, handicap, disability, sexual orientation, genetic information or veteran status or any other legally protected category) psychological, and/or harassment complaints pending nor threatened before any Governmental Authority or court of competent jurisdiction against any Seller, which has not been settled, adjudicated or otherwise resolved.

SECTION 3.12  *Inventory*.  A true and correct list of the Inventory, updated as of the day prior to the Closing Date, is set forth on Schedule 3.12.  The Inventory consists of a quality, quantity and price usable and/or saleable in the Ordinary Course of Business.  Other than as set forth on Schedule 3.12, none of the Inventory is obsolete, damaged, defective or slow-moving items or is subject to written off or written down or for which reserves have been established. The Inventory was acquired in the Ordinary Course of Business.

**Error! Unknown document property name.**

SECTION 3.13    *Customers and Suppliers*.  No customer or supplier of the Sellers (to the extent relating to the Purchased Assets) (i) has given any Seller any notice of such customer's or supplier's intent to terminate its working relationship with any Seller, (ii) has advised any Seller in writing that it will be unable to accept or supply, as applicable, products as previously agreed upon or will otherwise be unable to continue accepting or providing, as applicable, products or services in a manner consistent with past practices in its relationship with the Sellers, or (iii) has defaulted in any material respect regarding the purchase or delivery, as applicable, of materials, products or services, which default is not being cured.  No customer or supplier of any Seller has any basis to believe that it has or would be entitled to any payment terms other than terms in the Ordinary Course of Business.

SECTION 3.14    *Taxes*.  Each Seller has timely filed all material Tax Returns that it was required to file.  All such Tax Returns were correct and complete in all material respects. All material Taxes owed by each Seller (whether or not shown or required to be shown on any Tax Return) have been paid.  No Seller currently is the beneficiary of any extension of time within which to file any Tax Return.  No Claim has ever been made by an authority in a jurisdiction where any Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no Encumbrances on any of the assets of any Seller that arose in connection with any failure (or alleged failure) to pay any Tax.

SECTION 3.15    *Bank Accounts*.  <u>Schedule 3.15</u> sets forth a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts) of Sellers.

SECTION 3.16    *Undue Influence*.  In connection with the operation of the Business, no Seller or, to Sellers' knowledge, any director, officer, agent, employee or Affiliate of Sellers, has taken any action, directly or indirectly, with respect to the Business that would result in a violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "**FCPA**"). Sellers, and, to Sellers' knowledge, their Affiliates, have conducted the Business in compliance with the FCPA in all material respects and maintain procedures which are reasonably expected to ensure compliance therewith.

SECTION 3.17    *Accuracy of Information Furnished*.  No representation, statement or information contained in this Agreement (including the Disclosure Schedules) or any material Contract or document executed in connection herewith or delivered pursuant hereto or thereto or made available or furnished to Buyer or its representatives by any Seller contains or will contain any untrue statement of a material fact or omits or will omit any material fact necessary to make the information contained therein not misleading. Sellers have provided Buyer with correct and complete copies of all material documents listed or described in the Disclosure Schedules.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller that:

SECTION 4.01    *Corporate Existence and Power*.  Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of Delaware and has all

limited liability company powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

SECTION 4.02    *Corporate Authorization*.  The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part Buyer.  This Agreement constitutes the valid and binding agreement of Buyer.

SECTION 4.03    *Execution and Delivery; Enforceability*.  This Agreement has been duly and validly executed and delivered by Buyer, and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

SECTION 4.04    *Governmental Authorization*. The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby require no material action by or in respect of, or material filing with, any Governmental Authority other than filings with respect to any consents, approvals or expiration or termination of any waiting period, under any antitrust or foreign investment laws which may include the HSR Act.

SECTION 4.05    *Sufficiency of Funds*.  Buyer has, and will continue to have at all times prior to and at the Closing, sufficient cash or other sources of immediately available funds to enable it to make payment of the Purchase Price.

SECTION 4.06    *Inspections; No Other Representations*.  Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder.  Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Buyer acknowledges that except as set forth in this Agreement, neither Sellers nor any director, officer, manager, employee, agent, consultant, or representative of Sellers have made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets, or the physical condition of the Purchased Assets.  Buyer agrees, warrants and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto.

ARTICLE 5

COVENANTS OF SELLERS

SECTION 5.01    *Conduct of the Business*.

