## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| **AEROGROUP INTERNATIONAL,** | : | |
| **INC.,** *et al.,*[1] | : | Case No. 17-11962 (KJC) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | (Re: D.I. 779, 803) |
| | : | |

| | | |
|---|---|---|
| **POLK LENDING 33, LLC** | : | |
| Plaintiff, | : | |
| v. | : | Adv. Proc. No. 18-50383 (KJC) |
| | : | (Re: D.I. 1) |
| **THL CORPORATE FINANCE, INC.** | : | |
| Defendant. | : | |
| | : | |

## OPINION[2]

### BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

On September 15, 2017, Aerogroup International, Inc. and certain related entities (the "Debtors") filed chapter 11 bankruptcy petitions in this Court. On March 6, 2018, the Debtors sold their assets at an auction, receiving net sale proceeds of $25,450,000.[3] The assets sold were encumbered by the liens of THL Corporate Finance, Inc. ("THL")[4] and Polk 33 Lending, LLC

---

[1] The debtors in these jointly administered chapter 11 cases are Aerogroup International, Inc., AGI Holdco, Inc., Aerogroup International LLC, Aerogroup International Holdings LLC, Aerogroup Retail Holdings, Inc., and Aerogroup Gift Card Company (the "Debtors").

[2] This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K).

[3] The net proceeds were subject to certain reductions, resulting in overall net sale proceeds of $24,250,090.14 (the "Sale Proceeds").

[4] THL is acting in its capacity as administrative agent to the Debtors' Prepetition Term Loan Lenders, as that term is defined in the Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status with Respect to the DIP Collateral; (II) Granting Adequate Protection to the Prepetition Secured Credit Parties; (III) Modifying the Automatic Stay; (IV) Authorizing the Debtor to Enter Into Agreements with Polk 33 Lending, LLC (V) Authorizing Use of Cash Collateral; and (VI) Granting Related Relief (D.I. 231) (the

("Polk" or the "DIP Lender"). Pursuant to the Final DIP Order and the Order authorizing the sale,[5]

the Sale Proceeds have been placed in a sale escrow account pending distribution to THL and Polk,

either by mutual agreement of THL and Polk or pursuant to an order of this Court.

The following matters are before the Court for consideration:

(1)     Polk 33 Lending, LLC's Motion to Enforce Agreement by and among the
        Debtors, Polk 33 Lending, LLC and THL Corporate Finance, Inc.
        (D.I. 779) ("Polk's Motion to Enforce") in which Polk seeks to enforce
        the parties' agreement to distribute part of the Sales Proceeds;

(2)     THL Corporation Finance, Inc.'s Motion for Entry of Order (I) Valuing
        Secured Claims for Purpose of Allocating Sale Proceeds to Such Secured
        Claims and (II) Ordering Distributions (D.I. 803) ("THL's Allocation
        Motion"); and

(3)     The adversary proceeding captioned *Polk 33 Lending, LLC v. THL
        Corporate Finance, Inc. (In re Aerogroup International, Inc.)* (Adv. Pro.
        No. 18-50383) (the "Adversary Proceeding"), in which Polk asserts a
        breach of contract action against THL for allegedly failing to comply with
        certain payment obligations due to Polk under the parties' lender
        agreement dated February 12, 2018.[6]

On June 29, 2018 and July 13, 2018, the Court held an evidentiary hearing on the Contested

Matters. Thereafter, the parties filed Proposed Findings of Fact and simultaneous letter briefs in

accordance with the Order dated July 20, 2018 (D.I. 1023).

For the reasons set forth below, Polk's Motion to Enforce will be dismissed as moot.

THL's Allocation Motion will be granted, in part, and denied, in part. In the Adversary

---

"Final DIP Order"). Joint Exhibit 14. At the hearing held on June 29, 2018 and July 13, 2018, Polk and
THL submitted joint exhibits that are referred to herein as "JX [exhibit number]."

    [5] Order (I) Authorizing the Sale of Certain Assets of the Debtors Free and Clear of All Liens,
Claims, Liabilities, Rights, Interests and Encumbrances and Other Interests, (II) Authorizing the
Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection
Therewith, and (III) Granting Related Relief (D.I. 671) (the "Sale Order").

    [6] The Polk Motion, the THL Motion and the Adversary Proceeding are referred to herein as the
"Contested Matters."

Proceeding, judgment will be entered in favor of plaintiff, Polk, and against defendant, THL, in the amount of $1,991,162.25, plus pre-judgment interest.

<div align="center">

**FACTS**

</div>

A.    The Debtors' Business

The Debtors were a leading manufacturer and retailer of women's footwear that incorporated "the latest comfort technologies."[7] The Debtors operated through the following channels:

(1)    **Direct Retail Business Channel:** The Debtors operated retail stores across a variety of formats including malls, lifestyle centers, street locations, and outlet centers. In 2016, the Debtors closed over 30 stores. As of the Petition Date, the Debtors operated approximately 78 stores, but after filing the bankruptcy case, the Debtors moved for and received authority from the Court to close approximately 74 of the retail stores remaining at that time.[8]

(2)    **Direct E-Commerce Business Channel:** The Debtors sold their products directly to consumers through its website.[9]

(3)    **Wholesale Business Channel:** The Debtors supplied their products to retailers across a variety of wholesale formats, including department stores, off-price retail chains, specialty stores, home shopping networks, and internet businesses.[10]

(4)    **First Cost Business Channel:** The Debtors provided shoe design, sourcing, and production consulting services to customers who placed orders for Aerosoles-branded products directly from the factories. The Debtors never took possession of the finished products and received payment from the first cost customers in the form of a royalty, which was due 30-60 days after shipment from the factory.[11]

(5)    **International Licensing Business Channel:** The Debtors partnered with international licensees that distributed Aerosoles-branded products, either on a first costs basis or via long-term licensing agreements. The Debtors typically had design and marketing approval rights for Aerosoles-branded products developed by licensees.[12]

---

[7] JX 82 (Weinsten Decl.), ¶ 12.

[8] *Id.* ¶ 13(i), ¶ 90.

[9] *Id.* ¶ 13(ii).

[10] *Id.* ¶ 13(iii).

[11] *Id.* ¶ 13(iv).

[12] *Id.* ¶ 13(v).

B. The Debtors' Prepetition Debt

As of the Petition Date, the Debtors had approximately $72.3 million of outstanding funded indebtedness, comprised of approximately:

(i)     $22.9 million outstanding under a prepetition revolving facility;

(ii)    $19.7 million outstanding under a prepetition term loan facility;

(iii)   $19.1 million outstanding on Subordinated Convertible Notes due March 9, 2020 ("Prepetition Senior Notes");

(iv)    $8.9 million outstanding on Subordinated Convertible Non-Transferrable Notes due March 9, 2020 ("Prepetition Subordinated Notes"); and

(v)     $1.7 million outstanding on a prepetition subordinated loan.[13]

The Debtors' first and second lien debt was held in a "split lien" collateral structure by THL, as administrative agent for the Debtors' prepetition term loan lenders, and Wells Fargo, N.A. ("Wells Fargo") as administrative agent for the Debtors' prepetition revolver lenders.[14] The specific rights and priorities between THL and Wells Fargo were memorialized in an intercreditor agreement dated June 9, 2014 (the "Intercreditor Agreement").[15] Wells Fargo held a first lien on all "ABL Priority Collateral" consisting of, among other assets, accounts, credit card receivables, chattel paper, deposit accounts, inventory, cash, general intangibles (not including intellectual property), and tax refunds.[16] THL held a first lien on "Term Priority Collateral," defined as including "all Collateral other than ABL Priority Collateral, including without limitation . . . all Equipment, Fixtures, Real Property, Intellectual Property and the Capital Stock of domestic subsidiaries of the Parent."[17]

---

[13] *Id.* ¶ 20, ¶ 27, ¶ 29.

[14] Joint Pretrial Memorandum Relating to Contested Matters Between Polk 33 Lending, LLC and THL Corporate Finance, Inc. (D.I. 989) (the "Joint Pretrial Memo"), ¶ 1.

[15] JX 25, Joint Pretrial Memo ¶ 1.

[16] JX 25 at 7.

[17] JX 25 at 7, 18.