(a)    Except as may be approved or required by the Bankruptcy Court, from the date hereof until the Closing Date, the Sellers shall conduct the Business in the Ordinary Course of Business and shall use reasonable efforts to preserve intact the business organizations and relationships with third parties and to keep available the services of the present employees of the

**Error! Unknown document property name.**

Sellers. Without limiting the generality of the foregoing, from the date hereof until the Closing Date, except as disclosed on Schedule 5.01(a), the Sellers will not:

(i)    purchase or otherwise acquire any properties or assets (tangible or intangible), except for purchases of Inventory in the Ordinary Course of Business;

(ii)    without the prior written consent of Buyer, sell, lease, license or otherwise dispose of any Purchased Assets or any material assets except (A) pursuant to pre-existing contracts or commitments, or (B) as required by law;

(iii)    without the prior written consent of Buyer, sell any Inventory through any channels, other than e-commerce, for less than a 20% markup over landed cost;

(iv)    suffer any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(v)    enter into any employment, compensation, severance, non-competition, or similar contract (or amend or modify any such contract) to which any Seller is a party, or adopt any new severance pay, termination pay, deferred compensation, bonus or other employee benefit plan;

(vi)    change in any material respect Sellers' accounting methods, principles or practices other than required by changes in GAAP;

(vii)    take any action that could reasonably be expected to cause the failure of the conditions contained in Section 9.02; or

(viii)    agree or commit to do any of the foregoing.

SECTION 5.02    *Access to Information.*

(a)    From the date of the execution of this Agreement until the Closing Date, each Seller will (i) give Buyer, its counsel, financial advisors, auditors and other authorized representatives, subject to the terms of the Confidentiality Agreement, reasonable access to the offices, properties, books and records of such Seller relating to the Business or the Purchased Assets, (ii) furnish to Buyer, its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information relating to the Business or the Purchased Assets as such Persons may reasonably request (including, without limitation, 13 week cash flow forecasts and regular (if not daily) cash flow updates), (iii) allow Buyer, its counsel, financial advisors, auditors and other authorized representatives to contact, or engage in any discussions or otherwise communicate with, any of Sellers' employees, clients, suppliers and other Persons with which Sellers have commercial dealings relating to the Business or the Purchased Assets and (iv) instruct the employees, counsel and financial advisors of such Seller to cooperate with Buyer in its investigation of the Business or the Purchased Assets. Nothing herein shall in any way restrict or limit Buyer or its Affiliates from contacting, or engaging in discussions or otherwise communicating with, any Person in the ordinary course of the business of Buyer and its Affiliates as conducted on or prior to the date hereof.

**Error! Unknown document property name.**

(b)      Any investigation pursuant to this Section 5.02 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the Sellers.  Notwithstanding the foregoing, Buyer shall not have access to personnel records of any Seller relating to individual performance or evaluation records, medical histories or other information which, as determined in good faith by Seller after consultation with counsel, the disclosure of which could subject such Seller to risk of liability.

(c)      On and after the Closing Date, each Seller will afford promptly to Buyer and its agents reasonable access to its books of account, financial and other records (including accountant's work papers), information, employees and auditors to the extent necessary or useful for Buyer in connection with any audit, investigation, dispute or litigation or any other reasonable business purpose relating to the Business or the Purchased Assets; *provided* that any such access by Buyer shall not unreasonably interfere with the conduct of the business of any Seller.  Sellers shall bear all of the out-of-pocket costs and expenses (including attorneys' fees, but excluding reimbursement for general overhead, salaries and employee benefits) reasonably incurred in connection with the foregoing.

SECTION 5.03    *Notices of Certain Events*.  The Sellers shall promptly notify Buyer of:

(a)      any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; and

(b)      the occurrence of any event, which could be reasonably likely to cause any condition set forth in Article 9 to be unsatisfied at any time from the date hereof to the End Date.

SECTION 5.04    *Minimum Overbid*.  In connection with the Auction, Sellers agree that that any minimum overbid with respect to some or all of the Purchased Assets shall be no less than $500,000 more (which overbid may be in the form of cash or credit bid) than the Purchase Price allocated to such Purchased Assets by the Buyer.  The Buyer shall be free to make any allocation of the Purchase Price with respect to the Purchased Assets at the Auction in its sole discretion, which allocation shall be used for all purposes at the Auction.  In the event of a Credit Bid (as defined in the Bid Procedures), such Credit Bid must include payment, in full and in cash, of the Break-Up Fee and Expense Reimbursement.