C.    Events Leading Up to Bankruptcy

The Debtors' bankruptcy was the result of numerous factors that contributed to declining financial performance, including declining mall traffic, a highly promotional and competitive retail environment, and a shift in customer demand and preference for online shopping versus traditional brick and mortar stores.[18] The Debtors also faced certain company-specific challenges, including: (i) difficulty operating a levered business and maintaining cash reserves, (ii) retail unit expansion and lease renewal terms in the lead up to the retail industry slowdown, and (iii) disruptive and costly supply chain interruptions.[19]

In June 2017, the Debtors were facing liquidity issues and retained Berkeley Research Group, LLC ("BRG") as its financial advisor.[20] BRG and Mark Weinsten ("Weinsten"), a managing director at BRG and, later, the Debtors' chief restructuring officer, worked through credit issues with the prepetition lenders, and advised the Debtors with regard to cash management, inventory purchases, expense reductions, and a potential restructuring transaction or a potential sale of the business and/or its assets.[21]

Also in June 2017, the Debtors retained Piper Jaffray & Co. ("Piper Jaffray") as its investment banking firm to look at possible sources of capital funding and a potential sale of the company.[22] In connection with these efforts, a confidential information memorandum was prepared and a fully functional data room made available to potential investors or buyers who signed a non-disclosure agreement to review certain confidential company business and financial information.[23] The Debtors' senior management met with potential investors or buyers in person

---

[18] JX 82, ¶32.
[19] Id.
[20] JX 82, ¶ 4; Tr. 6/29/2018 at 33:11 – 33:19 (Weinsten).
[21] JX 82, ¶ 4; Tr. 6/29/2018 at 33:20 – 34:20 (Weinsten).
[22] JX 82, ¶ 35.
[23] Id. ¶ 36.

and via conference call to review the opportunity and answer questions pertaining thereto.[24]  Forty-two potential investors or buyers accessed the data room, and six potential investors or buyers engaged in active talks with the Debtors.[25]  In August 2017, the Debtors received two draft term sheets for potential investment or acquisition transactions, as well as two additional proposals that were deemed unresponsive or not actionable at the present time.[26]  The Debtors considered the proposals and ultimately did not proceed with either transaction at that time.[27]

D.  The Bankruptcy Case

The Debtors filed their chapter 11 petitions on September 15, 2017.  In his declaration in support of the First Day Motions, Weinsten noted that the Debtors filed chapter 11 to maximize value for the benefit of all interested parties - - including creditors and stockholders - - by immediately reducing their retail footprint and continuing the process of soliciting interest in the acquisition or financing of a business restructured around its wholesale, e-commerce and first cost business units.[28]

(1)  Cash Collateral and DIP Financing Agreements

The Debtors initially sought and obtained a Court order authorizing the use of THL's and Wells Fargo's cash collateral on a consensual, interim basis.[29]  Among other things, the Initial Interim Order contained milestones that contemplated consummation of a sale under Bankruptcy

---

[24] *Id.*

[25] *Id.*

[26] *Id.* ¶ 37.

[27] *Id.*

[28] *Id.* ¶ 38.

[29] Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying Automatic Stay, and (IV) Scheduling a Final Hearing (D.I. 63) (the "Initial Interim Order").

Code § 363 on or before November 29, 2017.[30]  The Court scheduled a hearing on October 18,

2017 to consider entry of a final cash collateral order.

On October 15, 2017, the Debtors filed a motion to approve a $25 million debtor-in-

possession financing facility from Polk.[31]  The proposed DIP facility contemplated, in part, paying

the Wells Fargo prepetition indebtedness in return for Polk receiving a rolled-up postpetition

superpriority administrative expense claim.[32]  THL objected to the DIP Motion and cross-claimed

for adequate protection under Bankruptcy Code §§ 361 and 363(e).[33]

With the Court's encouragement at the October 18, 2017 hearing, the Debtors, Polk and

THL began negotiating the terms of a consensual order regarding DIP financing.[34]  On October 20,

2017, the Court entered the negotiated and consensual Interim DIP Order.[35]  On November 2,

2017, the Court approved the consensual Final DIP Order.[36]

---

[30] *Id.* at 33, ¶ 16(w) - (x).

[31] Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status; (II) Granting Adequate Protection to the Prepetition Secured Credit Parties; (III) Modifying the Automatic Stay; (IV) Authorizing the Debtors to Enter into Agreements with Polk 33 Lending, LLC; (V) Authorizing Use of Cash Collateral; and (VI) Granting Related Relief (D.I. 146), JX 11 (the "DIP Motion").

[32] JX 11 at 4-5.

[33] JX 13.

[34] Tr. 10/18/2017 at 21:23 – 22:17 (D.I. 698).

[35] The Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status with Respect to the DIP Collateral; (II) Granting Adequate Protection to the Prepetition Secured Credit Parties; (III) Modifying the Automatic Stay; (IV) Authorizing the Debtors to Enter into Agreements with Polk 33 Lending, LLC; (V) Authorizing Use of Cash Collateral, and (VI) Granting Related Relief (D.I. 194) (the "Interim DIP Order). Joint Pretrial Memo, ¶ 6.

[36] *See* n.4, *supra.*  JX 14.  Polk, as the DIP Lender, provided a senior secured superpriority term loan up to the amount of $25 million (the "DIP Facility") under the Amended and Restated Senior Secured Superpriority Debtor-In-Possession Loan and Security Agreement (the "DIP Credit Agreement") and other related agreements and documents (collectively, the "DIP Documents").  Joint Pretrial Memo, ¶ 8.

(2) The Proposed Chapter 11 Plans

Between October 2017 and January 2018, the Debtors filed a proposed plan of reorganization and amended it three times.[37] The centerpiece of the plan contemplated a license and distribution agreement between the Debtors and Global Brands Group Holding Limited and/or Global Brands Group USA, Inc. a/k/a GBG USA, Inc. ("GBG") that would have granted a license from a reorganized intellectual property holding company to GBG to use the Aerosoles brand to sell and distribute products through various channels in specified territories (the "GBG Transaction").[38]  On January 11, 2018, Polk delivered a default notice to the Debtors for, *inter alia*, failure to obtain a confirmation order by no later than January 11, 2018.[39]  Minutes before the scheduled confirmation hearing on January 17, 2018, GBG notified the Debtors that it was terminating its agreements with the Debtors.[40]  On January 19, 2018, THL delivered a default notice to the Debtors for, *inter alia*, failure to achieve certain milestones set forth in the Final DIP Order.[41]

(3) The § 363 Sale

Polk and THL elected not to exercise their respective rights and remedies and, instead, supported a sale process, led by the Debtors, pursuant to Bankruptcy Code § 363.[42]  In connection with the sale process, Polk and THL entered into a Lender Agreement dated February 12, 2018 (the "Lender Agreement").[43]  Under the Lender Agreement, Polk and THL agreed to, among other things, a budget and their respective allocations of various operating and other administrative costs

---

[37] Joint Pretrial Memo, ¶ 10.  *See also* D.I. 203, 326, 346, 468, 502.
[38] Joint Pretrial Memo, ¶ 11.  *See also* Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization, JX 6 at 8-9.
[39] Joint Pretrial Memo, ¶ 12.
[40] *Id.* ¶ 13.
[41] *Id.* ¶ 14.
[42] *Id.* ¶¶ 15-16.
[43] *Id.* ¶ 17.

(the "Lender Allocation").[44]    Under the Lender Allocation, both Polk and THL agreed each was

responsible on a 50/50 basis for the professional fee carve-out (pre- and post-trigger notice), wind-

down fees, payroll, U.S. Trustee fees, salaries, retention, and the e-commerce platform.[45]    On

warehousing and sales tax expenses, Polk covered 100% of the expenses, and on other wind-down

costs, THL covered 67%.[46]

The Debtors used Polk's cash collateral to fund the sale process and to make payments set

forth in the Lender Agreement, including operating expenses, payroll expenses and professional

fee carve-out payments.[47]    Pursuant to the Lender Allocation, as of March 6, 2018 (the closing

date of the sale), THL owed Polk $1,991,162.25 (the "Lender Reimbursement").[48]

After the proposed plan failed, the Debtors relaunched an accelerated version of the sale

process they had undertaken prepetition.[49]    Piper Jaffray reached out to approximately 35-50

parties, a combination of strategic and financial investors.[50]    In early February, the Debtors

received two informal indications of interest for the intellectual property only.[51]    The first was

submitted telephonically by David Peress on behalf of a consortium comprised of Hilco

Streambank, Xcel Brands and BBC, which proposed to purchase the intellectual property for

$10 million.[52]    The second informal indication of interest was received through an email from the

---

[44] *Id.* ¶ 18.

[45] *Id.*

[46] *Id.*

[47] *Id.* ¶ 19.

[48] *Id.* ¶20.

[49] Tr. 7/13/2018 at 30:15 – 31:4 (Shinder) (D.I. 1019). Richard M. Shinder was a managing director of the investment banking group and the head of the restructuring and special situations group at Piper Jaffray, Tr. 7/13/2018 at 17:23-17:25.

[50] Tr 7/13/2018 at 31:17 – 31:18.

[51] *Id.* at 33:8 – 33:16.

[52] *Id.* at 33:18-33:20.

Blue Star Group, d/b/a Aero Brands, which proposed to purchase the intellectual property within a range of $12-14 million.[53]

On January 24, 2018, the Debtors filed a motion for approval of bidding procedures for the sale of substantially all of the Debtors' assets (the "§ 363 Sale").[54] On January 31, 2018, the Court entered an Order approving the Bid Procedures Motion.[55] Among other things, the Bid Procedures Order allowed the Debtors to enter into a stalking horse agreement containing customary terms and conditions and providing the stalking horse bidder with reasonable bid protections, subject to Court approval.[56]

On February 14, 2018, the Court held a hearing to consider Alden Global Capital, LLC ("Alden") as the Debtors' proposed stalking horse bidder to acquire substantially all of the Debtors' assets.[57] On that date, the Court entered an Order (I) Approving Selection of a Stalking Horse, (II) Approving Bid Protections, and (III) Granting Related Relief (with revisions).[58]

On February 15-16, 2018, the Debtors conducted an auction in connection with the § 363 Sale.[59] Various parties (including THL, Alden, Aero IP Group, and Aero Brand Group), submitted bids at the auction.[60] At approximately 7:15 p.m. on February 15, 2018, Aero IP Group submitted

---

[53] *Id.* at 36:15- 36:20.