SECTION 5.05    *Expense Reimbursement and Break-Up Fee*. Notwithstanding anything in this Agreement to the contrary, the Sellers agree, on a joint and several basis, to pay Buyer the Expense Reimbursement and Break-Up Fee (i) from the proceeds of a sale of any of the Purchased Assets to a "Successful Bidder" other then the Buyer and (ii) if the Stalking Horse Bidder has not terminated this Agreement prior to the Closing of the Sale; *provided*, *however*, that, subject to further order of the Bankruptcy Court, if Buyer terminates this Agreement due to a breach by the Sellers, Buyer shall still be entitled to the Expense Reimbursement.  The Parties acknowledge and agree that the terms and conditions set forth in Section 11.02 with respect to the payment of the Expense Reimbursement and Break-Up Fee shall become operative upon entry by the Bankruptcy Court of the Stalking Horse Order.

**Error! Unknown document property name.**

SECTION 5.06    *Update of Disclosure Schedules*.  Until the Closing Date, Sellers shall as promptly as practicable deliver any new schedules or supplement or amend the Disclosure Schedules with respect to any matter that, if existing, occurring or known as of the date hereof, would have been required to be set forth or described in the Disclosure Schedules. Any such supplement or amendment shall be deemed to modify the Disclosure Schedules for purposes of this Agreement except to the extent the matters set forth in such supplement or amendment are material to the Purchased Assets or the Business. Notwithstanding anything in this Section 5.06 to the contrary, in no event will Sellers be permitted to supplement or amend any Disclosure Schedules without the prior written consent of Buyer and any such supplements or amendments will not be deemed to modify any Schedules other than the Disclosure Schedules required under Article 3.

SECTION 5.07    *Sale Free and Clear*.  Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, shall be fully released with respect to the Purchased Assets. On the Closing Date, the Purchased Assets shall be transferred to Buyer free and clear of all obligations, liabilities and Encumbrances, including those purported to be held or retained by any actual or purported Licensee of any Intellectual Property, other than the Permitted Encumbrances and the Assumed Liabilities; *provided*, *however*, that the transfer of the Purchased Assets to Buyer shall not be free and clear of any Licensees' Claims that are the subject of any License Disputes that remain pending and unresolved as of the date hereof.

ARTICLE 6

COVENANTS OF BUYER

Buyer agrees that:

SECTION 6.01    *Confidentiality*.  Prior to the Closing Date and after any termination of this Agreement, the Confidentiality Agreement shall remain in full force and effect.  After the Closing has occurred, the Confidentiality Agreement shall be terminated to the extent relating to the Purchased Assets and Assumed Liabilities and the employees of the Sellers, and shall, with respect to any of the Excluded Assets and Excluded Liabilities, remain in full force and effect.

SECTION 6.02    *Notices of Certain Events*.  The Buyer shall promptly notify Sellers of the occurrence of any event, which would be reasonably likely to cause any condition set forth in Article 9 to be unsatisfied at any time from the date hereof to the End Date.

ARTICLE 7

COVENANTS OF BUYER AND SELLERS

Buyer and the Sellers agree that:

SECTION 7.01    *Further Assurances*.  At and after the Closing, and without further consideration therefor, Sellers shall execute and deliver to Buyer such further instruments and certificates as shall be necessary or desirable (i) to vest, perfect or confirm ownership (of record

26

or otherwise) in Buyer and/or one or more Buyer Designees, Sellers' right, title or interest in, to or under any or all of the Purchased Assets and Business, including the Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances) or (ii) to otherwise effectuate the purposes and intent of this Agreement and the other documents contemplated hereunder or for aiding, assisting, collecting and reducing to possession any of the Purchased Assets and exercising rights with respect thereto. Each Seller shall take, or cause to be taken, all actions, do or cause to be done all things as may be requested by the Buyer in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be required to consummate the transactions contemplated by this Agreement (including, with respect to the Intellectual Property, making all appropriate filings and submissions with the United States Patent and Trademark Office promptly after Closing, and in any event within 30 days of Closing).

SECTION 7.02    *Certain Filings*.