[54] The motion was entitled "Motion of the Debtors for Entry of (I) An Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Approving Related Contract Assumption and Assignment Procedures, (C) Authorizing the Debtors to Enter Into Stalking Horse Agreements and Approving Certain Bid Protections, Subject to a Further Hearing, (D) Scheduling a Sale Hearing, and (E) Granting Certain Related Relief; and (II) An Order (A) Approving the Sale of the Debtors Assets, (B) Approving the Assumption and Assignment of Certain Executory contracts and Unexpired Leases, and (C) Granting Certain Related Relief" (D.I. 532) (the "Bid Procedures Motion"). Joint Pretrial Memo, ¶ 22.

[55] Joint Pretrial Memo, ¶ 23 (D.I. 566) (the "Bid Procedures Order").

[56] The Bid Procedures Order, ¶¶ 18-19.

[57] Notice of Filing of Stalking Horse Agreement with Proposed Bid Protections (D.I. 618); *see also* Notice of Hearing (D.I. 626).

[58] D.I. 635.

[59] Joint Pretrial Memo, ¶ 25.

[60] *Id.* ¶ 26.

a bid for $20 million, which would eventually be selected by the Debtors as the back-up bid (the "Aero IP Backup Bid").[61]

On or about 8:00 p.m. at the auction, THL indicated that it wished to place a credit bid for the intellectual property.[62] For purposes of evaluating THL's credit bid, the Debtors' advisors prepared a document marked as Exhibit 14 to the Auction Transcript (the "Auction Analysis").[63] THL submitted a credit bid of $12,209,519 (the "Credit Bid").[64] As part of its credit bid, THL said it would leave behind the inventory and accounts receivable.[65] The Debtors advised THL that its credit bid was not higher and better than the Aero IP Backup Bid.[66] After the THL Credit Bid, during a recess of the auction, the Debtors asked THL to refrain from submitting further credit bids so as not to interfere with the active bidding of other cash bidders.[67] THL agreed to temporarily refrain from bidding, but reserved its right to resume credit bidding if other bidders did not bid amounts satisfactory to THL.[68]

The auction continued and other bidders, including Alden, continued to bid in a process that lasted through the night.[69] Ultimately, the Debtors deemed Alden's bid as the highest and best bid for substantially all of the Debtors' assets for a cash purchase price of $26,175,000 (the "Alden Bid"), and the auction closed.[70] On February 21, 2018, the Court entered an Order (the "Sale Order") approving the Debtors' entry into the asset purchase agreement dated as of February 20,

---

[61] *Id.* ¶ 27.
[62] Joint Pretrial Memo, ¶ 28.
[63] *Id.* ¶ 29.
[64] *Id.* ¶ 30.
[65] *Id.*
[66] *Id.* ¶ 31.
[67] JX 15 (Handy Decl.), ¶¶ 7-8.
[68] *Id.*
[69] JX 21.
[70] Joint Pretrial Memo, ¶ 32; JX 21 at 59.

2018 (the "APA") with Alden.[71] Section 5.01 of the APA obligated the Debtors to continue operating in the ordinary course of business.[72] The APA also provided for a purchase price adjustment for working capital at closing.[73]

At closing on March 6, 2018, (the "Closing Date"), a purchase price adjustment was made on a dollar-for-dollar basis for accounts receivable and inventory.[74] Further, the Debtors, Alden, Polk and THL agreed to a purchase price reduction of $750,000 and a reduction of $450,000 in expenses resulting in overall net sale proceeds of $24,250,090.14 (the "Sale Proceeds").[75] The parties further agreed to escrow an additional $910,097 from cash-on-hand to reimburse Alden to the extent Alden made certain scheduled payments that were included as part of the budget agreed upon by and among the Debtors, Polk, and THL, but that had not been paid (the "Adjustment Escrow Account").[76] The Sale Order required that the Sale Proceeds be placed in an escrow account (the "Sale Escrow Account") in accordance with the Final DIP Order until further order of the Court.[77]

---

[71] Order (I) Authorizing the Sale of Certain Assets of the Debtors Free and Clear of All Liens, Claims, Liabilities, Rights, Interests and Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief (D.I. 671) (the "Sale Order"); JX 8; Joint Pretrial Memo, ¶ 33.

[72] JX 26 at 29, § 5.01(a). Specifically, Section 5.01 provides that the Debtors "shall conduct the Business in the Ordinary Course of Business and shall use reasonable efforts to preserve intact the business organizations and relationships with third parties and to keep available the services of the present employees of the [Debtors] . . ."

[73] Joint Pretrial Memo, ¶ 34; JX 26 at 20, § 2.06(c). Specifically, Section 2.06(c) provided for cash consideration to be reduced on a dollar-for-dollar basis if the value of the inventory and accounts receivable collectively is less than (a) $5,300,000 for the value of the inventory and (b) $3,449,000 less sales, returns and allowances of $1,044,000 for accounts receivable.

[74] Joint Pretrial Memo, ¶ 35.

[75] Joint Pretrial Memo, ¶ 36.

[76] Joint Pretrial Memo, ¶ 37.  JX 27, ¶ 2.

[77] Joint Pretrial Memo, ¶38; JX 8 at 18, ¶ 8.

(4) Post-Closing Agreements

As of the Closing Date, the outstanding DIP obligations were approximately $10,785,748.[78] On the Closing Date, the DIP Lender received a payment of $2,708,653.38 from the operating cash account, which was an excluded asset under the APA, and two subsequent payments from its cash collateral in the amount of $98,597.00 and $412,999.43.[79] Thereafter, the outstanding DIP obligations were $7,745,448.00.[80]

On March 27, 2018, the Debtor proposed to pay Polk $7.0 million, THL $10.5 million, and the estate professionals approximately $1.1 million (the "Debtors' March Paydown Proposal").[81] The Debtors' March Paydown Proposal did not account separately for the Lender Reimbursement owed to Polk in accordance with the Lender Agreement or THL's portion of expenses related to the Adjustment Escrow Account.[82]

On March 30, 2018, THL proposed reduced payout amounts to Polk and THL and an elimination of the payment of professional fees.[83] THL and Polk initially authorized the Debtors to distribute $5.25 million to Polk and $7.25 million to THL (the "Initial Disbursement"). The parties specifically represented that any payment of the Sale Proceeds by the Debtors would not constitute a predetermination of any allocation of the proceeds or expenses and that each lender's rights in that regard would be fully preserved notwithstanding the agreed Initial Disbursement.[84]

On March 30, 2018, the Debtors initiated the wire transactions. However, due to the intervening Good Friday holiday, the Debtors were unable to receive a waiver of the $5 million

---

[78] Joint Pretrial Memo, ¶ 39.
[79] Id.
[80] Id. ¶ 40.
[81] Id. ¶ 41.
[82] Id. ¶ 42.
[83] Joint Pretrial Memo, ¶ 43.
[84] Id. ¶ 44.

daily disbursement imposed on the Sale Escrow Account.[85]  As a result, the Debtors were unable to make the $12.5 million Initial Disbursement on Friday, March 30, 2018.  To accommodate the administrative issue, THL and Polk decided upon a temporary proportional allocation of the $5 million maximum daily disbursement in the amount of $2.1 million to Polk and $2.9 million to THL, with the remainder of the Initial Disbursement to be made over the next two business days (*i.e.*, Monday, April 2 and Tuesday, April 3, 2018).[86]  On March 30, 2018, the Debtors completed wire transfers in the amounts of $2.1 million to Polk and $2.9 million to THL.[87]

On April 2, 2018, the Monday morning following the holiday weekend, THL's counsel informed the Debtor and Polk that THL had withdrawn consent to completing the Initial Disbursement.[88]

On April 6, 2018, Polk commenced the Adversary Proceeding to enforce the Lender Agreement and payment of the $1,991,162.25 Lender Reimbursement due thereunder prior to resolving the dispute over allocation of the Sale Proceeds.  On April 13, 2018, Polk filed its Motion to Enforce, to compel payment of the remainder of the Initial Disbursement.  On April 23, 2018, THL filed the Allocation Motion.  The parties held two mediation sessions before the Honorable Kevin Gross, but, regrettably, were unable to resolve their disputes.[89]

On June 8, 2018, Polk filed a motion for summary judgment in connection with THL's Allocation Motion, arguing that THL's credit bid at the auction set the value of its secured claim. On June 25, 2018, the Court issued an Opinion and Order denying Polk's summary judgment motion.[90]

---

[85] *Id.* ¶ 45.
[86] *Id.*.
[87] *Id.* ¶ 46.
[88] Joint Pretrial Memo, ¶ 47.
[89] Adv. D.I. 8 (Mediator's Report).
[90] D.I. 977, 978.

On June 29, 2018 and July 13, 2018, the Court held an evidentiary hearing on Polk's

Motion to Enforce and THL's Allocation Motion, with the understanding that the evidentiary

hearing would also resolve Polk's Adversary Proceeding.[91]


## DISCUSSION

Here we have two lenders asserting competing secured claims to one pot of money,

consisting of the proceeds from the § 363 Sale of substantially all of the Debtors' assets. The

parties have failed to reach any agreement on how to allocate the Sale Proceeds. After an

adjustment to the purchase price, the final net Sale Proceeds were $24,250,090.14. THL maintains

that the outstanding obligations under its credit agreement exceed $22 million.[92] Polk claims that

as of the time of trial the outstanding DIP Obligations exceeded $12 million.[93] To divide the pot

of money between the two lenders requires a determination of the value of the individual assets

underlying each lender's lien.