(a)    The Sellers and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

(b)    The Sellers and Buyer shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under the HSR Act and any comparable laws or regulations in any foreign jurisdiction to obtain any necessary Regulatory Approval, as applicable, and to consummate and make effective the transactions contemplated by this Agreement, including furnishing all information required by applicable law in connection with approvals of or filings with any Governmental Authority, and filing, or causing to be filed, as promptly as practicable, any required notification and report forms under other applicable competition laws with the applicable governmental antitrust authority.  The parties shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings.  Subject to appropriate confidentiality safeguards, each party shall (i) respond promptly to any request for additional information made by the antitrust agency, (ii) promptly notify counsel to the other party of, any communications from or with the antitrust agency in connection with any of the transactions contemplated by this Agreement, (iii) not participate in any meeting with the antitrust agency unless it consults with counsel to the other party in advance and, to the extent permitted by the agency, give the other party a reasonable opportunity to attend and participate thereat, and (iv) furnish counsel to the other party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the antitrust agency. The Sellers and Buyer shall use their reasonable best efforts to cause the waiting periods under the applicable competitions laws to terminate or expire at the earliest possible date after the date of filing.  All filing fees relating to this Section 7.02 shall be borne and paid fully by Sellers.

27

SECTION 7.03    *Public Announcements*.  Absent the prior written consent of the Seller, the Buyer shall not make any press release, public announcement, securities filing or public statement concerning this Agreement or the transactions contemplated hereby, except as and to the extent that any such party shall be required to make any such disclosure by applicable law, and then only after giving the other party hereto adequate time to review, under the circumstances, such disclosure and consider in good faith the comments of the other party hereto and consultation as to such comments with such party as to the content of such disclosure.  For the avoidance of doubt, nothing herein shall be construed to prohibit any disclosure or announcement that the Sellers are required to make in connection with the Chapter 11 Cases.

SECTION 7.04    *Bankruptcy Court Approval*.

(a)    Promptly upon the execution of this Agreement, the Sellers shall file with the Bankruptcy Court this Agreement and shall seek an Order (such Order, in form attached hereto as **Exhibit F**, the "**Stalking Horse Order**") among other things, (i) approving this Agreement as the Stalking Horse Agreement and the Buyer as the Stalking Horse Bidder, each as defined in the Bid Procedures Order, and (ii) authorizing the Expense Reimbursement and Break-Up Fee as "**Bid Protections**" as contemplated under the Bid Procedures Order.

(b)    Promptly upon the designation of the Buyer as the "Successful Bidder," as defined in, and contemplated under, the Bid Procedures Order, the Sellers shall file with the Bankruptcy Court the Sale Order. The Sellers each use their reasonable best efforts, and shall cooperate, assist and consult with Buyer, to secure the entry of the Sale Order no later than February 16, 2018.  The Sellers and Buyer shall consult with one another regarding pleadings which any of them intend to file, or positions any of them intend to take, with the Bankruptcy Court in connection with or which might reasonably affect, the Bankruptcy Court's entry of the Sale Order.

(c)    If the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such Order), the Sellers and Buyer will cooperate in taking such steps to reasonably diligently defend such appeal, petition or motion; and the Sellers and Buyer shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

ARTICLE 8

TAX MATTERS

SECTION 8.01    *Tax Definitions*.    The following terms, as used herein, have the following meanings:

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Income Tax**" means any federal, state, local or non-U.S. tax based on or measured by reference to net income, including any interest, penalties, or additions thereto, whether disputed or not.

28

**Error! Unknown document property name.**

"**Tax or Taxes**" means (i) any tax, governmental fee, levy, duty, tariff, impost, custom, license, payroll, employment, excise, severance, premium, windfall profits, environmental (including taxes under Code § 59A), sales, franchise, profits, pension, social security (or similar), unemployment, capital stock, or other like assessment, charge or premium of any kind whatsoever (including, but not limited to, withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "**Taxing Authority**") responsible for the imposition of any such tax (federal, state, local or non-U.S.), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person, or as transferee, successor, guarantor or surety.

"**Tax Return**" means any return, declaration, report, Claim for return, or information return or statement relating to Taxes; including any schedule or attachment thereto, and including any amendment thereof.

SECTION 8.02    *Tax Cooperation; Allocation of Taxes.*

(a)    Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax.  Buyer shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six years following the Closing Date.  The Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets

(b)    To the extent not exempt under Section 1146(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, all excise, sales, use, value added, registration stamp, recording, documentary, conveyance, franchise, property, transfer and similar Taxes, levies, charges and fees, whether federal, state, local or non-U.S., including any interest and penalties (collectively, "**Transfer Taxes**") incurred in connection with the transactions contemplated by this Agreement shall be borne by Seller when due, and Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes.  Buyer and the Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.  Buyer and the Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation, relating to Transfer Taxes.