In the Final DIP Order, the parties agreed to application of the proceeds from any

§ 363 Sale as follows:

> Notwithstanding anything otherwise provided herein, 100% of any net cash
> proceeds of any sale of DIP Collateral outside of the ordinary course of business
> shall be held by the Debtors in a separate segregated account (the "Sale Escrow
> Account"). The outstanding DIP Obligations and Prepetition Secured Obligations
> shall be secured by a lien on the Sale Escrow Account in accordance with the
> priorities set forth in the Interim Order and this Final Order and, with respect to
> the Prepetition Secured Note Credit Parties, pursuant to the Prepetition
> Documents. The Debtors shall not distribute any proceeds from the Sale Escrow
> Account until:

---

[91] Tr. 6/29/18 at 18:3 – 18:25.
[92] Joint Pretrial Memo, ¶ 54.
[93] JX 96 (demonstrative exhibit).

(a) With respect to the identifiable cash proceeds of the Term Priority Defined Collateral[94] and the DIP Priority Collateral,[95] the earlier of such time as the DIP Lender and the Prepetition Term Loan Credit Parties have reached an agreement or the Court makes a determination, as to the amounts of such proceeds that constitute proceeds of the Term Priority Defined Collateral or proceeds of the DIP Priority Collateral; and

(b) With respect to all other identifiable cash proceeds (the "Undefined Collateral Proceeds"), the earlier of such time as

    i. The DIP Lender and the Prepetition Term Loan Credit Parties have reached an agreement or the Court makes a

---

[94] The "Term Priority Defined Collateral" is defined in the Final DIP Order as "all Equipment, Fixtures, Real Property, Intellectual Property (as defined below) and the Capital Stock of domestic subsidiaries of AGI Holdco, Inc., all as more particularly described on Schedule T-1 of the DIP Credit Agreement." JX 14 at 29. The Final DIP Order provides that Capitalized Terms not defined in the same paragraph have the meaning ascribed to them in the Intercreditor Agreement. Schedule T-1 is found at D.I. 194-1 at 62-75.

[95] The "DIP Priority Collateral" is defined in the Final DIP Order as "all DIP Collateral other than the Term Priority Collateral." JX 14 at 29. The Final DIP Order provides that "Term Priority Collateral" is defined in the Intercreditor Agreement and "for the avoidance of doubt, excludes all prepaid inventory, inventory deposits, and, solely on account of assets that otherwise constitute ABL Priority Collateral, (x) prepaid expenses and (y) all other current assets." JX 14 at 11. "DIP Collateral" is defined in the Final DIP Order as "collectively, all assets and properties (whether tangible, intangible, real, personal, or mixed) of the Debtors, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors, (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, or hereafter acquired by, the Debtors, and regardless of where located, before or after the Petition Date, including without limitation: (i) all Prepetition Collateral, ABL Priority Collateral, and Term Priority Collateral; (ii) all cash and cash equivalents, (iii) all funds in any deposit account, securities account or other account of the Debtors and all cash and other property deposited therein or credited thereto from time to time; (iv) all accounts and other receivables (including those owed to the Debtors generated by intercompany transactions); (v) all contracts and contract rights; (vi) all instruments, documents and chattel paper; (vii) all securities (whether or not marketable); (viii) all goods, as-extracted collateral, equipment, inventory and fixtures; (ix) all real property interests; (x) all interests in leaseholds, (xi) all franchise rights; (xii) Intellectual Property (as defined below); (xiii) all general intangibles (xiv) all capital stock, limited liability company interests, partnership interests financial assets, and current assets; (xv) all investment property; (xvi) all supporting obligations; (xvii) all letters of credit issued to the Debtors and letter of credit rights; (xviii) all commercial tort claims (including D&O claims); (xix) all other claims and causes of action and the proceeds thereof (excluding, however, all Avoidance Actions and the proceeds thereof); (xx) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (xxi) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed including prepaid expenses, prepaid inventory, and inventory deposits; and (xxii) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing." JX 14 at 28-29.

determination, that such Undefined Collateral Proceeds are identifiable proceeds of the Term Priority Defined Collateral or the DIP Priority Collateral;

ii.  The Prepetition Term Loan Obligations have been satisfied in full, in which case the Undefined Collateral Proceeds shall be distributed first to the DIP Lender until all DIP Obligations are satisfied in full and second to the Prepetition Secured Note Credit Parties;

iii. The DIP Obligations have been satisfied in full, in which case the Undefined Collateral Proceeds shall be distributed first to the Prepetition Term Loan Agent until all Prepetition Term Loan Obligations are satisfied in full and second to the Prepetition Secured Note Credit Parties;

iv.  Each of the DIP Obligations and Prepetition Term Loan Obligations have been satisfied in full, in which case the Undefined Collateral Proceeds shall be distributed to the Prepetition Secured Note Credit Parties; or

v.   All DIP Priority Collateral and Term Priority Collateral has been fully liquidated for less than the total amount owed on account of the DIP Obligations and Prepetition Term Loan Obligations, in which case the Undefined Collateral Proceeds shall be distributed first to the DIP Lender until all DIP Obligations are satisfied in full, second to the Prepetition Term Loan Agent until all Prepetition Term Loan Obligations are satisfied in full and third to the Prepetition Secured Note Credit Parties.[96]

The plain language of this section requires an initial determination of the "identifiable cash proceeds" of the Term Priority Defined Collateral (or THL's collateral), the DIP Priority Collateral (or Polk's collateral), and then - - to the extent there are any cash proceeds left over - - the Undefined Collateral Proceeds.  THL argues that the only DIP Priority Collateral sold in the § 363 Sale was the Debtors' accounts receivable and inventory. Therefore, THL claims, all remaining sale proceeds (after deducting the value of the accounts receivable and inventory) were generated

---

[96] JX 14 at 45-47.

from the sale of the Debtor's Intellectual Property (and goodwill associated with the Intellectual Property), which fall under the Term Priority Defined Collateral.  THL argues that Polk has not adequately described any other assets with value that could fall within the Undefined Collateral Proceeds. So, THL claims that the solution to the allocation issue is to distribute the value of the accounts receivable and inventory to Polk, and to distribute the remaining § 363 Sale Proceeds (attributable to Intellectual Property) to THL.

Polk argues, in response, that the Court must: (1) value all of the DIP Priority Collateral that was sold (consisting of accounts receivable, inventory, inventory deposits, books and records and general intangibles), then (2) value the Term Priority Defined Collateral that was sold (Intellectual Property), and then (3) determine that any remaining Sales Proceeds are "Undefined Collateral Proceeds," which get distributed to Polk first, in accordance with paragraph 23(b)(v) of the Final DIP Order.

(1) Summary of Competing Valuations

To value the assets sold at the § 363 Sale, THL and Polk offered expert testimony.  Other valuations that are discussed by the parties include an analysis used by the Debtors to evaluate bids at the auction, as well as the allocation announced by the buyer, Alden, (over some protestation by secured creditors) at the end of the auction.  Those valuations line up as follows:

| | Intellectual Property | Accounts Receivable | Inventory | Inventory Deposits | "Other" |
|---|---|---|---|---|---|
| THL Experts[97] | $22.56 M | $1.4M | $3.3M | 0 | 0 |
| Polk Experts[98] | $12 M - $14M | $1.86M | $5.12M | $1.175M | $4.095M |
| Debtors' Auction Analysis[99] | Liquidation value: $13.7 | $2.3M – $1.19M | $5.2M – $2 M | 0 | 0 |
| Alden Allocation[100] | Not Stated | $2.4M | $5.3M | $1.15M | Not Stated |
| | | | | | |

The inconsistency of the proposed allocations requires review of the collateral groups, as defined in the Final DIP Order, and closer examination of the expert testimony.

(2) Term Priority Defined Collateral

There is no dispute that THL's collateral includes the Debtors' Intellectual Property, but the main source of contention between the parties is the *value* of that Intellectual Property.   THL submitted expert testimony that the Intellectual Property had a value of at least $22.561 million as of the closing date of the § 363 Sale[101]

THL's expert, David Peress, is an Executive Vice President at Hilco IP Services, LLC ("Hilco"), who has extensive experience valuing intellectual property assets, having participated in more than 200 such valuations in his career.[102]  The Debtors employed Hilco in 2014 and again in 2017 to assess the value of the Company's Intellectual Property.[103]  In 2017, Hilco performed

---

[97] JX 66; JX 65.  THL valued all of the assets at an amount that exceeds the Sale Proceeds, so THL argues that the Sale Proceeds should be allocated $20.02 million (82.76%) to Intellectual Property; $1.25 million (5.14%) to Accounts Receivable; and $2.94 million (12.11%) to inventory.  THL Proposed Findings of Fact (D.I. 1059), ¶ 163.

[98] JX 64; JX 63.

[99] JX 51.

[100] JX 21 at 234:9 – 234:14.

[101] JX 66 at 6.

[102] Tr. 7/13/2018 at 43:3 – 43:11; 46:21 – 47:2 (Peress).