(c)    Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable law.  If the paying party is entitled to reimbursement from the non-paying party pursuant to the preceding sentence, upon payment of any such Transfer Tax, the paying party shall present a statement to the non-paying party setting forth the amount of reimbursement to which the paying party is entitled under Section 11.02(b), together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed.

**Error! Unknown document property name.**

SECTION 8.03   *Purchase Price Allocation*.   To the extent the acquisition of the Purchased Assets and/or the Business is not treated as a reorganization under Section 368(a) of the Code, within one hundred and twenty (120) days of the Closing Date, Buyer shall prepare and deliver to Sellers a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (such statement, the "**Allocation Statement**"), and the Allocation Statement shall be finalized upon reasonable consultation with Sellers. Unless otherwise required by law, the IRS or any other taxing authority, the allocation of the Purchase Price pursuant to the Allocation Statement shall be final and binding on the Parties, and the Parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not take any position inconsistent therewith. If the IRS or any other taxation authority proposes a different allocation, Sellers or Buyer, as the case may be, shall promptly notify the other party of such proposed allocation. Sellers or Buyer, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section 8.03.   Except as otherwise required by any applicable law or regulation, or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 8.03; and (ii) neither Party (nor any of their Affiliates) will take any position inconsistent with this Section 8.03 in any Tax Return, in any refund Claim, in any litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Purchased Assets or the allocation of the value of the Purchased Assets in any plan or reorganization or liquidation that may be proposed.

ARTICLE 9

CONDITIONS TO CLOSING

SECTION 9.01   *Conditions to Obligations of Buyer and the Sellers*.  The obligations of Buyer and the Sellers to consummate the Closing are subject to the satisfaction of the following conditions:

(a)     any applicable waiting period under the HSR Act relating to the transactions contemplated hereby shall have expired or been terminated;

(b)     all Regulatory Approvals shall have been obtained; and

(c)     no provision of any applicable law or regulation and no judgment, injunction or Order shall prohibit the consummation of the Closing.

SECTION 9.02   *Conditions to Obligation of Buyer*.   The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following further conditions:

**Error! Unknown document property name.**

(a)      the representations and warranties of Sellers contained in this Agreement shall be true and correct in all respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (*provided* that representations and warranties which are confined to a specified date shall speak only as of such date).   Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer of each Seller;

(b)      the covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof;

(c)      no Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Order, which is in effect and has the effect of prohibiting (or delaying beyond the End Date) the consummation of the transactions contemplated by this Agreement;

(d)      the Bankruptcy Court shall have approved and authorized, other than with respect to Cure Costs, the assumption and assignment of each Assumed Contract;

(e)      the Bankruptcy Court shall have entered the Stalking Horse Order;

(f)      the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order;

(g)      Lien releases and termination statements have been delivered by Sellers to Buyer with respect to all Encumbrances (other than Permitted Encumbrances) related to the Purchased Assets;

(h)      the Transfer Consents listed on Schedule 3.05(ii) shall have been obtained;

(i)      the Chapter 11 Cases have not been converted to Chapter 7 cases under the Bankruptcy Code;

(j)      [Reserved];

(k)      the Sellers shall have paid in full any Expense Reimbursement, which payment may be made, at Buyer's option, as an offset against the Cash Consideration;

(l)      [Reserved]; and

(m)      no Material Adverse Effect on the Business or operations of Sellers that is or could reasonably be expected to impact the Purchased Assets shall have occurred.

SECTION 9.03    *Conditions to Obligation of the Sellers*.  The obligation of the Sellers to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)      Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date; and

31

**Error! Unknown document property name.**

(b)    the representations and warranties of Buyer contained in this Agreement shall be true and correct, in all material respects, on and as of the Closing Date, as if made at and as of such date.

ARTICLE 10

SURVIVAL

SECTION 10.01  *Survival*.  The (a) representations and warranties of the Sellers and (b) covenants and agreements of the Sellers that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith shall not survive the Closing.  The covenants and agreements contained herein that by their terms are to be performed after Closing shall survive the Closing indefinitely except the covenants, agreements, representations and warranties contained in Article 8 shall survive until expiration of the statute of limitations applicable to the matters covered thereby (giving effect to any waiver, mitigation or extension thereof).