[103] *Id.* at 47:15 – 50:9 (Peress).

two different valuations - - an orderly liquidation value ("OLV") of the Intellectual Property at the Debtors' request, and a forced liquidation value ("FLV") at THL's request.[104]  In August 2017, Hilco completed reports estimating the Intellectual Property's value as of June 30, 2017 at an OLV of approximately $29.49 million and a FLV of approximately $17.32 million.[105]

Peress testified that, generally, valuation reports are intended to be used prospectively and are reliable for business planning purposes for 12 months (although sometimes it may be appropriate to update them earlier).[106] Because the August 2017 Reports had conservative assumptions built into them, and based on his conclusions that "deployment of the brand, and the engagement of the consumer with the brand - - the e-commerce business was still functioning, the social media sites were still functioning, [and] customer service was still being provided," Peress decided that the August 2017 Reports "remained valid insofar as [they] addressed the four channels of revenue that the Debtors continued to engage in."[107]

Peress then valued the Intellectual Property as of the closing date of the § 363 Sale by modifying the analyses in the August 2017 Reports in two ways, by: (i) removing the value attributable to the retail channel, and (ii) adjusting the analysis to reflect the appropriate standard of value, i.e., OLV, FLV or something in between.  As described in the summary of his expert report:

> [T]he sale of the Intellectual Property took place under circumstances that had elements of both an orderly liquidation and a forced liquidation.  Looking at those two poles and adjusting for the cessation of the use of the Intellectual Property in the retail channel, as of the Sale Date, the Intellectual Property had a value between $28.414 Million and $16.709 Million.  In my opinion, the sale had more elements of an orderly liquidation than a forced liquidation; therefore, the value

---

[104] *Id.*

[105] *Id.* at 75:3 – 75:17; JX 66 at 46, 106. Hilco's reports dated August 15, 2017 (one determining Net Orderly Liquidation Value (*see* JX 66 at 9) and one determining Net Forced Liquidation Value (*see* JX 66 at 69)) have a valuation date as of June 30, 2017, and are referred to herein as the "August 2017 Reports."

[106] Tr. 7/13/2018 at 83:23 – 84:25 (Peress).

[107] *Id.* at 84:18 – 84:25.

of the Intellectual Property as of the Sale Date was greater than $22.561 Million which represents that mid-point of the value range between an OLV and an FLV.[108]

In contrast, Polk's expert, James Donohue, valued the Intellectual Property at $12 - $14 million.[109]  Donohue is a Vice President at Charles River Associates and has been valuing intellectual property for over twenty years.[110]  To prepare his valuation, Donohue considered three well-accepted methods for valuing intellectual property, including the cost approach, the income approach and the market approach, but mainly focused on the income approach and market approach.[111]

"The income approach values assets based on the present value of the future income streams expected to come from the assets under consideration."[112]  "The future income stream from the asset may be quantified using a variety of approaches depending on the specific circumstances of each case."[113]  In valuing intellectual property, one such approach - - known as the "relief from royalty approach" - - "assumes that the asset's value can be measured by what the owner of the asset would otherwise have to pay in royalties if it did not own the asset and had to license the asset from a third party."[114]  More specifically:

> The relief from royalty approach therefore estimates revenues associated with intellectual property, applies a royalty on those revenues to determine an intellectual property income stream, subtracts applicable costs, and uses a capitalization rate to convert the resulting cash flow stream into a value.[115]

---

[108] JX 66 at 6.
[109] JX 64 at 6, ¶ 7.
[110] Tr. 7/13/2018 at 143:17 – 145:1 (Donohue).
[111] JX 64 at 19 – 28.
[112] JX 64 at 23, ¶ 54.
[113] *Id.* ¶ 55.
[114] *Id.* ¶ 56.
[115] *Id.*

Donohue applied the relief from royalty approach to all of the Debtors' business channels, except Retail (which was not valued).[116]  Donohue claimed that this approach is appropriate because the GBG Transaction provided a market comparable that included negotiated royalty rates for the same Intellectual Property during the relevant post-petition time period, which was very close to the environment that Alden faced in the § 363 Sale.[117]

Donohue also used a market approach to test his income approach for valuing the Intellectual Property.  Donohue describes the market approach as a way to value assets based on comparable transactions and notes that "[w]hen considering potentially comparable transactions, it is necessary to evaluate the comparability of the transaction in terms of subject matter and timing."[118]  He relied on three primary market indicators for this approach: two indications of interest made in February 2018 for Intellectual Property only (one for $10 million and one for $12 – $14 million), and THL's credit bid at the § 363 Sale of $12.2 million for the Intellectual Property.[119]

Peress claims that Donohue's income approach substantially undervalues the Intellectual Property.  Although Peress used the relief from royalty approach to value the Intellectual Property in the Debtors' Wholesale Channel, he used variations of the income approach for the Debtors' other business channels - - specifically, Peress used a profit split methodology to value the E-Commerce Channel, and a discounted cash flow methodology for the Licensing and First Cost Channels.[120]  Peress claimed that using a relief from royalty approach in the First Cost and Licensing Channels would result in an unreasonably lower value because it does not recognize the

---

[116] *See* JX 69 at 64.
[117] Tr. 7/13/2018 at 154:14 – 155:23 (Donohue); JX 64 ¶¶ 61-67; JX 88 at 6-7.
[118] JX 64 at 19, ¶ 44.
[119] JX 64 at 19 – 22; Tr. 7/13/2018 at 158:22 – 163:21 (Donohue).
[120] Tr. 7/13/2018 at 64:14 – 66:5; 67:10 – 68:1 (Peress).

high profit margins in those channels.[121] Peress also noted that Donohue understated international revenues in the First Cost Channel because Donohue excluded license agreements that the buyer, Alden, did not assume. However, Peress asserts that Alden could still market the Aerosoles brand and generate business in those territories and, therefore, he claimed Donohue's approach was overly conservative.[122] Moreover, while both experts used the relief from royalty method for the Wholesale Channel, Peress claims that Donohue's 5% royalty rate is too low.[123] Peress asserts that Donohue improperly relied on a range of royalty rates from the unconsummated GBG Transaction, and focused on the lower end of that range on the flawed assumption that the Debtors' wholesale customers were "off price" retailers.[124]

Peress also contends that Donohue's market approach is flawed. Peress described the two indications of interest that were made in February 2018, after the GBG Transaction collapsed, as unhelpful in a valuation because in a distressed context he will often "have conversations with opportunistic buyers who float numbers that are either not helpful, low, or otherwise not substantiated by the actual value."[125] Further, the evidence shows that THL's credit bid was not a final offer[126] and, therefore, it is not a useful comparable.

In response, Donohue contends that the flaws in Peress' analysis result in substantially over-valuing the Intellectual Property. Donohue's main contention is that Peress' June 8, 2018 Report (the "Peress Report")[127] relies upon Hilco's August 2017 Reports, making only one

---

[121] *Id.* at 68:12 – 72:16 (Peress).

[122] *Id.* at 73:7 – 75:2 (Peress).

[123] *See* JX 64 at 26, ¶ 67.

[124] Tr. 7/13/2018 at 194:12 – 196:4 (Donohue).

[125] Tr. 7/13/2018 at 79:8 – 79:21 (Peress).

[126] JX 15 (Decl. of Michelle Handy); *See also In re Aerogroup Int'l, Inc.*, Case No. 17-11962, 2018 WL 3155250 (Bankr. D. Del. Jun. 25, 2018).

[127] JX 66.

adjustment to reflect the closing of the retail stores.[128]  Peress did not make any adjustment in his report for events that occurred after June 2017, including the Debtors' chapter 11 bankruptcy filing in September 2017, the GBG Transaction and proposed chapter 11 plan, GBG's termination of the GBG Transaction on the eve of confirmation in January 2018, or the § 363 Sale.[129]  The Peress Report did not update the financial data used in the August 2017 Reports (which relied on the Debtors' actual financial data through May 2017 and a one-month projection for June 2017).[130] For example, Donohue asserts that updating the data as of December 2017 in the overall First Cost Channel shows a decrease in revenue from $9.707 million as of June 30, 2017 to $7.601 million as of December 31, 2017, which is a "20 percent plus decline."[131]    Donohue also claims that compound annual growth rates (or "CAGR") used in the Peress Report's OLV and FLV calculations are flawed.  For example, in the First Cost Channel, the August 2017 Reports apply a growth rate of 0% in the OLV, and a growth rate of -5% in the FLV, although Donohue's analysis of the Debtors' financials showed an actual growth rate for calendar year 2017 of -18.25% for that channel.[132]  Similarly, in the International Licensing Channel, the August 2017 Reports apply a growth rate of -2.5% in the OLV, and a growth rate of -7.5% in the FLV, while Donohue's analysis showed an actual growth rate of -33.08% in that channel.[133]

As often happens in a bankruptcy case, two qualified, experienced professionals have arrived at very different conclusions about the value of an asset.  Section 506(a) of the Bankruptcy Code fixes the amount of a creditor's secured claim based on the value of the property that is

---

[128] JX 66 at 6, 127.

[129] Tr. 7/13/2018 at 113:9 – 114:11 (Peress).

[130] Tr. 7/13/2018 at 106:22 – 107:18 (Peress).

[131] Tr. 7/13/2018 at 177:10 – 179:3 (Donohue).

[132] JX 66 at 66, 126; JX 64 at 56.