ARTICLE 11

TERMINATION

SECTION 11.01  *Grounds for Termination*.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of the Sellers and Buyer;

(b)    by either the Sellers or Buyer, if the Closing has not occurred on or prior to March 2, 2018 (the "**End Date**");

(c)    by either the Sellers or Buyer, if any condition set forth in Section 9.01 is not satisfied, and such condition is incapable of being satisfied by the End Date, unless the party seeking termination is in material breach of its obligations hereunder;

(d)    by either the Sellers or Buyer, if at the end of the Auction for the Purchased Assets, the Buyer is not determined by the Sellers to be either the "Successful Bidder" or "Backup Bidder" (each as defined in the Bid Procedures Order);

(e)    by the Sellers, if failure to perform any covenant or agreement on the part of the Buyer set forth in this Agreement shall have occurred that would cause the conditions set forth in Sections 9.01 or 9.03 not to be satisfied, or if Buyer shall have failed to consummate the Closing as required by this Agreement;

(f)    by the Buyer, if failure to perform any covenant or agreement on the part of the Seller set forth in this Agreement shall have occurred that would cause the conditions set forth in Sections 9.01 or 9.02 not to be able to be satisfied, or if Seller shall have failed to consummate the Closing as required by this Agreement;

**Error! Unknown document property name.**

(g)      by the Buyer, if this Agreement is not the "Stalking Horse Agreement" (as defined in the Bid Procedures Order) for all of the Purchased Assets;

(h)      by the Buyer, upon the appointment of a trustee or examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code;

(i)      by the Buyer, in the event Sellers amend or modify any Disclosure Schedules without the prior written consent of Buyer;

(j)      by the Buyer, upon the conversion of any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; and

(k)      by the Buyer, upon the taking of any enforcement action, or the filing of any motion or other proceeding seeking to take enforcement action, by any creditor with respect to any assets of the Debtors.

The party desiring to terminate this Agreement pursuant to this Section 11.01 (other than pursuant to Section 11.01(a)) shall give notice of such termination to the other Party in accordance with Section 12.01.

SECTION 11.02  *Effect of Termination.*

(a)      If this Agreement is terminated as permitted by Section 11.01, such termination shall be without liability of either Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement, except as provided in Sections 2.07, 5.05 and 11.02(b); *provided* that if such termination shall result from the (i) failure of either Party to fulfill a condition to the performance of its obligations, (ii) failure of either Party to perform a covenant of this Agreement, or (iii) breach of representation or warranty by either Party, the breaching Party shall be fully liable for any and all damages incurred or suffered by the non-breaching Party as a result of such failure or breach.  The provisions of Sections 2.07, 5.05, 6.01, 11.03, 12.04, 12.05, 12.06 and 12.11 and this Section 11.02 shall survive any termination pursuant to Section 11.01.

(b)      Sellers shall pay to Buyer the Expense Reimbursement and the Break-Up Fee by wire transfer of immediately available funds promptly (and in any event no later than one (1) Business Day following notice from the Buyer to Sellers of such event) upon the earlier to occur of (i) Bankruptcy Court approval of a "Successful Bidder" (as defined in the Bid Procedures Order) that is not the Buyer or (ii) termination of this Agreement if, as of such termination, any Seller was in breach of any of its representations, warranties, covenants or other agreements under this Agreement or if a Material Adverse Effect has occurred prior to such termination; *provided* that under no circumstances shall Sellers be obligated to pay the Expense Reimbursement more than once; and *provided*, *further* that, if Sellers fail to pay any amounts due to Buyer pursuant to this Section 11.02(b) within the time period specified herein, Sellers shall pay the costs and expenses (including reasonable legal fees and expenses) incurred by Buyer in connection with any action or proceeding taken to collect payment of such amounts.

(c)      The Parties acknowledge and agree that any payment of the Break-Up Fee and the Expense Reimbursement described in this Section 11.02 shall constitute liquidated damages (and

33

**Error! Unknown document property name.**

not a penalty) and shall be deemed to be the sole and exclusive remedy of Buyer and any other Person against Sellers in connection with this Agreement and the transactions contemplated hereby. The Parties acknowledge and agree that (i) the agreements contained in this Section 11.02 are an integral part of this Agreement and the transactions contemplated hereby and (ii) in light of the difficulty of accurately determining actual damages with respect to the foregoing, the right to any such payment of the Break-Up Fee and the Expense Reimbursement constitute a reasonable estimate of the damages that will compensate Buyer in the circumstances in which such fees are payable for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated by this Agreement.