[133] *Id.*

subject to the creditor's lien.[134]  Section 506(a) further provides, in pertinent part, that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property."[135]  The "'proposed disposition or use' of the collateral is of paramount importance to the valuation question."[136]

Here, we do not have to wonder about the proposed disposition of the collateral; it was sold at the § 363 Sale.  THL values the Intellectual Property at $22.561 million, although the total Sales Proceeds were $24,250,090.14. THL argues that those Sale Proceeds should be allocated among the Company's assets in equal proportion to their respective values (based upon THL's valuation of other assets which is discussed below) as follows:  82.76% of the Sale Proceeds (or $20.02 million) should be allocated to Intellectual Property; 5.14% (or $1.25 million) to Accounts Receivable, and 12.11% (or $2.94 million) to inventory.[137]  This position implies that the § 363 Sale resulted in a significant discount and the Debtors did not receive fair market value or reasonably equivalent value for the purchased assets.[138]  Polk labels this as THL's "Discount Theory" and argues that it is inconsistent with the findings of fact and conclusions of law contained

---

[134] 11 U.S.C. § 506(a)(1) provides in part that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim."

[135] 11 U.S.C. § 506(a)(1).

[136] *In re Motors Liquidation Co.*, 576 B.R. 325, 423 (Bankr. S.D.N.Y. 2017) (quoting *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 962, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) *superseded by statute* 11 U.S.C. § 506(a)(2)). Although *Rash* was decided in the context of a chapter 13 plan, the *Motors* Court determined that the Supreme Court's emphasis on the *actual* disposition of the property, rather than a hypothetical outcome, was applicable to the chapter 11 case. *Motors*, 576 B.R. at 424.

[137] THL Proposed Findings of Fact (D.I. 1059) ("THL PFF"), ¶ 163.

[138] In the THL Proposed Findings of Fact, THL criticizes Polk's expert for "improperly assum[ing] that the total value of the Company's assets could not exceed the $24.25 million purchase price, and he therefore worked backward from that number to determine the value of the Intellectual Property" and notes that the expert "admitted on cross-examination . . . [that] in the context of a bankruptcy sale, assets can be sold for less than the value of those assets." (citing Tr. 7/13/2018 at 183 (Donohue)). THL PFF, ¶ 135.

in the Sale Order, which was negotiated and agreed to by the parties, including THL. In particular, the Court entered the following findings of fact in the Sale Order:

(i)     The sales process engaged in by the Debtors and the Purchaser, including, without limitation, the Auction, which was conducted in accordance with the Bid Procedures and the Bid Procedures Order, and the negotiation of the APA, was at arm's length, non-collusive, in good faith, and substantively and procedurally fair to all parties in interest.[139]

(ii)    The form and total consideration to be realized by the Debtors under the APA constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Purchased Assets.[140]

(iii)   The consideration provided by the Purchaser for the Purchased Assets pursuant to the APA (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtors' creditors and estates than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, and each state, territory, possession and the District of Columbia.[141]

The § 363 Sale was held pursuant to a fair and open process, other interested parties were invited to - - and did - - participate in the auction, and the result represents fair and reasonable consideration for the time, place and manner of the § 363 Sale. I am unprepared to conclude otherwise. The auction result set the value of the collateral, and the issue now before me is to determine the appropriate allocation of those Sale Proceeds.

When considered in light of the facts and circumstances of this case, I conclude that THL's valuation of the Intellectual Property is not the best assessment for this particular purpose. Peress' Report adopted an appraisal exercise that valued the Intellectual Property as of June 2017 and did not consider certain significant and relevant data points that occurred after the August 2017 Reports, including the chapter 11 filings, the GBG Transaction, the collapse of the GBG

---

[139] JX8, ¶ O.
[140] Id. ¶ R.
[141] Id. ¶ T. See also JX8, ¶ 7.

Transaction, the transition to a quick § 363 Sale, and the result of the § 363 Sale. THL's valuation did not consider updated post-petition financial data. Although THL's expert adjusted the report by deleting any value attributed to the Debtors' Retail Channel, I agree with Polk's argument that this adjustment fails to consider how closing retail stores could impact other business channels, through lack of brand presence or interruption to consumer engagement. Moreover, the main variance between the two expert reports mostly centered on the First Cost and Licensing Business Channels. THL's valuation did not update the growth rates to reflect impairment of the business in those channels in 2017.

Polk's valuation, while more reliable for the purpose of allocating the Sales Proceeds, also suffers from some flaws resulting in a low value. Polk's market approach also skews too low by cherry-picking lowball offers and relying on THL's credit bid, which I've previously decided did not set the value of the Intellectual Property. For these reasons, I conclude that the high end of the Polk valuation ($14 million) is still too low. After reviewing the two appraisals together, I conclude that the appropriate amount of the Sales Proceeds that should be allocated to the value of the Intellectual Property is $15.6 million.

However, this conclusion does not end the valuation of the Term Priority Defined Collateral. The parties amended the definition of Intellectual Property in the Final DIP Order to the following:

> The term "Intellectual Property" shall mean all intellectual and similar property of every kind and nature now owned or hereafter acquired by any Loan Party, including inventions, designs, Patents, Copyrights, Licenses (as defined below), Trademarks, Trade Secrets, Domain Names, confidential and proprietary information, including, without limitation, all trade secrets, technology, ideas, know-how, formulae and customer lists, any and all intellectual property rights in computer software and computer software products (including without limitation, source codes, object codes, data and related documentation), any and all design rights owned or used by such Loan Party, all other intellectual property rights of every description, *and in each case all goodwill associated therewith,*

and with respect to the foregoing, any proceeds thereof. For the avoidance of doubt, any DIP Collateral to which the Intellectual Property is affixed or applied but does not otherwise constitute intellectual property in accordance with this definition shall not be deemed to be Intellectual Property.[142]

This revised definition includes "all goodwill associated" with the Intellectual Property. THL argues that it holds the lien against the Debtors' brand, which it claims is "by far" the most valuable asset of a footwear company like Aerosoles. I agree that the Term Priority Defined Collateral includes value allocated for goodwill associated with the Intellectual Property. However, I must first decide how to value the working capital assets - - or the DIP Priority Collateral.

(3) The DIP Priority Collateral

The DIP Collateral includes a rather exhaustive list of the Debtors' assets and property.[143] The DIP Priority Collateral is defined as "all DIP Collateral other than Term Priority Collateral."[144] THL argues that the only valuable DIP Priority Collateral that was sold in the § 363 Sale was the Debtors' inventory and accounts receivable. THL relied on the expert report and testimony of Steven J. Hazel,[145] who ascribed a value of $3.3 million to the Debtors' inventory and $1.4 million to the Accounts Receivable, for a total DIP Priority Collateral value of $4.7 million as of the closing date of the § 363 Sale.[146]

---

[142] JX 14 at 30 (emphasis added).

[143] JX 14, ¶ 12.

[144] Id. ¶ 12(b).

[145] Steven J. Hazel, a Senior Managing Director at FTI Consulting, is a Certified Public Accountant and is certified in Financial Forensics. He earned the Accredited Senior Appraiser designation from the American Society of Appraisers, the Accredited in Business Valuation designation from the American Society of Public Accountants and the Certified Valuation Analyst designation from the National Association of Certified Valuation Analysts, among other qualifications. JX 65 at 1, 12-13.

[146] JX 65 at 5.

Polk, on the other hand, relied on the expert report and testimony of Henry F. Owsley,[147] who remarked that the "balance sheet book values of inventory and net receivables is a fair proxy for the value of these assets," and noted that the value of the Debtors' inventory and net receivables was $6.98 million.[148] His conclusion rests on recognizing the § 363 Sale as a going concern sale, Alden's comments in the sales transcript that it purchased the assets at face value, and finding no other reason to write-down the inventory and receivables.[149] Owsley also valued certain inventory deposits at 50% of "face value" (or $1.175 million), which Owsley determined accounted for the risk of acquiring the inventory.[150] Accordingly, Owsley valued the working capital assets in the DIP Priority Collateral in the total amount of $8.155 million.

At issue in the two appraisals is how to characterize the § 363 Sale. Owsley refers to it as a "going concern" sale,[151] while Hazel notes that, in an auction setting, buyers seek to purchase working capital assets at a significant discount.[152] Both appraisers raise valid points. "[W]hen assets are sold in bankruptcy as part of the business as a going concern, going concern value, as opposed to liquidation value, is appropriate under section 506(a)(1)."[153] Here, the Debtors' assets were not liquidated in a rapid, piece-meal fashion. Instead, the assets were sold together in an orderly process, that included (i) marketing the company by Piper Jaffray, (ii) entering into an arms-length asset purchase agreement with a stalking horse bidder, (iii) holding an auction under approved bidding procedures that included a competitive bidding environment, and (iv) resulting

---

[147] Henry F. Owsley is a Chief Executive Officer of the Gordian Group, LLC, which is an investment banking firm that specializes in advising companies and their constituencies in a variety of financial matters, most of which require valuation work and analysis. JX 63 at 2, 15-16.

[148] JX 63 at 8.

[149] Tr. 6/29/2018 at 182:21 – 183:7 (Owsley); JX 21 at 60.

[150] Tr. 6/29/2018 at 183:8 – 184:24 (Owsley).

[151] JX 63 at 3, ¶ 7.

[152] JX 69 at 4-5.

[153] *In re Motors Liquidation Co.*, 576 B.R. 325, 423-24 (S.D.N.Y. 2017) (internal quotations omitted).

in the fair, reasonable and adequate consideration for those assets.[154] At the same time, it cannot be overlooked that this particular "going concern" sale was held in a expeditious fashion after the proposed chapter 11 plan failed, which attracted the interests of value-oriented investors.[155] Both appraisers recognized that the concept of going concern versus liquidation is not a binary "either/or" situation; instead, a company's status appears on a spectrum between the sale of a true, financially healthy going concern business and a forced liquidation - - with an orderly liquidation somewhere in between.[156] I review the working capital asset appraisals, then, in this light, noting that Owsley's appraisal is too light on analysis, whereas Hazel's pen is a little too sharp for this situation.

Owsley valued the Debtors' net accounts receivable at their book value of $1.86 million and he saw no reason to further discount them.[157] Hazel, on the other hand, adjusted the book value of the net accounts receivable based on their age and collectability and valued the accounts receivable at $1.4 million.[158] The net book value for the receivables includes adjustments based upon "charge backs" and "doubtful accounts" for aged accounts receivable.[159] Hazel, however, applies a 10% discount on the current receivables to account for "potential accuracy problems" because people have just received the invoices and, ultimately, there will be a bad-debt analysis and the amount may not be 100% collectible.[160] Hazel also applies a 100% reduction (or, rather, no value) for receivables over 60 days, noting that, in his experience, people valuing receivables "don't ascribe a value to AR over 60 days. Banks don't do it. Manufacturing companies don't do

---

[154] JX 8.
[155] Tr. 7/13/2018 at 31:8 – 32:11 (Shinder).
[156] Tr. 6/29/2018 at 232:18 – 232:22 (Owsley); 244:2 – 244:18 (Hazel).
[157] JX 63 at 8, ¶ 17; Tr. 6/29/2018 at 182:15 – 183:7; 212:3 – 213:15 (Owsley).
[158] JX 60; Tr. 6/29/2018 at 251:12 – 255:14 (Hazel).
[159] JX 60.
[160] Tr. 6/29/2018 at 252:14 – 253:4 (Hazel).

it. Buyers don't do it."[161]    While I find Hazel's testimony informative and helpful, his valuation skews too far below the adjustments already made in the net accounts receivable book value. Therefore, I conclude that the appropriate value allocated to the Debtors' accounts receivable is $1.6 million.

The two appraisers' opinions vary most with respect to inventory. The first issue is whether the inventory deposits have any value at all. The inventory deposits represent deposits for inventory ordered from foreign manufacturers. Hazel determined that the inventory deposits had no value to the buyer, citing the possibility that the foreign manufacturers or agents might not honor the contracts and deliver the inventory.[162] Owsley, on the other hand, recognized the risk by applying a 50% reduction to the $2.35 million book value for the inventory deposits, valuing them at $1.175 million.[163]    At the end of the auction, Alden attributed $1.15 million for the inventory deposits.[164]    In this case, I conclude that the inventory deposits had some value and should be valued at $1.15 million for purposes of the allocation.

Owsley again used the Debtors' book value in his appraisal to determine that the Debtors' inventory should be valued at $5.12 million.[165]    Hazel analyzed the inventory and valued it at $3.3 million.[166] Hazel testified that he analyzed the age and seasonality of the inventory, as well as the obsolescence of fashion-type inventory, such as footwear, in which trends can change quickly.[167] Hazel adjusted the inventory by discounting the value as follows:  100% discount for

---

[161] JX 60; Tr. 6/29/2018 at 254:4 – 254:25 (Hazel).

[162] JX 65 at 8.

[163] JX 67 at 5, ¶ 11; Tr. 6/29/2018 at 184:6 – 184:24 (Owsley).

[164] JX 21 at 60.  I do not accord much weight to the buyer's statements at the end of the auction with respect to value since the buyer may have other purposes for selecting values. But I do note the buyer's statement that inventory deposits have at least *some* value to be meaningful.

[165] JX 63 at 8, ¶ 17;

[166] JX 59.

[167] Tr. 6/29/2018 at 247:3 – 249:6 (Hazel); JX 69 at 4.

pre-2017 inventory; 75% discount for spring 2017 inventory (when the Debtors had issues with a new sourcing agent); 50% discount for fall 2017 inventory due to aging; 30% discount for spring 2018 and forward inventory due, in part, to the issues arising from impairment of existing sales channels.[168] The value allocated to the Debtor's inventory should be in an amount between the Debtors' book value and the Hazel valuation, with less discount for the current inventory. I conclude that the appropriate valuation for the inventory should be $4.5 million. Accordingly, the value allocated to accounts receivable, inventory and inventory deposits is rounded up to $7.25 million.

(4) Residual Value

If the Sales Proceeds of $24.25 million are allocated $15.6 million to Intellectual Property and $7.25 million to the working capital assets, this leaves a Sales Proceeds balance of $1.4 million to be allocated between THL and Polk. Polk, relying on its experts, argues that this residual value represents goodwill related to the value to the buyer of maintaining business continuity through the company's books and records, workforce, contractual relationships, vendor relationships and customer relationships.[169] In Donohue's expert report, he explains:

> The amount paid to acquire an ongoing enterprise beyond the value associated with individual assets is often referred to as goodwill. Goodwill from a financial reporting perspective is an asset representing the future economic benefit arising from other assets acquired in a business combination that are not individually identified and separately recognized. Assets such as cash, accounts receivable, inventory, land, equipment, deposits, trademarks, patents, domain names, noncompetition agreements, databases, software, leases, licenses, backlog, customer contracts, customer lists, customer relationships and license agreements would all be considered assets that can be individually identified and separately recognized. Goodwill would therefore be the value paid to acquire a business beyond the values associated with these types of individual assets.[170]

---

[168] JX 65 at 6-7.
[169] JX 63 at 6-7, ¶15; JX 64 at 14-15.
[170] JX 64 at 14, ¶ 26.

Polk claims that the remaining Sales Proceeds are either general intangibles that are part of the DIP Priority Collateral, or Undefined Collateral Proceeds that must be distributed to Polk pursuant to the subordination agreement set forth in paragraph 23(b)(v) of the Final DIP Order.

Not so fast, argues THL. As discussed above, the Final DIP Order amended the definition of Intellectual Property specifically to include all goodwill associated with the Intellectual Property. And THL asserts that any part of the Sale Proceeds attributable to goodwill arises from or is associated with the Intellectual Property which, in addition to Patents, Copyrights, Licenses and Trademarks, also includes items like trade secrets, technology, ideas, know-how, formulae and customer lists.[171]   Therefore, THL claims that the goodwill associated with Intellectual Property cannot be considered Undefined Collateral Proceeds because it falls within the Term Priority Defined Collateral.

THL's expert, Hazel, asserted that the § 363 Sale was a "bargain purchase," in which the value of the assets exceeded the purchase price and, therefore, goodwill is negative.[172]  However, if the value of the assets is determined to be less than the purchase price, Hazel agreed that one could conclude that the buyer paid for goodwill.

Here, I have decided that the value of the hard assets is less than the purchase price. I agree with Owsley that, under these circumstances, this sale tends more toward a going concern sale than a forced liquidation. Black's Law Dictionary defines "going concern value" as "[t]he value of a commercial enterprise's assets or of the enterprise itself as an active business with future earning power, as opposed to the liquidation value of the business or its assets. Going concern value includes, for example, goodwill."[173]

---

[171] JX 14 at 30, ¶ 12(e).
[172] JX 65 at 9.
[173] *Value*, BLACK'S LAW DICTIONARY (10th ed. 2014).

"Typically, goodwill is created when the price paid for the acquired company exceeds the fair value of the identifiable assets acquired minus the liabilities assumed."[174]  In his expert report, Hazel notes: "[t]he International Glossary of Business Valuation Terms defines 'goodwill' as an 'intangible asset arising as a result of name, reputation, customer loyalty, location, products and similar factors not separately identified.'"[175]  Peress agreed[176] and also defines "Goodwill Value" as "[t]he value attributable to the elements of intangible assets above the identifiable tangible and intangible assets employed in a business."[177]  A rationale for creating goodwill has been described as follows:

> Often (though not always), the amount paid for assets above the fair value of those assets represents the value to the acquirer of owning those assets. Thus, goodwill is often created as a result of a buyer's expectations to benefit from controlling the target company, synergies and other economic benefits.[178]

Polk argues that, in this case, the going concern value arises from acquiring items such as books and records or an experienced workforce.  THL's expert, Hazel, asserts that, in the context of a bankruptcy auction, a buyer would not assign value to items such as books and records or the workforce.[179]  He also testified that, in his experience, goodwill is not associated with assets such as inventory or accounts receivable.[180]  Here, it makes sense that the majority of any going concern

---

[174] Dr. Israel Shaked and Robert F. Reilly, *A Practical Guide to Bankruptcy Valuation* 297 (Am. Bankr. Institute 2013).

[175] JX 65 at 9.

[176] JX 66 at 44.  Also relevant to this discussion, Donohue noted that Black's Law Dictionary defines "goodwill" as follows:
> A business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase; the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets. Because an established business's trademark or servicemark is a symbol of goodwill, trademark infringement is a form of theft of goodwill. By the same token, when a trademark is assigned, the goodwill that it carries is also assigned.

*Goodwill*, BLACK'S LAW DICTIONARY (10th ed. 2014).  *See* JX 64 at 14 ¶ 27.

[177] JX 66 at 44.

[178] *See* Shaked, *supra* note 174, at 298.

[179] JX 69 at 6; Tr. 6/29/2018 at 260:8 – 260:24 (Hazel).

[180] Tr. 6/29/2018 at 265:19 – 266:16 (Hazel).

value arises from goodwill attributed to the Debtors' Intellectual Property, or as Hazel notes, "[t]he Company's IP - - patents, copyrights, licenses, trademarks, etc. - - are the very assets that inherently increase in value when valued as part of a going concern."[181] As pointed out in a hypothetical on Donohue's cross-examination, if the buyer purchased the working capital, Intellectual Property, synergies and business processes, but changed the name of the products and no longer used the brand "Aerosoles," the value of those purchased assets likely would be impaired.[182]

THL specifically intended that the definition of Intellectual Property in the Final DIP Order ensure that its collateral captured any goodwill value. The record before me establishes that the lion's share of the residual value is not "unidentifiable" assets, but identifiable as goodwill associated with the Intellectual Property. I conclude, therefore, that $1.2 million of the residual value from the § 363 Sale should be allocated to goodwill associated with the Intellectual Property, which is part of the Term Priority Defined Collateral belonging to THL. The remaining $200,000 is allocated to general intangibles, which fall within the DIP Priority Collateral belonging to Polk.

(5) Reallocation of THL's Adequate Protection Payments

In Polk's objection to THL's Allocation Motion, Polk argues that the adequate protection payments made to THL during the Debtors' case must be reallocated because THL is undersecured. A creditor's right to receive adequate protection payments is calculated at the time adequate protection is sought.[183] The Final DIP Order includes a finding of fact that, as of the petition date, THL was an oversecured creditor.[184] Circumstances changed rapidly throughout the

---

[181] JX 69 at 8.
[182] Tr. 7/13/2018 at 186:8 – 187:10 (Donohue).
[183] *Fremont Fin. Corp. v. Izzo (In re Rach Eng'g Co.)*, 2112 B.R. 98, 104-05 n.9 (Bankr. W.D. Pa. 1997) (citing *Nantucket Investors II v. Cal. Federal Bank (In re Indian Palms Assoc., Ltd)*, 61 F.3d 197, 201 (3d Cir. 1995) (recognizing that adequate protection had been determined as of the petition date)).
[184] JX 14, at 17-19 ¶ P(vii)(i).

course of this troubled case. The record does not explain when THL's claim was no longer oversecured or whether it matters. If THL was no longer entitled to apply adequate protection payments to interest and post-petition costs, then THL would apply such payments to reduce its principal.[185] The record before me does not contain sufficient evidence to determine when, if at all, THL's adequate protection payments should be reallocated to principal payments. Polk's request for reallocation of adequate protection payments is denied.

(6)  The Adversary Proceeding

In the Joint Pretrial Memorandum, the parties stipulated that "[p]ursuant to the Lender Allocation set forth in the Lender Agreement, as of the closing of the 363 Sale . . . on March 6, 2018, THL owed Polk $1,991,162.25 (the "Lender Reimbursement")."[186] The same filing states that the "parties dispute whether THL must pay the Lender Reimbursement prior to the resolution this allocation dispute."[187]

In the Adversary Proceeding Complaint, Polk claims that paragraph 2(f) of the Lender Agreement provides that the Lender Reimbursement must be paid immediately following consummation of the § 363 Sale.[188]   Attached to the Complaint are three letters:  (i) a letter dated April 2, 2018 from Polk's counsel to THL's counsel requesting immediate payment of the Lender Allocation; (ii) THL's counsel's response dated April 3, 2018 stating that the Final DIP Order provides that the Sale Proceeds are to be held in an escrow account pending agreement or decision

---

[185]*Indian Palms*, 61 F.3d at 210 (the United States Court of Appeals for the Third Circuit noted the district court's conclusion that the creditor could accrue post-petition interest only to the extent the creditor's secured claim exceeded the value of the property securing it; additional adequate protection payments had to be allocated to reduce the principal debt).

[186] Joint Pretrial Memo, ¶ 20.

[187] *Id.* ¶ 21.

[188] Adversary Proceeding Complaint, ¶ 71.  Section 2(f) of the Lender Agreement provides: "All amounts owed by the Prepetition Term Loan Agent pursuant to the Lender Allocation shall be paid to the DIP Lender immediately following consummation of a 363 Sale or within thirty (30) days of the exercise of remedies pursuant Section 2(b) of this Agreement." JX 24 at 3.

by the Court, and further noting THL is committed to continuing discussions with Polk about the

appropriate allocation of the Sales Proceeds; and (iii) Polk's counsel's response dated April 4,

2018, arguing that:

> Section 2(f) of the Lender Agreement is clear:  THL's obligation to pay the
> Closing Amount to Polk 33 is an independent obligation of THL separate and
> apart from any obligations, issues, disputes, or provisions relating to the
> distribution of the sale proceeds pursuant to the order approving the 363 Sale.
> Thus, pursuant to Section 2(f) of the Lender Agreement, the Closing Amount
> [Lender Allocation] is due and payable to Polk 33.  If THL refuses to make the
> payment immediately, Polk 33 will seek to enforce all rights and remedies,
> including an order from the Bankruptcy Court compelling such payment.[189]

I agree that the plain language of the Lender Agreement is clear:  THL sought to improperly

tie resolution of the Lender Agreement issues to the Sale Proceeds allocation issues.  However,

THL's agreement to pay the Lender Allocation was not properly conditioned upon release of the

Sale Proceeds. Polk did not control payment of the Sale Proceeds. THL refused to pay Polk the

Lender Allocation upon closing of the § 363 Sale, thus breaching its obligation under the Lender

Agreement.

In the Complaint, Polk seeks judgment in the amount of the Lender Allocation, plus (i) pre-

and post-judgment interest thereon, and (ii) attorney's fees and expenses incurred in connection

with the adversary proceeding.  The Lender Agreement provides that it "shall be governed by and

shall be construed and enforced in accordance with the internal laws of the State of New York,

without regard to conflicts of law principles."[190]

New York law provides that "[i]nterest shall be recovered upon a sum awarded because of

a breach of performance of a contract."[191] "In an action at law for breach of contract, 'prejudgment

---

[189] Adv. Pro. 1850383, D.I. 1-2, 1-3, and 1-4.

[190] JX 24 at 5, ¶ 7.

[191] N.Y. C.P.L.R. § 5001 (MCKINNEY 1992).  If the right to recovery arises under state law, state
law also governs the availability of prejudgment interest.  *In re Mortg. Lenders Network USA, Inc.*, 406
B.R. 213, 247-48 (Bankr. D. Del. 2009); *see also Petroleum Kings, LLC v. United Metro Energy Corp. (In*

interest is recoverable as of right.'"[192]  "[S]tatutory interest under New York law accrues as simple interest at a rate of 'nine per centum per annum.'"[193]  New York law further provides that prejudgment interest "shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred."[194]

THL's obligation to pay the Lender Allocation was not dependent upon resolution of the issues regarding allocation of the Sales Proceeds.  THL breached its agreement to pay its share of the expenses arising from continued operation of the Debtors and the § 363 Sale.  Pursuant to New York law, Polk is entitled to recover pre-judgment interest on the unpaid Lender Allocation from the closing date of the § 363 Sale through the date this matter was taken under advisement (August 29, 2018).[195]

Polk also asked to recover attorneys' fees associated with the adversary proceeding. "Under New York law, attorneys' fees are treated as the ordinary incidents of litigation, and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule."[196]  Polk does not identify any such contract provision, statute or rule that would

---

*re Petroleum Kings, LLC)*, Case No. 17-22154, 2018 WL 4907613, *19 (Bankr. S.D.N.Y. Oct. 9, 2018) ("And just as a district court sitting in diversity is required under the *Erie* doctrine to apply state substantive law, it is well established that state law provides the substantive rules of decision for a court determining the nature and amount of state law claims under the Bankruptcy Code . . . . Accordingly, New York substantive law (including CPLR § 5001) governs the amount of [these] claims.").

[192] *Wechsler v. Hunt Health Systems, Ltd.*, 330 F.Supp.2d 383, 434–35 (S.D.N.Y. 2004) (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir.1993)).

[193] *Petroleum Kings*, 2018 WL 4902613, *19 (citing N.Y. C.P.L.R. § 5004; *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998) *mod.on other ground by Baron v. Port Auth. of New York & New Jersey*, 271 F.3d 81 (2d Cir. 2001)).

[194] N.Y. C.P.L.R. § 5001(b).

[195] I make no decision today with respect to post-judgment interest.  That request is denied, without prejudice.

[196] *Thor 725 8th Ave. LLC v. Goonetilleke*, 2015 WL 8784211, *4 (S.D.N.Y. Dec. 15, 2015) (internal punctuation omitted).

provide a basis for an award of attorneys' fees in this case. The request for recovery of attorneys' fees is denied.

## CONCLUSION

For the reasons set forth above, I conclude that the allocation of the Sales Proceeds should be $16.8 million to the Term Priority Defined Collateral, $7.45 million to the DIP Priority Collateral. The parties are directed to meet and confer to adjust the waterfall payment analysis attached to THL's Allocation Motion using the allocation of Sales Proceeds decided herein. A status hearing will be set. I strongly encourage THL and Polk to resolve any remaining differences.

Further, for the reasons set forth above and in accordance with the parties' stipulation regarding the Lender Allocation under the Lender Agreement, judgment will be entered in the adversary proceeding against defendant THL and in favor of plaintiff Polk in the amount of $1,991,162.25 plus pre-judgment interest at the New York statutory rate of nine percent per annum from on March 6, 2018 through August 29, 2018.

Polk's Motion to Enforce will be dismissed as moot.

An appropriate Order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: March 26, 2019