SECTION 11.03  *Costs and Expenses*.  Except as otherwise expressly provided in this Agreement, including as set forth in Section 11.02(b) whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

SECTION 11.04 *Exclusive Remedies*.  Except as specifically set forth in this Agreement, effective as of Closing, Buyer and Seller waive any rights and Claims, whether in law or in equity, relating to (i) any breach of representation, warranty, covenant or agreement contained herein occurring on or prior to the Closing or (ii) the Purchased Assets or Assumed Liabilities.  Buyer and the Sellers acknowledge and agree that if this Agreement is terminated for any reason, the provisions of Section 11.02 shall be the sole and exclusive remedies of the parties for any breach of the representations, warranties, covenants or agreements contained herein.

ARTICLE 12

MISCELLANEOUS

SECTION 12.01  *Notices*.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or email transmission with delivery confirmation) and shall be given,

if to Buyer:

Alden Global Capital, LLC
885 Third Avenue, 34th Floor
Attention: Jennifer Wild
            Michael Monticciolo
Email: JWild@aldenglobal.com
        MMonticciolo@aldenglobal.com

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:  Arik Preis

34

> Allison Miller
> Fax: 212-872-1002
> Email: apreis@akingump.com
>          amiller@akingump.com

if to the Sellers, to:

> Aerogroup International, Inc.
> 201 Meadow Road
> Edison, NJ 08817-6002
> Attn: Jonathan A. Weiss
> Email: jweiss@aerosoles.com

With a copy to:

> Ropes and Gray LLP
> 1211 Avenue of the Americas
> New York, New York 10036
> Attn: Gregg Galardi
> Email: Gregg.Galardi@ropesgray.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day at the place of receipt.

SECTION 12.02  *Amendments and Waivers*.

(a)    Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by the party against whom the waiver is to be effective.  For clarity, Bankruptcy Court approval shall not be required for any amendment to this Agreement.

(b)    No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 12.03  *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided* that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

**Error! Unknown document property name.**

SECTION 12.04  *Governing Law*.  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

SECTION 12.05  *Jurisdiction*.  The parties hereto agree that, during the period from the date hereof until the date on which Sellers' the Chapter 11 Case is closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court.  The Parties further agree that, following the Bankruptcy Period, any suit, action or proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the parties exclusively in either the United States District Court for the District of Delaware or any state court of the State of Delaware located in such district, and each of the parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the such courts or that any such suit, action or proceeding which is brought in such courts has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the District of Delaware or any state court of the State of Delaware.  Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 12.01 shall be deemed effective service of process on such party.

SECTION 12.06  *WAIVER OF JURY TRIAL*.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 12.07  *Counterparts; Third Party Beneficiaries*.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.  No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

SECTION 12.08  *Specific Performance*.  It is understood and agreed by the parties that money damages would be an insufficient remedy for any breach of this Agreement and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, each party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for such breach, including an Order of the Bankruptcy Court or other court of competent jurisdiction requiring either party to comply promptly with any of its obligations hereunder.  Sellers shall be entitled to an injunction to enforce specifically the consummation of the transactions contemplated herein in a proceeding instituted in any court in the State of New York having jurisdiction over the parties and the matter.

**Error! Unknown document property name.**

SECTION 12.09  *Entire Agreement*.  This Agreement and the Confidentiality Agreement constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 12.10  *No Strict Construction*.  Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

SECTION 12.11  *Non-Recourse*.  No past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any Party hereto shall have any liability for any obligations or liabilities of the Parties under this Agreement or any other Transaction Document, for any Claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby, and each Party hereby covenants not to sue any past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any other Party for any such Claim.

SECTION 12.12  *Severability*.   The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

**Error! Unknown document property name.**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

AEROGROUP INTERNATIONAL, INC.


By:_____
Name:
Title:


AGI HOLDCO, INC.


By:_____
Name:
Title:


AEROGROUP INTERNATIONAL LLC


By:_____
Name:
Title:


AEROGROUP INTERNATIONAL HOLDINGS LLC


By:_____
Name:
Title:

AEROGROUP RETAIL HOLDINGS, INC.


By: _____
Name:
Title:


AEROGROUP GIFT CARD COMPANY, INC.


By: _____
Name:
Title:

ALDEN GLOBAL CAPITAL, LLC


By: _____
Name:
Title: